**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TAJ WILSON ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 05-2146 (GK/AK) |
| ) | |
| WASHINGTON METROPOLITAN ) | |
| AREA TRANSIT AUTHORITY ) | |
| ) | |
| Defendant. ) | |
| ) | |

**WMATA's STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO DISPUTE**

I. **JURISDICTIONAL PRE-REQUISITES**

1.  Plaintiff filed a Charge of Discrimination with the EEOC on April 8, 2005.
**Plaintiff's Charge of Discrimination, Ex. 1.**

2.  Plaintiff's Charge of Discrimination filed with the EEOC alleged only racial discrimination and retaliation.  **Id.**

II. **DISPARATE TREATMENT**

A. PLAINTIFF'S HIRING AND TRAINING

3.  Plaintiff began his employment with the Metro Transit Police on January 14, 2002. **Affidavit of Robert  Melan, Ex. 2, ¶ 4.**

4.  After completion of his training, plaintiff took the oath of office on September 24, 2002. **Oath of Office, Ex. 3.**

5.  Plaintiff was assigned to field training from September, 2002, to December, 2002. **Ex. 2, ¶ 6.**

B.    <u>ALTERCATION OVER PARKING SPACE AT WALMART STORE (DECEMBER 3, 2003)</u>.

<u>Background</u>

6.   On December 3, 2003, plaintiff was involved in an off duty altercation over a parking space at a local store.  **Plaintiff's Statement to Capt. Heilmann, Ex. 4.**

7.   Plaintiff displayed his service weapon during the course of this incident.  **Id.; Followup Interview, Q & A, Officer Taj Wilson, Ex. 5.**

8.   Plaintiff failed to identify himself as a police officer.  **Id.**

9.   Plaintiff had his service revolver placed in an unlocked glove compartment of his vehicle.  **Ex. 5.**

10.   The incident was reported to MTPD by a civilian, Billy Little.  **Memorandum from Captain George Heilmann to Chief Polly Hanson, dated February 26, 2004, Ex. 6.**

11.   An investigation of this incident was conducted by Captain George Heilmann of MTPD's Office of Professional Responsibility and Integrity.  **Id.**

12.   Captain Heilmann interviewed plaintiff, Mr. Little and Mr. Little's girlfriend, Cynthia Crawford, who was a witness to the subject incident.  Another witness, plaintiff's girlfriend Lovoncye Shannon, was unavailable to be interviewed.  **Id.**

<u>Charges</u>

13 Captain Heilmann's investigation resulted in three sustained charges.  **Id.**

<u>Charge 1</u>

14.  (a)  Charge 1 charged that plaintiff violated General Order 131, "Firearms" Part IV, Section B, 2, b and c.  (b)  Charge 1 specified that plaintiff left his issued service

2

revolver in the glove compartment of his vehicle even though he was wearing his holster. (c)  Plaintiff received a written reprimand for this violation. **Id.**

Charge 2

15.   (a)   Charge 2 charged violation of General Order 131, "Firearms" Part IV, Section B, 4.   (b) Charge 2 specified that plaintiff did not conceal and did not wear his issued service weapon in his holster during the subject incident.   (c)  This violation was combined with Charge 1. (4)  Plaintiff received a written reprimand.  **Id.; General Order 131, Ex. 7**

Charge 3

16.   (a)   Charge 3 charged violation of General Order 217 "Ethical Standards of Conduct and Financial Interest" Part III, Section D, 9.  (b) Charge 3 specified that plaintiff did not identify himself as a police officer and that a citizen had to summon the Prince George County. (c)  Plaintiff received a one day suspension for this violation.  **Id.; General Order 217, Ex. 8.**

17.   Captain Heilmann determined that plaintiff's version of events was less likely than the version recounted by Mr. Little and Ms. Crawford.  As grounds for this conclusion, Captain Heilmann concluded, if a reasonable police officer was in fear for his safety like plaintiff claimed, the reasonable police officer would have readied his weapon by chambering a round.  Yet, plaintiff denied chambering a round.  **Id.**

C.   PLAINTIFF'S FIRST COLLISION WHILE OPERATING AN MTPD SCOUT CAR (MAY 4, 2004**).**

18.   On May 4, 2004, plaintiff was involved in a motor vehicle accident while operating his MTPD scout car. **Memorandum from Sergeant Helen Acton to Chief Polly**

3

**Hanson et al., dated May 20, 2004, Ex. 9.**

19.  The subject accident resulted in injuries both to plaintiff and to the operator of a vehicle which was struck.  **Id.**

20.  There was $14,000 worth of damage to the MTPD vehicle.  **Id.**

21.  The May 4, 2004 incident was investigated by Sergeant Helen Acton.  **Id.**

22.  Sergeant Acton concluded that "[plaintiff's] claim that the light was yellow is inconsistent with the evidence".  **Id.**

23 Plaintiff received a one day suspension for this incident.  **Memorandum from Deputy Chief Gronau to Plaintiff dated June 16, 2004, Ex. 10.**

    D.    <u>ATTEMPTED THEFT OF PLAINTIFF'S SERVICE REVOLVER (JUNE 13, 2004).</u>

<u>Background</u>

24.  On June 13, 2004, plaintiff was involved in another incident involving his service weapon.  **Memorandum from Plaintiff to Sgt. Proctor dated June 13, 2004, Ex. 11.**

25.  While visiting a friend off duty, plaintiff attempted to break up an altercation and an unknown person attempted to grab plaintiff's service weapon.  **Id.**

<u>Investigation</u>

26.  An investigation conducted by Captain Heilmann concluded that plaintiff's actions were appropriate but stated that "It does not seem reasonable that [plaintiff] did not pursue identification of the person who tried to steal his gun in what may have been a deadly force situation.  He has also not provided a logical reason why he could not identify who that person way.  Again, some testimony from unverified witnesses said it was his girlfriend who tried to take his weapon."  **Memorandum from Captain George Heilmann**

4

**to Chief Polly Hanson, dated August 20, 2004, Ex. 12.**

27.  Captain Heilmann recommended that the complaint be unfounded but that plaintiff receive remedial training in weapon retention and additional training on proper judgment and behavior while carrying his weapon off-duty.  **Id.**

E.    PLAINTIFF LEFT HIS SECTOR TO ATTEND TO PERSONAL BUSINESS, I.E., TO ATTEND TO A MOTOR VEHICLE ACCIDENT INVOLVING HIS PERSONAL VEHICLE WHICH WAS BEING OPERATED BY HIS GIRLFRIEND (JUNE 18, 2004).

Background

28.  On June 18, 2004, while on duty, plaintiff left his assigned sector to attend to personal business, i.e, a motor vehicle accident involving plaintiff's automobile which was being driven by his girlfriend. **Plain. depo., Ex. 13, vol. I, p. 64.**

29.  Plaintiff did not receive permission to leave his sector prior to doing so.  **Id., p. 69**

30 .  Plaintiff submitted an inaccurate run sheet for the time he was engaged in personal business.  **Id., p. 72.**

Investigation

31.  This incident was investigated by Captain Heilmann.  **Ex. 12.**

32.  Captain Heilmann concluded that plaintiff remained at the location of the motor vehicle accident for more than an hour without anyone knowing his whereabouts.  **Id.**

33.  Captain Heilmann concluded that plaintiff falsely told Captain Heilmann that he was out of his sector for only 10 or 15 minutes.  **Id.**

34.  Captain Heilmann concluded that plaintiff  falsified his run sheet in an effort to

cover up his absence from his sector. **Id.**

35.  Captain Heilmann concluded that, while plaintiff was absent from his sector to engage in persona business, plaintiff became involved in a highly emotional dispute involving his girlfriend and other parties regarding the traffic accident but plaintiff did not summon the local police even though it was obvious that the gravity of the situation dictated local police response. **Id.**

36.  Captain Heilmann concluded that plaintiff provided false information to the dispatcher in an effort to cover up absence from his sector. **Id.**

<u>Charges</u>

37.  The July 18, 2004 incident resulted in nine charges against plaintiff. **Id.**

<u>Charge 1</u>

38.  Charge 1 charged that plaintiff violated his oath of office for the reasons outlined in Charges 2-9.  Plaintiff received a two day suspension for this violation. **Id.; Ex. 3.**

<u>Charge 2</u>

39.  (a) Charge 2 charged violation of General Order 217, "Ethical Standards of Conduct and Financial Interest Part III, Section A, 5.  (b) Charge 2 specified that plaintiff made a false report on his official daily activity log (run sheet) by entering a run assignment to the Navy Yard station when, in fact, plaintiff was attending to personal business in Prince Georges County.  (c) Plaintiff further falsified his run sheet by entering two entries 30 to 45 minutes earlier than he was actually assigned to these runs by the Communications Division.  (d) Prior to these false entries, plaintiff had made accurate entries on his run

sheet.  (e)Plaintiff received a two day suspension for this charge.  **Id.; Ex. 8.**

### Charge 3

40.  (a) Charge 3 charged violation of General Order 217, "Ethical Standards of Conduct and Financial Interest Part III, Section A, 5.  (b) Charge 3 specified that plaintiff gave false information to the dispatcher concerning his location while on personal business. (c) Plaintiff received a two day suspension for this violation.  **Id.**

### Charge 4

41.  (a) Charge 4 charged violation of General Order 217 "Ethical Standards of Conduct and Financial Interest", Part III, Section A, 4.  (b) Charge 4 specified that plaintiff falsely advised Captain Heilmann that he was at his location conducting personal business for about ten minutes when, in fact, he was there for over an hour.  (c) Plaintiff received a two day suspension for this charge.  **Id.**

### Charge 5

42.   (a) Charge 5 charged violation of General Order 105, "Authority and Jurisdiction", Part II, Policy Statement. (b) Charge 5 specified that plaintiff's activities while on duty were not related to the protection of WMATA customers, personnel, and transit facilities in that plaintiff left his assigned sector, without permission, to respond to his girlfriend's call for assistance in a minor traffic accident in which she was involved with plaintiff's vehicle.  (c) Charge 5 further specified that, while at the scene of the traffic accident, plaintiff did not summon the local police to assist even though the situation called for it.  (d) Plaintiff received a one day suspension for this charge which was combined with the penalty assessed for Charge 6.  **Id.; General Order 105, Ex. 14.**

Charge 6

43.  (a) Charge 6 charged violation of General Order 217, "Ethical Standards of Conduct and Financial Interest" part III, Section D, 9.   (b) Charge 6 specified that, when United States Park Police Sergeant Michael Snowden stopped to assist in the traffic accident, plaintiff failed to advise Sergeant Snowden about his personal involvement in the dispute.  (c) Charge 6 also specified that plaintiff should have advised Sergeant Snowden that his girlfriend was involved in the accident.  (d) Charge 6 further specified that the failure to advise Sergeant Snowden jeopardized the safety of Sergeant Snowden.   (e) Plaintiff received a two day suspension for this charge which was combined with the penalty assessed for Charge 5.  **Id.; Ex. 8.**

Charge 7

44.  (a) Charge 7 charged General Order 215, "Duties and Responsibilities" Part III, Section B.  (b) Charge 7 specified that plaintiff left his sector for over an hour without authorization or knowledge of any supervisor or Communications Division personnel.  (c) Plaintiff received a two day suspension for this charge which was combined with the penalty assessed for Charges 8 and 9.  **Id.; General Order 215, Ex. 15.**

Charge 8

45.  (a)  Charge 8 charged violation of General Order 215, "Duties and Responsibilities" Part III, Section B.  (b) Charge 8 specified that plaintiff absented himself from his beat for over an hour due to personal business.  (c) Plaintiff received a two day suspension for this charge which was combined with the penalty assessed for Charges 7 and 9.  **Id.**

Charge 9

46.    (a) Charge 9 charged violation of General Order 215, "Duties and Responsibilities" Part IV, Section A,11.    (b) Charge 9 specified that plaintiff left his assigned sector without permission of his supervisor or of the Communications Division. (c) Charge 9 further specified that plaintiff left his assigned sector to attend to personal business.  (d) Plaintiff received a two day suspension for this charge which was combined with the penalty assessed for Charges 7 and 8.  **Id.**

47.  On October 5, 2004, plaintiff was served with written notice that he would be terminated from employment with WMATA should he have future integrity issues. **Memorandum from Chief Hanson to Plaintiff dated October 5, 2004, Ex. 16.**

F.    PLAINTIFF'S SECOND COLLISION WHILE OPERATING AN MTPD SCOUT CAR (AUGUST 15, 2004)

Background

48.  On August 15, 2004, plaintiff was responding to a radio run for a fight in progress at the New Carrollton Metrorail station.  **Ex. 13, p. 85.**

49.  Officer Scott Bird also responded to the radio run and was in a scout car following plaintiff.  **Arbitration Testimony of Officer Scott Bird, Ex. 17., pp. 11-12.**

50.  While traveling in the 6000 block of Addison Road, plaintiff's scout car swerved to the right and struck a curb. **Plaintiff's statement to Sgt. Proctor, Ex. 18; Ex. 17, pp. 13-14; Statement of Scott Bird, Ex. 19.**

51.  Plaintiff lost control of his scout car which left the roadway, became airborne, and struck a house located at 6004 Addison Road.  **Id.**

52.  Plaintiff claimed he was wearing a seat belt at the time of the accident.

9

**Arbitration Testimony of Sergeant Donald Proctor, Ex. 20, pp. 33-34.**

53.  When Officer Bird attempted to remove plaintiff from his scout car immediately after the collision, he observed that the airbag had deployed but that plaintiff was unconscious and was not wearing a seat belt.  **Ex. 17, p. 22-23, 25.**

54.  An inspection of plaintiff's scout car subsequent to the accident revealed that the seat belt was working properly.  **Arbitrator Testimony of Lieutenant Shawn Doody. Ex. 21, pp. 115-116.**

55.  The event data recorder from plaintiff's scout car revealed that plaintiff was not wearing his seat belt at the time the airbag deployed.  **Id., pp. 116-117.**

56.  The posted speed was 30 miles per hour in the 6000 block of Addison Road. **Memorandum from Lieutenant Doody to Chief Hanson, dated October 25, 2004, Ex. 22.**

57.  The road conditions were dry.  **Ex 20., p. 32.**

58.  The weather was clear.  **Id.**

59  .  There was no fog.  **Id.**

60.  There were no objects in the road..  **Id.**

61.  Plaintiff's WMATA issued scout car was a total loss.

62.  The residence which plaintiff struck with his vehicle was closed by the Prince Georges County building inspectors. **Ex. 22; Deposition of Chief Polly Hanson, vol. II, Ex. 23, pp. 79-80.**

63.  Investigation by the Prince Georges County Police Department determined that plaintiff was at fault for the accident.  **State of Maryland Motor Vehicle Accident Report,**

10

**Ex. 24.**

## Investigation

64    In a statement given to Sgt. Proctor the day of the accident, plaintiff initially stated he was traveling 45 to 50 MPH at the time of the accident. **Statement of plaintiff to Sgt. Proctor, Ex. 25.**

65.  In a statement given to Lt. Olson on August 26, 2004, plaintiff stated he was traveling 45-55 MPH at the time of the accident. **Statement of plaintiff to Lt. Olson, Ex. 26.**

66.  Plaintiff later admitted his speed was 65-70 MPH. **Statement of plaintiff to Lt. Melan, Ex. 27.**

67.  An internal investigation of the subject accident was conducted by Lt. Shawn Doody. **Ex. 22.**

## Charges

68.  The investigation resulted in seven charges. **Id.**

## Charge 1

69.  (a) Charge 1 charged violation of the oath of office.  (b) By way of specification, charge 1 referred to Charged 2-7.  (c) Plaintiff was terminated for this violation. **Id.**

## Charge 2

70.  (a) Charge 2 charged a violation of General Order 217, "Ethical Standards of Conduct and Financial Interest", Part III, Section A 5, Members will not knowingly make a false statement in any written or verbal report".  (b)  Charge 2 specified that plaintiff gave false statements during the investigation, namely that he was wearing a seat belt at the

11

time of the accident.  (c) Plaintiff was terminated for this violation.  **Id; Ex. 8.**

Charge 3

71.  (a) Charge 3 charged violation of General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section A, 5, Members will not knowingly make a false statement in any written or verbal report".  (b) Charge 2 specified that on August 15, 2004 and August 26, 2004, plaintiff provided false written information regarding his speed of travel as well as the exact events which caused the accident.  (c)  Plaintiff was terminated for this violation.  **Id.**

Charge 4

72.  (a) Charge 4 charged violation of General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section A, 4.  Members will respond promptly and truthfully to all inquiries initiated by an official".  (b) Charge 4 specified three incidences of false statements: (I) plaintiff initially stated his speed was 45 to 50 MPH.  He later admitted he was traveling 65 to 70 MPH, (ii) plaintiff claimed a vehicle swerved into his lane of travel causing him to take evasive action and lose control of his vehicle.  The physical evidence as well as the CVSA demonstrated that no vehicle traveled into  plaintiff's lane of traffic and that plaintiff's vehicle traveled into oncoming traffic, and (iii) plaintiff reported wearing his seatbelt whereas the event data recorder revealed this to be false.  (c)  Plaintiff was terminated for this violation.  **Id.**

Charge 5

73.  (a) Charge 5 charged violation of General Order 306, Emergency Vehicle Operations, Part IV, Paragraph B, Subsection 3.  "Members are reminded that traffic laws

12

exemptions do not relieve the driver of an emergency vehicle from the duty to drive with due regard for safety". (b) Charge 5 specified that plaintiff operated his scout car at a high rate of speed and failed to maintain his lane without due regard for safety. (c) He received a two day suspension for this violation. **Id; General Order 306, Ex. 28.**

### Charge 6

74. (a) Charge 6 charged violation of General Order 306, Emergency Vehicle Operations, Part IV, Paragraph C, Subsection 1. "Emergency vehicles will not be operated at speeds so great that life or property is endangered". (b) Charge 6 specified that plaintiff operated his scout car at a high rate speed without regard to life and property. (c) Plaintiff received a one day suspension for this violation. **Id.**

### Charge 7

75. (a) Charge 7 charged violation of General Order 306, Emergency Vehicle Operations, Part IV, Paragraph C, Subsection 2(f), failing to wear a seatbelt. (b) Plaintiff received a letter of reprimand for this violation. **Id.**

76. Plaintiff was terminated for the culmination of several incidents which occurred over a short period of time. **Ex. 23, p. 6; Ex. 21, pp. 126-127.**

77. Plaintiff's termination was upheld by an arbitrator. **Ex. 32.**

G. <u>THERE ARE NO PERSONS WITH DISCIPLINARY HISTORIES SIMILAR TO PLAINTIFF.</u>

78. Plaintiff has identified six persons whom plaintiff claims were similarly situated who were not subject to the same discipline to which plaintiff was subjected: Steven Morrison, Jason Williams, Julie Dronsfield, Scott Bird, Tommie Call, and Thomas Stolz. **Plaintiff's Responses to Defendant's Interrogatories, Ex. 29, Nos. 1 & 3, pp. 2-5.**

13

<u>Tommie Call</u>

79. Sergeant Call is a white male. **Ex. 2, ¶ 7.**

80. Sergeant Call has been a member of the Metro Transit Police since November 29, 1989. **Id., ¶ 8.**

81. Throughout his career with MTPD, Tommie Call had two disciplinary violations. **Id., ¶ 9.**

82. In 2001, Sergeant Call was reprimanded for use of profanity toward a citizen. **Id. ¶ 10.**

83. In 2006, Sergeant Call was found to be negligent in the performance of his duties in that he failed to adhere to the collective bargaining agreement when assigning overtime. **Id., ¶ 11.**

84. Sergeant Call received a three day suspension for this latter violation. **Id.**

85. In neither of Sergeant Call's disciplinary violations was there a finding of deception. **Id., ¶ 12.**

86. Neither of Sergeant Call's disciplinary violations impacted the safety of the public or of other officers. **Id., ¶ 13.**

<u>Julie Musitano (Dronsfield)</u>

87. Julie Musitano (Dronsfield) is a white female. **Id., ¶ 14.**

88. Julie Musitano was a member of the Metro Transit Police from May 8, 2000 to October 6, 2006, when she resigned her position. **Id., ¶ 15.**

89. During this time, Julie Musitano (Dronsfield) had a single disciplinary violation. **Id., ¶ 16.**

14

90. This investigation involved missing prisoner property. **Id., ¶ 17.**

91. Two charges were sustained against Officer Musitano: failure to safeguard prisoner property for which Officer Musitano received a two day suspension and failure to ensure that prisoner property is returned to the rightful owner for which she received a one day suspension. **Id., ¶ 18-20.**

92. It was specifically determined that Officer Musitano was not being deceptive. **Id., ¶ 21.**

93. The charges for which Officer Musitano was suspended did not impact the safety of the public or of other officers. **Id., ¶ 22.**

<u>Steven Morrison</u>

94. Steven Morrison is a white male. **Id., ¶ 23.**

95. Officer Morrison has been a member of the Metro Transit Police since April 14, 2000. **Id., ¶ 24.**

96. During this time Officer Morrison had a single disciplinary violation. **Id., ¶ 25.**

97. One charge was sustained against Officer Morrison, bringing discredit to the department, for taking leave without reporting it. **Id., ¶ 26.**

98. Officer Morrison was given a three day suspension and ordered to repay the leave. **Id., ¶ 27.**

99. This disciplinary violation did not impact the safety of the public or of other officers. **Id., ¶ 28.**

<u>Jason Williams</u>

100. Jason Williams is a white male. **Id., ¶ 29.**

15

101.  Officer Williams has been a member of the Metro Transit Police since July 19, 1999.  **Id., ¶ 30.**

102.  During this time, Officer Williams had two disciplinary violations.  **Id., ¶ 31.**

103.  On September 13, 2003, Officer Williams engaged in personal business and made false entries on his run sheet.  **Id., ¶ 32**

104.  This investigation resulted in four sustained charges: (a) failure to devote full time and attention to the business of the department, (b) failure to provide the Communications Division with an odometer reading prior to and following the transport of juveniles or persons of the opposite sex, (c)  knowingly make a false statement in any written or verbal report, and (d) failure to perform duties impartially, without favor or affection or ill will, and without regard to status, sex, race, religion, political belief or aspiration.  **Id., ¶ 33.**

105.  Officer Williams received a one day suspension for each charge and was removed from mobile patrol.  **Id., ¶ 35.**

106.  On March 10, 2005, Officer Williams conducted an unauthorized traffic stop when he stopped a vehicle in the vicinity of a metrorail station but which was outside WMATA property.  **Id., ¶ 36**

107.  He received a six day suspension and a reprimand for this violation.  **Id., ¶ 37.**

<u>Thomas Stolz</u>

108.  Thomas Stolz is a white male.  **Id., ¶ 38.**

109.  Officer Stolz was a member of the Metro Transit Police from October 29, 2001 to May 1, 2007, when he resigned his position.  **Id., ¶ 39**

110.  While a member of the Metro Transit Police, Officer Stolz was involved in three disciplinary incidents.  **Id., ¶ 40.**

111.  He received written counseling  for two infractions (failure to possess his credentials and sleeping while at the Corporation Counsel's Office).  **Id., ¶ 41, 43.**

112.  On August 29, 2003, Officer Stolz was involved in a vehicular collision for which he received a one day suspension.  **Id., ¶ 42.**

113.  None of Officer Stolz's disciplinary violations involved deception.  **Id., ¶ 44.**

<u>Scott Bird</u>

114.  Scott Bird is a white male.  **Id., ¶ 45.**

115.  Officer Bird was a member of the Metro Transit Police from December 17, 2001 to October 24, 2007, when he resigned his position.  **Id., ¶ 46.**

116.  During this time, Officer Bird only had one disciplinary violation.  **Id., ¶ 47.**

117.  Officer Bird was suspended for three days for an accidental discharge of a firearm.  **Id.**

118.  This violation did not involve deception.  **Id., ¶ 48.**

<u>Kenneth Honick</u>

119.  Kenneth Honick is a white male.  **Id., ¶ 49.**

120.  Officer Honick has been a member of the Metro Transit Police since April 14, 2003.  **Id., ¶ 50.**

121.  During this time, Officer Honick has received two disciplinary violations.  **Id., ¶ 51.**

122.  On December 25, 2004, Officer Honick was involved in a motor vehicle

accident with a police vehicle.  He received a one day suspension for this violation.  **Id., ¶ 52.**

123.  On June 24, 2005, while assisting Officer Burkholder in a traffic stop, Officer Honick failed to notify the Communications Division of his whereabouts.  He received a reprimand for this violation. **Id., ¶ 53.**

124.  This violation did not involve deception.  **Id., ¶ 54.**

Robert Burkholder

125.  Robert Burkholder is a white male.  **Id., ¶ 55.**

126.  Officer Burkholder has been a member of the Metro Transit Police since August 25, 1997.  **Id., ¶ 56.**

127.  During this time, Officer Burkholder has had eleven disciplinary violations. **Id., ¶ 57.**

128.  Officer Burkholder received a dereliction for failure to reinspect the prisoner transport area of his patrol vehicle following the transport of a prisoner on December 11, 1998.  He received counseling for this violation and was removed from solo patrol and assigned to work alongside seasoned officers for a month in order to gain positive influence and a better understanding of police work.  **Id., ¶ 58.**

129.  Officer Burkholder received a one day suspension for a April 7, 1999, motor vehicle accident involving his police vehicle.  **Id., ¶ 59.**

130.  Officer Burkholder was counseled for use of profanity on December 27, 1999. He was also order to undergo additional training in communicating with tact.  **Id., ¶ 60.**

131.  Officer Burkholder received a reprimand for use of inappropriate language on

March 13, 2000.  Also, he was removed from solo patrol, was denied his request to engage in outside employment and was ordered to receive additional training in verbal judo and crisis management.  **Id., ¶ 61.**

132.  Officer Burkholder was formally counseled for rudeness to another WMATA employee on February 8, 2001.  **Id., ¶ 62.**

133.  Officer Burkholder received a one day suspension for a motor vehicle accident occurring on April 4, 2001.  Officer Burkholder struck a parking meter while backing his MTPD vehicle out of a parking space.  The vehicle was not disabled and remained in service.  There were no injuries.  Officer Burkholder admitted to the facts surrounding this incident.  **Id., ¶ 63.**

134.  The collective bargaining agreement between WMATA and Local 246 of the International Brotherhood of Teamsters in effect at the time of this incident precluded consideration of Officer Burkholder's prior accident in determining appropriate disciplinary action for the April 4, 2001 accident because the April 4, 2001 accident occurred more than 18 months after the April, 7, 1999 accident.  **Id., ¶ 69; Ex. 31.**

135.  Officer Burkholder received a one day suspension for a motor vehicle accident occurring on December 29, 2003.  Officer Burkholder's MTPD vehicle came in contact with the rear of a second vehicle which, in turn, had struck a third vehicle.  Minor damage was sustained to the MTPD vehicle and the vehicle which was struck.  There were no reported injuries.  Officer Burkholder admitted to the facts surrounding this incident  **Id., ¶ 64.**

136.  The collective bargaining agreement between WMATA and Local 246 of the International Brotherhood of Teamsters in effect at the time of this incident precluded

consideration of either of Officer Burkholder's prior accidents in determining appropriate disciplinary action for the December 29, 2003 accident because each of the prior accidents occurred more than 18 months prior to the December 29, 2003 accident. **Id., ¶ 69; Ex. 31.**

137.  Officer Burkholder was counseled for conducting a traffic stop while engaged as a rail canine explosives team member on January 25, 2005. **Id., ¶ 65.**

138.  Officer Burkholder received a one day suspension for conduct unbecoming of an officer arising out of a traffic incident on April 29, 2005. **Id., ¶ 66.**

139.  Officer Burkholder received a one day suspension for the incident with Officer Honick noted above.  Officer Burkholder was found to have left his sector without notification, failed to notify communications that he had initiated a traffic stop, and failed to notify an official that his vehicle had become disabled. **Id., ¶ 67.**

140.  Officer Burkholder received a four day suspension for the March 10, 2005 incident with Officer Williams noted above. **Id., ¶ 68.**

III. **HOSTILE WORK ENVIRONMENT**

141. Plaintiff alleges four incidents constituting a racially hostile work environment: (1) during training a white officer refused to touch plaintiff during a drill without putting gloves on even though the white officer touched other white officers without gloves, **Second Amended Complaint, ¶ 24**, (2) often during roll call white officers would refer to Anacostia as "Animal Costia", **Id., 1st ¶ 26[1]**, (3) a white officer repeatedly made racial slurs to him and would often refer to plaintiff and other black officers as a black gang, **Id., 2nd ¶**

---

[1]  The Second Amended Complaint has two paragraphs numbered 25 and two paragraphs numbered 26.

**25**, and (4) the Chief made the reference that "people like him in the department do not change" which Plaintiff interpreted as a racially charged statement. **Id., 2nd ¶ 26; Plaintiff's deposition, vol. II, Ex. 30, pp. 29-30.**

142   None of these incidents were listed in plaintiff's EEOC charge.   **Ex. 1.**

143.   Even if these statements individually or as a whole could be considered racially offensive, they were not sufficiently severe or persuasive to constitute a racially hostile work environment.

## IV.   <u>RETALIATION</u>

144.   The only protected activity which plaintiff engaged in while employed by WMATA was complaining about an incident which occurred while attending the police academy.   **Second Amended Complaint, ¶ 30; Ex. 30,  pp. 29-33.**

145.   This incident involved a white recruit officer, Jonathan Vakassian,  refusing to touch plaintiff without wearing gloves during a CPR class.   **Ex. 30, pp.  18-19, 22.**

146.   Plaintiff completed police training and took the oath of office on September 24, 2002. **Ex. I; Ex. 2, ¶ 2.**

147.   Plaintiff alleges that the retaliation he suffered was that he was subject of intense scrutiny with respect to disciplinary actions and punishments,   **Second Amended Complaint, ¶ 31; Ex. 30, 40-41**, that his entire class, white and black officers alike, were subject to punishment.

148.    Plaintiff's first adverse job action after the protected activity was his suspension on February 26, 2004.   <u>Supra</u> §§ II.B.8-12.


Respectfully submitted,


WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY

Carol B, O'Keeffe, #445277
General Counsel


_____/s/_____
Bruce P. Heppen #252171
Deputy General Counsel



_____/s/_____
David J. Shaffer, #413484
Assistant General Counsel
WMATA
600 Fifth Street, N.W.
Washington, D.C.  20001
(202) 962-2820