# EXHIBIT 1

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 100-2005-00457 |

| D.C. Office Of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Mr. Taj D. Wilson | (301) 702-9386 | 01-25-1977 |

Street Address                    City, State and ZIP Code

**5000 Brinkley Rd. Temple Hills, MD 20748**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| WMATA | 500 or More | (202) 962-2303 |

Street Address                    City, State and ZIP Code

**600 Fifth St., N.W., Washington, DC 20001**

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address                    City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **10-01-2004**    Latest **11-12-2004**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.   I have been employed with the Respondent as a Police Officer since January 14, 2002. I feel that the Respondent has treated me differently than similarly situated white employees and reported this to management and EEO. On November 12, 2004 I was terminated from my position with Respondent. I believe I have been discriminated against based on my race (Black) and retaliation (Discharge).

II.  Respondent's Reason for Adverse Action: Providing false statements.

III. I believe I have been discriminated against in violation of Title VII of the Civil Rights Act of 1967, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Apr 08, 2005 _____<br>Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TAJ WILSON, | : |
| | : |
| **Plaintiff** | : |
| | : |
| v. | : Civil No. 05-2146 (GK) |
| | : |
| WASHINGTON METROPOLITAN AREA | : |
| TRANSIT AUTHORITY, | : |
| | : |
| **Defendant** | : |
| | : |

## <u>DECLARATION OF LIEUTENANT ROBERT MELAN</u>

Robert Melan, declare as follows::

1. I make this Declaration on personal knowledge and am competent to testify to the matters related in this Declaration.

2. I am the commander of the Metro Transit Police Office of Professional Responsibility and Investigations.

3. I am the custodian of records for personnel and disciplinary files.

Personnel and disciplinary files in my custody reflect the following:

<u>Plaintiff</u>

4. Plaintiff began his employment with the Metro Transit Police on January 14, 2002.

5. After completion of his training at the Northern Virginia Criminal Justice Training Academy and the Maryland Police Training Commission, plaintiff took the oath of office on September 24, 2002.

6. Plaintiff was assigned to field training from September, 2002, to December, 2002.

<u>Sergeant Tommie Call</u>

7. Sergeant Tommie Call is a white male.

8. Sergeant Call has been a member of the Metro Transit Police since November 29, 1989.

9. During this time, Sergeant Call has had two disciplinary violations.

10. In 2001, Sergeant Call was reprimanded for use of profanity toward a citizen.

11. In 2006, Sergeant Call was found to be negligent in the performance of his duties for failure to adhere to collective bargaining requirements when assigning overtime to subordinates. He received a three day suspension.

12. There were no sustained findings of deception in either of Sergeant Call's disciplinary violations.

13. Neither of these violations impacted the safety of the public or of other officers.

<u>Officer Julie Musitano (Dronsfield)</u>

14. Julie Musitano (Dronsfield) is a white female.

15. Julie Musitano was a member of the Metro Transit Police from May 8, 2000, to October 6, 2006 when she resigned her position.                              .

16. During this time, Officer Musitano was subject to one disciplinary investigation.

17. This investigation involved missing prisoner property.

18. Two charges were sustained against Officer Musitano..

19. Officer Musitano received a two day suspension for failure to safeguard prisoner property.

20. Officer Musitano also received a one day suspension for failure to ensure prisoner

2

property is returned to the rightful owner.

21. During this investigation, it was determined that Officer Musitano was not being deceptive.

22. The charges sustained against Officer Musitano did not impact the safety of the public or of other officers.

### Officer Steven Morrison

23. Officer Steven Morrison is a white male.

24. Steven Morrison has been a member of the Metro Transit Police since April 14, 2000.                    .

25. During this time, Officer Morrison has had one disciplinary violation.

26. A charge of bringing discredit to the department was sustained against Officer Morrison for taking leave without reporting it.

27. Officer Morrison was given a three day suspension and was ordered to repay the leave.

28. This disciplinary violation did not impact the safety of the public or of other officers.

### Officer Jason Williams

29. Officer Jason Williams is a white male.

30. Officer Williams has been a member of the Metro Transit Police since July 19, 1999.

31. During this time, Officer Williams has had two disciplinary violations.

32. On September 13, 2003, Officer Williams engaged in personal business while on duty and made false entries on his run sheet.

33. This incident resulted in four sustained charges against Officer Williams: failure to

3

devote full time and attention to the business of the department; failure to provide the

Communications Division with an odometer reading prior to and following the transport of

juveniles or persons of the opposite sex; knowingly making a false statement in any written or

verbal report; and failure to perform duties impartially, without favor or affection or ill will, and

without regard to status, sex, race, religion, political belief, or aspiration.

34.  This incident involved Officer Williams transporting a female victim for personal

gain.

35.  Officer Williams received a one day suspension for each charge and was removed

from mobile patrol.

36.  On March 10, 2005, Officer Williams conducted an unauthorized traffic stop when

he stopped a vehicle in the vicinity of a metrorail station but which was outside WMATA

property.

37.  Officer Williams received a six day suspension and a reprimand.

<u>Thomas Stolz</u>

38.  Officer Thomas Stolz is a white male.

39.  Officer Stolz was a member of the Metro Transit Police from October 29, 2001 to

May 1, 2007, when he resigned his position.

40.  While a member of the Metro Transit Police, Officer Stolz was involved in three

disciplinary incidents.

41.  On August 26, 2003, received a dereliction report when he could not be raised by the

dispatcher.  Investigation revealed Officer Stolz  was asleep at the Corporation Counsel's office.

Officer Stolz was given written counseling for failing to remain on patrol, being in a location

4

without permission where he could not monitor his radio, and unprofessional behavior in full view of the public.

42. On August 29, 2003, Officer Stolz was involved in an automobile accident. He received a one day suspension.

43. On March 4, 2007, during a routine inspection of credentials, Officer Stolz failed to be in possession of his credentials. Officer Stolz received a written warning for this infraction.

44. None of Officer Stolz's violations involved deception.

<u>Scott Bird</u>

45. Officer Scott Bird is a white male.

46. Officer Bird was a member of the Metro Transit Police from December 17, 2001 to October 24, 2007 when he resigned his position.

47. During this time, Officer Bird had one disciplinary violation. Officer Bird was suspended for three days for an accidental discharge of a firearm.

48. This violation did not involve deception.

<u>Kenneth Honick</u>

49. Kenneth Honick is a white male.

50. Officer Honick has been a member of the Metro Transit Police since April 14, 2003.

51. During that time, Officer Honick has received two disciplinary violations.

52. On December 25, 2004, Officer Honick was involved in a motor vehicle accident with a police vehicle. He received a one day suspension for this violation.

53. On June 24, 2005, while assisting Officer Burkholder in a traffic stop, Officer Honick failed to notify the Communications Division of his whereabouts. He received a

5

reprimand for this violation.

54. This violation did not involve deception.

### Robert Burkholder

55. Robert Burkholder is a white male.

56. Officer Burkholder has been a member of the Metro Transit Police since August 25, 1997.

57. During that time, Officer Burkholder has had 11 disciplinary violations.

58. Officer Burkholder received a dereliction for failure to reinspect the prisoner transport area of his patrol vehicle following the transport of a prisoner on December 11, 1998. He received counseling for this violation. He was also removed from solo patrol and assigned to work along with seasoned officers for a month in order to gain positive influence and a better understanding of police work.

59. On April 7, 1999, Officer Burkholder was involved in an accident with his police vehicle. He received a one day suspension for this violation.

60. Officer Burkholder was counseled for use of profanity on December 27, 1999. He was given additional training in communicating with tact.

61. Officer Burkholder received a reprimand for use of language on March 13, 2000. He was removed from solo patrol and assigned to ride along with seasoned officers for a month. Shortly after receiving the reprimand, Officer Burkholder's request to engage in outside employment was denied because of concerns regarding his judgment and interpersonal relationships. Officer Burkholder received additional training in verbal judo and crisis management.

62.   Officer Burkholder was formally counseled for rudeness to another WMATA employee on February 8, 2001.

63.   Officer Burkholder received a one day suspension when his MTPD vehicle struck a parking meter while he was backing out of a parking space.  The vehicle was not disabled and remained in service.  There were no injuries.  This incident occurred on April 4, 2001.  Officer Burkholder admitted striking the parking meter stating that he did not realize his vehicle was close to the parking meter.

64.   Officer Burkholder received a one day suspension for a traffic accident occurring on December 29, 2003.  Officer Burkholder's vehicle came in contact with the rear of another vehicle which had come in contact with a third vehicle.   Minor damage was sustained to both vehicles.  There were no injuries.  Officer Burkholder admitted to striking the other vehicle.

65.   Officer Burkholder was counseled for conducting a traffic stop while engaged as a rail canine explosive team on January 25, 2005.

66.   Officer Burkholder received one day suspension for conduct unbecoming of an officer arising out of a traffic incident on April 29, 2005.

67.   Officer Burkholder received a one day suspension for the incident with Officer Honick noted above.  Officer Burkholder was found to have left his sector without notification, failed to notify communications that he had initiated a traffic stop, and failed to notify an official that his vehicle had become disabled.

68.   Officer Burkholder received a four day suspension for the March 10, 2005 incident with Officer Williams noted above.

<u>Collective Bargaining Agreement</u>

7

69.  Section 17, Section 3 of the Collective Bargaining Agreement between the

Washington Metropolitan Area Transit Authority and Local 246 of the International Brotherhood

of Teamsters, AFL-CIO (Metro Transit Police) in effect from October 1, 1998 to September 30,

2004 provided "Adverse entries into an employee's personnel file shall not be used in

determining disciplinary action or cited in subsequent disciplinary action after a period of

eighteen (18) months from the effective date of such adverse entry."

I hereby declare, under penalty of perjury, that the statements contained in this

Declaration are true to the best of my knowledge and belief , this 28 day of March, 2008..


_____
Robert Melan

# EXHIBIT 3

# OATH OF OFFICE

# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

# METRO TRANSIT POLICE

I, Taj D. Wilson, do hereby swear (or affirm), that I will support and defend the Constitution of the United States and will discharge my responsibilities as a police officer of the Washington Metropolitan Area Transit Authority, with dispatch, total dedication, integrity and impartiality, and will faithfully perform the duties of that office. I will obtain all evidence lawfully and will work diligently to determine guilt without fear or favor. I will accurately report my findings regardless of whether they establish the guilt or innocence of an individual. I will obey as well as enforce the law where it is incumbent upon me to do so. I will abide by the rules and regulations of the Transit Authority and I will obey my superiors in all lawful matters of duty performance. I accept the police credential and shield as being representative of the special trust placed in me as a Metro Transit Police Officer.

_____
SIGNATURE OF OFFICER

SUBSCRIBED AND SWORN BEFORE ME THIS 24th DAY OF September, 2002

MY COMMISSION WILL EXPIRE September 30, 2004

_____
NOTARY PUBLIC

Ex 1

2399

# EXHIBIT 4

To: Captin George Heilmann

Subject: Police Conduct

In Reference to Case Number 03-348-1279, The undersigned
[office]er Reports that on December 13, 2003 being involved in a
[verb]al Argument in the Wal-Mart Parking Lot in Clinton Maryland.
[The] Undersigned officer was on sick-leave that day, due to a broken
[toot]h incident that happen the day before. The undersigned officer
[be]ing asleep in the passenger side of his vehicle, to be awaken
[by c]ar horns. At this time W2 (Lavoncye Shannon) informed the
[under]signed officer that R1 (Billy Little) had almost hit the undersigned
[offic]er's vehicle, going into a parking space. At this time the
[und]ersigned officer got out of his vehicle to inform R1 that W2
[was] intitled to the parking space first. R1 then told the undersigned
[off]icer "Fuck-You", "I was here first. The undersigned officer
[the]n told R1 "Whatever" and proceeded to walk off. At this
[tim]e R1 said unknown words to the undersigned officer, and proceeded
[to] get out of his vehicle. As the undersigned officer got in
[his] vehicle, the undersigned officer noticed R1 standing in the
[mid]dle of the parking lot, looking towards the undersigned
[off]icer's vehicle. At this time not knowing what R1's
[in]tentions were, the undersigned officer unlocked the glove
[box] in his vehicle and then placed his issued service weapon
[in] his holster. At this time the undersigned officer instructed
[W]2 to drive off and find another parking space. At this time
[th]e undersigned officer and W2 went inside the store, to finish
[the]r christmas shopping. Upon leaving the store, the undersigned

2598  2

ffer WAS STOPPED BY PG OFFICERS. OFFICER TAYLOR

THIS TIME ASK THE UNDERSIGNED OFFICER FOR HIS VERSION

HE STORY. IT WAS AT THIS TIME THAT THE UNDERSIGNED

CER IDENTIFIED HIMSELF AS A METRO TRANSIT POLICE OFFICER.

ER P.G. OFFICERS GATHERED THE INFORMATION NEEDED FOR

EIR REPORTS, PG OFFICERS INFORMED THE UNDERSIGNED OFFICER

T HE MAY LEAVE, AND THAT A REPORT COULD BE FILED

x T.D. WILSON _____ MTPD # 414  12-23-03

2599

# EXHIBIT
# 5

## Followup Interview, Q&A, Officer Taj Wilson
### January 20, 2004, 1430 hours

------------------------------------------------------------

This interview was conducted by Capt. Heilmann with Officer Taj Wilson as a follow up to his written statement reference an off-duty incident at the Walmart in Clinton, MD on 12-13-03.

------------------------------------------------------------

1. Q. Who did you report sick to and when did you do this?
   a. Saturday, Dec. 13, 2003, same day at about 1000 or 1100. I talked with Officer Irizarry who said no Sergeants were available. He said he got me and that was it. I called back around 1400 to confirm with one of my Sgt's, H. Acton who confirmed I was on sick leave.

2. Q. How did you break your tooth and do you have doctor's notes concerning your treatment?
   a. Playing basketball the evening before around 1800 hours. I have Doctor's notes to confirm my treatment including a visit with her on Saturday, 12-13-03 around 1300. She prescribed medicine to keep the infection down and I took a pill that day.

3. Q. As I understand it, you were in your car which was being driven by Lavoncye Shannon. What kind of car were you in and who is Ms. Shannon?
   a. 2001 Mitsubishi Gallant. Ms. Shannon is my girlfriend.

4. Q. Why were you asleep, and whose horns were blowing that woke you up?
   a. Medication for the broken tooth made me sleepy. Ms. Shannon was blowing the horn in my car, and she was fussing back and forth with the other man (Little). Both were exchanging unpleasantries with each other and both were saying they were there first.

5. Q. You then approached Mr. Little's car to tell him that the space was yours? What was said between the two of you?
   a. Ms. Shannon had advised me that the lady who was pulling out of the space had indicated to her that she could have the space so Ms. Shannon thought it was hers. I got out of the car to mediate the space dispute with Mr. Little. I advised him Ms. Shannon was there first. He replied that he was there first and stated "F_____ you." I asked if all that was necessary and he said you came up to my car. I told him he doesn't have to go there and then said "Whatever" and went back to my car.

6. Q. Did you say, That's OK, I got something for you" or something to that effect?
   a. No sir. I said "Whatever" and went back to the car.

7. Q. Could you hear what Mr. Little said to you as you returned to your car?
   a. It sounded like he was saying something towards me but there was a lot of noise in the parking lot and I could not tell what he was saying. Ms. Shannon and he were jawing back and forth and I was telling her to just move the car, but she did not do that right away.

Ex 3   2609

8. Q. What happened then?
   a. Mr. Little got out of the car and paused for maybe 20 or 30 seconds while looking at us. He then starting walking towards the car. I felt threatened by his action so I took my issued service weapon, Sig Sauer .40 caliber, out of the glove compartment and holstered it. My holster was already on my right hip. That's it. Mr. Little may have seen me do that and I was kind of hoping he would, but more I did this because I was in fear for our safety.

9. Q. What about the magazine? Was it already in the weapon?
   a. No, I loaded the magazine in the weapon while it was in my holster like they teach us in training.

10. Q. Did you chamber a round into the weapon to make it live?
    a. No.

11. Q. It seems to me that not racking the weapon and making it live jeopardized your safety. Why didn't you rack your weapon to make it live?
    a. I was just trying to get the gun on my person. I know I put the clip in and put it on my person. But I do not remember racking the weapon. I am 100% sure I did not rack the weapon.

12. Q. You said in your written statement that the glove compartment was locked. Was it?
    a. No, what I meant was that it was closed and secured in there, but not locked.

13. Q. How long did Ms. Shannon keep the car in that position after you got back into the vehicle?
    a. Seemed like a long time but probably about three to five minutes. I told her to just drive but she was trying to get the last word in.

14. Q. When you put the gun on, what did they do?
    a. He made a sharp turn and began walking toward the Walmart.

15. Q. What about his lady friend, what was she doing?
    a. I know he had a friend with him but I could not tell you what she was doing. My focus was on him.

16. Could Ms. Shannon hear your conversation with Mr. Little when you were standing by his car?
    a. Probably not but maybe after I started walking back to my car.

17. Q. Is there anything else that you would like to add?
    a. Nothing new to add to what you already know.

The above answers to the questions are true and accurate to the best of my knowledge.

_Taj Wilson  NPD 414_      _01-20-04_

Officer Taj Wilson, Badge 414          Date

2610

# EXHIBIT
# 6

# M E M O R A N D U M


**M** metro

SUBJECT: **Adminstrative Inquiry, Re: Taj Wilson**
**Displayed Weapon - Off-Duty Incident**

DATE: **February 26, 2004**

FROM: **MTPD - Captain George F. Heilmann**

TO: **MTPD - Chief Polly L. Hanson**    Case #:    **PRI 03-14**

This inquiry was conducted after Sergeant W. Ebing was contacted on December 16, 2003 by a citizen, Mr. Billy Little. Mr. Little alleged that on December 13, 2003, Officer Taj Wilson (while off-duty on sick leave) brandished his gun at him and his family over a parking space dispute (**Attachment #1**). On December 18, 2004, Chief Hanson assigned this case to OPRI for investigation. Documents were reviewed, and statements/interviews were obtained from witnesses, police officers and complainants to learn the facts of this case.

OBSERVATIONS:
On December 13, 2003, Prince George's County Police responded to the Walmart store located at 8755 Brandt Avenue, in Clinton, Maryland concerning a subject carrying a gun. PGPD Officer H. Taylor, #2636 initiated an Incident Report #03-348-1279 (**Attachment #2**) which described the following scenario:

At approximately 2204 that evening, a Mr. Billy Little advised he had an argument with a subject over a parking space at the Walmart. Little stated that when he drove into a parking space, the subject (eventually identified as MTPD Officer Taj Wilson who was off-duty and not in uniform) yelled, "Didn't you see my girl trying to get that space?" Little advised Wilson that he got there first. He then reports that Wilson placed a magazine in a gun as Little walked past him while he was in his vehicle. Little affirms in the PGPD Officer's report that Wilson did not point the weapon at him or make any threats but was concerned because he saw the weapon.

PGPD eventually located Officer Wilson in the store and quickly learned that he was MTPD Officer Taj Wilson, Badge 414. Wilson advised the officers that he and Little exchanged words and that he felt threatened and placed his issued service weapon on his body, but never said anything to Little reference to the gun. PGPD then sent Officer Wilson on his way and documented the incident in the report. Two witnesses were named in the report. They were Ms. Cynthia Crawford who was a passenger in Mr. Little's vehicle, and Lovoncye Shannon who was the driver in Officer Wilson's vehicle.

On January 7, 2004, this writer met with Mr. Little and Ms. Crawford at her apartment in the Forest Parks complex in Suitland, MD. They provided a written statement of

Washington
Metropolitan Area
Transit Authority

Page 1 of 5

D 65

their account of this incident and were interviewed (**Attachment #3**). Mr. Little advised that after he parked his car in the disputed space, Officer Wilson exited his vehicle and walked over to Little's car to speak with him. They exchanged words about whose space it was and as Officer Wilson left to return to his vehicle, he allegedly said, "That's O.K., I got something for you." After securing their vehicle in the space, both Little and Crawford had to walk past Wilson's vehicle, which was still sitting in the traffic aisle between their car and the Walmart. As they walked past, they observed Wilson, who was sitting in the front passenger seat, place a magazine in a weapon and rack a round in the chamber. Ms. Crawford said Wilson held the weapon chest high as he did so, while Mr. Little advised that the weapon was lower at about waist height.

Their statement went on to relate that the PGPD did not arrest Wilson. When they asked the PG officers why, they advised that Wilson was an officer of the law, he did not threaten them, and he did not point his gun at them. Little then related in the statement that he told the PGPD officers that he wanted to press charges. The PGPD Officers asked him, "For what, this is nothing."

On December 23, 2003, Officer Taj Wilson was notified that the Department was conducting an investigation into allegations of misconduct identified in the police report. He was asked to review the report and provide a written statement (**Attachment #4**) regarding his conduct in this event to include what was said between him and Mr. Little, all actions concerning his weapon, and circumstances surrounding his sick leave status (**Attachment #5**) on the night of this incident. Additionally, he was interviewed on January 20, 2004, to clarify comments in his written statement (**Attachment #6**). Officer Wilson relates the following:

Officer Wilson wrote that he was on sick leave on December 13, 2003 for a broken tooth which he incurred the previous evening playing basketball. He advised that he called in sick on December 13th at about 1000-1100 hours. No sergeants were available to take his call so he left a message with Officer Irrizarry. He then called back at 1400 hours and confirmed with Sgt. Acton that he was on sick leave. He related that he saw a doctor on that day concerning his broken tooth and was prescribed medication to keep the infection down. He took one pill that day and provided a doctor's note confirming his appointment (**Attachment #7**).

He reports being asleep in the front passenger seat of his vehicle, a 2001 Mitsubishi Gallant, when this incident started and was awakened by car horns. His girlfriend, Lavoncye Shannon, was driving the vehicle and told him that another car (Mr. Little's) had almost hit his car while entering a parking space. Mr. Little's car ended up in the space while Wilson's vehicle was left in the aisle outside of the space. Officer Wilson advised that his girlfriend and Mr. Little were "fussing back and forth" exchanging unpleasantries, and each claiming they were there first. He further explained that his girlfriend said that the lady driving the vehicle that vacated the parking space indicated to her that she could have the space.

At this time, Officer Wilson exited his vehicle and informed Mr. Little that Ms. Shannon was entitled to the space first. Mr. Little disagreed and said, "F____ you, I was here first." Wilson stated he told Mr. Little he did not have to go there and said "Whatever" before returning to his vehicle. Ms. Shannon apparently continued trading barbs with Mr. Little even though Officer Wilson asked her to move the car. He says she kept the car in that position for three to five minutes, and advised "I told her to just drive but she was trying to get the last word in."

Mr. Little then said some "unknown" words and proceeded to get out of his vehicle. As Wilson got into his vehicle, he noticed Mr. Little standing in the middle of the parking lot looking towards Wilson's vehicle for 20-30 seconds and then started walking towards Wilson's car. Not sure of Little's intentions and feeling threatened, Wilson says he retrieved his issued service weapon (Sig Sauer .40 caliber pistol) from the locked glove compartment and placed it in his holster. Officer Wilson says he then instructed his girlfriend to drive off and find another parking space.

In the followup interview with Officer Wilson, he advised that he meant to say that his weapon was in a closed, but not locked glove compartment where the weapon was secured. No key was needed to open the glove box. He reported that he placed his weapon in the holster which was already on his belt and then took the magazine and loaded the weapon into the magazine port while it was in the holster "just like they teach in training." He further advised that he kind of hoped that Mr. Little saw the weapon, but more, he says he did it because he was in fear for his safety.

When asked if he racked a round into the chamber to make the weapon live, he advised no. He further advised that he did not chamber a round into his weapon before entering the Walmart and therefore he was carrying an uncharged weapon. MTPD Firearms Training Coordinator Officer Greg Fox was asked if officers are trained to wear an uncharged firearm. He advised they are not and provided the Firearms Safety Lesson Plan **(Attachment #8)** as support of the training received in the Police Academy.

Several attempts to arrange an interview with Officer Wilson's girlfriend, Ms. Lavoncye Shannon, proved negative. She apparently had some form of medical surgery and was unable to meet with this writer.

Officer Wilson's police service file was reviewed and no adverse entries were found. He also rated outstanding in his use of sick leave (one day used) during the last rating period.

<u>CONCLUSIONS:</u>
Based on all the information above, this writer believes that Officer Taj Wilson became involved in a parking space dispute with a citizen although Wilson did not actually observe the events that led up to the dispute because he was asleep. He confronted the driver of the other vehicle after his girlfriend told him she arrived at the parking space first. He then directed the other driver (Little) to vacate the space so that his girlfriend could park in it (Little declined).

Officer Wilson's girlfriend did not make herself available for an interview with this writer, but according to Officer Wilson's testimony, it appears she, as the driver, may have exacerbated the situation by remaining parked by the citizen's vehicle without reason other than to continue a verbal confrontation. This is noted to more readily explain the setting and not to offer excuses for Officer Wilson's behavior.

Possibly the citizen's actions were less than courteous, and Officer Wilson did have words with Mr. Little. However, it is not clear if Wilson conveyed a threat saying he "had something for

you" or merely said "whatever." Officer Wilson should be given the benefit of the doubt in this regard for lack of a corroborating witness to the complainant's claim. Additionally, the Prince George's County police report did not indicate that there were any threats made at the scene, and they explained that to Mr. Little.

Mr. Little and Ms. Crawford's account state that when they exited their vehicle and were walking by Wilson's vehicle, they observed Wilson hold his weapon at waist or chest high level, place a magazine into the port, and then rack the weapon to prepare it for action. Officer Wilson says he holstered his issued service weapon after what he perceived to be a threat by Mr. Little, and stated that he "kind of hoped" that Little would see his weapon.

He advised that he took out his weapon from the "unlocked" glove box and immediately placed it in his holster which was already on his belt. He wrote in his statement that his weapon was stored in the locked glove compartment of the vehicle. However, when questioned, he advised that it was "secured" in the unlocked glove compartment.

He was asked if the weapon had a magazine in it. He said no but that he placed the magazine into the magazine port while it was in the holster on his belt "just like they teach you in training." When asked if he charged his weapon to make it live, he said no. He acknowledged that he also did not charge his weapon before walking into the Walmart with the weapon still holstered. Therefore, he carried an uncharged weapon which is contrary to training instruction.

In reality, it seems that the account of Mr. Little and Ms. Crawford is more likely. If Officer Wilson was threatened by Mr. Little's actions, wouldn't it be reasonable to expect a trained police officer to prepare his weapon for service if it was not already prepared? It seems that is the more cautious and sensible method for a police officer who was in fear for his safety.

This writer believes that Officer Wilson intended for Mr. Little to see him load his weapon, most likely to intimidate the supposed threat. At that point, it would have been prudent for Officer Wilson to identify himself as a police officer to quell any anxiety that the complainant may have felt over seeing someone with a gun. However, Wilson made no attempt to do so. It is clear that Officer Wilson did not brandish the weapon, and that was supported by Mr. Little's testimony. However, it is also clear that he did not identify himself as a police officer after displaying his weapon to the citizen, which caused enough fear in that citizen to summon the local police for help.

In reference to Officer Wilson's sick leave status on the evening of this incident, it appears he had leave approved for a legitimate reason. He was taking medication for a broken tooth received a day earlier and it was supported by a Doctor's certificate.

D 68

## RECOMMENDATIONS:

It is recommended that this inquiry be classified as SUSTAINED and that Officer Taj Wilson receive a Written Reprimand from the Chief for Charges 1 & 2 combined, and a One-Day Suspension for Charge 3. He should also receive remedial training in two areas – firearms safety, and training on conflict resolution. This report should be made a part of his police service file.

## CHARGE 1:

Violation of **General Order 131, "Firearms" Part IV, Section B, 2, b & c** - Members will not carry issued firearms in paper bags, pocketbook, briefcases, or similar containers without the prior approval of an Official. Issued firearms will not be left in automobiles, lockers, desks, or similar locations without prior approval of the Chief, even though these sites may be locked.

> **SPECIFICATION:**
> Officer Taj Wilson left his issued service weapon in the glove compartment of his vehicle even though he was wearing his holster.
> **RECOMMENDATION:**
> SUSTAINED, Written Reprimand From the Chief (combine with Charge 2)

## CHARGE 2:

Violation of **General Order 131, "Firearms" Part IV, Section B, 4** - While off-duty, Department issued handguns must be concealed and carried in an issued and approved holster.

> **SPECIFICATION:**
> Officer Taj Wilson did not conceal nor was he wearing his issued service weapon in his holster when this off-duty incident was unfolding.
> **RECOMMENDATION:**
> SUSTAINED, Written Reprimand From the Chief (combine with Charge 1)

## CHARGE 3:

Violation of **General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section D, 9** - Members will conduct their professional and private lives so as to avoid bringing discredit or the appearance of discredit upon themselves or the police department.

> **SPECIFICATION:**
> A citizen had to summon the Prince George's County Police after Officer Taj Wilson displayed his weapon to him but did not tell him he was a police officer. The PGPD had to stop the officer and eventually determined he was an off-duty Metro Transit Police Officer. Incident Report was initiated by PGPD concerning the event.
> **RECOMMENDATION:**
> SUSTAINED, One-Day Suspension

**Attachments**:
1. Memo from Lt. M. Daly dated 12-16-03
2. PGPD Incident Report #03-348-1279
3. Written Statement and Interviews of complainants, 1-07-04
4. Daily Assignment Schedule, D2 "B" Section, 12-13-03
5. Officer T. Wilson Written Statement, 12-23-03
6. Followup Interview with Officer T. Wilson, 1-20-04
7. Officer T. Wilson Doctor SL Certification for 12-13-03
8. Firearms Safety Lesson Plan

**I HAVE READ THIS REPORT AND I AM AWARE THAT A COPY WILL BE PLACED IN MY PERSONNEL FOLDER.**

_Taj Wilson 3-02-04_
**SIGNATURE/DATE**

# EXHIBIT 7

# GENERAL ORDER
## Metro Transit Police

| | |
|---|---|
| **Subject:** Firearms | **Number:** 131 |
| | **Effective:** 02/15/02 |

## I. Purpose

This Order prescribes regulations for the carrying and use of Department issued firearms and ammunition. This Order also provides for investigations and a Review Board for firearm discharges.

## II. Policy

All reasonable means of apprehension or self-defense will be exhausted prior to the discharge of a firearm. The decision to discharge a firearm will be based upon the threat posed by a situation encountered rather than by the nature of an offense.

## III. Definition

*Issued Firearm* - A revolver, semi-automatic pistol, shotgun, MP-5 or other approved firearm owned or authorized by the Washington Metropolitan Area Transit Authority.

*Reasonable Belief* - The facts or circumstances the officer knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

## IV. Procedures

A. Use of Firearms

1. Firearms may only be discharged:
   a. in defense of self or others when there is reasonable belief that death may occur or there is an immediate threat of serious bodily injury to the member or another person.
   b. to prevent the escape of a fleeing felon whom the member has reasonable belief will pose a significant threat to human life, should escape occur.
   c. to fire at or from a moving vehicle when the safety of innocent persons is not unduly jeopardized by the member's action, <u>and</u> when the criteria noted in Part IV,A,1,a of this Order is met.
   d. to destroy animals that are seriously injured or pose a threat to human safety. Animals may only be destroyed with a firearm when local animal control personnel are unable or unwilling to respond in a timely manner and upon the concurrence of an official.
   e. during annual qualifications, target practices or competitions on an approved range.

2. Firearms may be drawn whenever a member has a reasonable fear for his or her safety or the safety of another person.

3. Use of a Firearm is Prohibited
   a. when a lesser degree of force can reasonably be used,
   b. to discharge warning shots, or
   c. to effect or maintain the stop of a person.

4. Use of Issued Firearms Resulting in Injury or Death
   a. The involved member will be removed from line duty assignments pending an investigation by an official appointed by the Chief.
   b. The member will undergo appropriate psychological or post incident debriefing(s).

5. Notifications and Documentation
   a. Following the on or off-duty discharge of an issued firearm or the aiming of same at another person, members will notify an on-duty official without delay and document the incident on an appropriate report.

b. Notifications and reports are not required for annual qualifications, target practices or competitions on an approved range.

c. An appropriate delay in the required notification(s) following the aiming or discharge of a firearm is authorized:

(1) to render first aid,

(2) to maintain an arrest or prevent an escape,

(3) to protect a crime scene until assistance arrives, or

(4) when the involved member is incapacitated.

B. Carrying Issued Firearms

1. Sworn members are authorized to carry issued firearms and ammunition on or off duty, only after the member has been qualified by the Training Division to carry the weapon, instructed in the proper use of force guidelines, and issued copies of General Orders relating to that topic.

2. Members are responsible for the continuous safe handling, cleanliness, and security of all issued firearms.

a. Members will not permit others to borrow their issued firearms and will not borrow a firearm issued to another without the permission of an official.

b. Members will not carry issued firearms in paper bags, pocketbooks, briefcases, or similar containers without the prior approval of an official.

c. Issued firearms will not be left in automobiles, lockers, desks, or similar locations without prior approval of the Chief, even though these sites may be locked.

3. While on duty, members will carry and use only firearms and ammunition issued by the Department.

4. While off-duty, Department issued handguns must be concealed and carried in an issued or approved holster.

5. Privately-owned holsters used to carry issued firearms will be inspected and approved by the Training Division Commander prior to use.

6. Members will notify the Watch Commander without delay in the event their issued firearm is confiscated by, or relinquished to, any law enforcement agency for any investigation or incident while on or off-duty.

7. If a member's police powers are suspended, he or she will surrender his or her service firearm(s) to an official and may not carry, transfer, transport or receive issued firearms and or ammunition.

8. Members undergoing mental health counseling/treatment will, without delay, inform an official and submit appropriate documentation to the Chief of Police detailing their state of health. The member may be directed to surrender his or her issued firearm(s) to an official and may be placed in a limited duty status.

C. Shotguns

1. Shotguns will not be taken into the Metrorail system during revenue hours without the permission of an official or unless otherwise authorized by Departmental policies.

2. Absent an emergency situation, shotguns will not be loaded or unloaded in the presence of the general public.

3. While unloading a shotgun, shells will not be racked through the action. With the exception of shells loaded in the chamber, shotguns will be unloaded through the loading port. Chambered shells will be unloaded by first releasing the action slowly, then removing the shell through the ejection port.

4. Shotguns, when not in service, will be unloaded with actions open, safety devices engaged and secured within designated storage areas.

5. In non-emergency situations, members will ensure that shotguns are carried:

a. with the chamber empty,

b. with the action closed,

c. with the safety device engaged,

    d. with four rounds of issued shotgun ammunition in the magazine,

    e. with the muzzle pointed in an upward position, and

    f. in the approved electronic shotgun rack when in patrol vehicles.

6. Members will account for the issuance and condition of shotguns on a daily basis by signing a ledger. The ledger will be maintained by an official and will contain the following:

    a. time and date,

    b. shotgun serial number,

    c. change(s) in the shotgun's condition,

    d. signature of the official issuing the shotgun, and

    e. signature of the official accepting the shotgun upon return.

D. MP-5

1. Members will be certified as required by the Training Division.

2. Only authorized members will carry the MP-5.

3. When not in service, the MP-5 will be secured in the designated storage area unloaded, bolt open, selector switch on safe, magazine removed and the chamber empty.

4. Magazines and ammunition will be stored with the weapon. Ammunition may be retained in the magazine during storage.

5. Members will complete the MP-5 ledger prior to placing the weapon into service. The ledger will be maintained by an official and contain the following:

    a. time and date

    b. serial number

    c. member's name

    d. condition of weapon

    e. signature of issuing official, and

    f. signature of official accepting the weapon upon return.

6. Members will inspect and function check the weapon prior to placing it in service. Inspection and function check procedures will be posted at the designated loading and unloading areas.

7. Loading and unloading will take place in designated areas.

8. When being transported to patrol vehicles, the MP-5 will be carried port arms directly to and secured in the weapons rack of the vehicle.

9. As conditions warrant and the MP-5 has been removed from the weapons rack of the vehicle, the member will sling the weapon.

10. Members will sling the MP-5 immediately after issuance.

E. Center-fire Rifles

1. The center-fire rifle is a bolt-action or semi-automatic rifle equipped with a bipod or tri-pod, precision telescope and sling.

2. Members of the S.R.T. will be selected to carry center-fire rifles. They must successfully complete mandated training.

3. Center-fire rifles will be stored unloaded and with the bolt removed.

F. Damaged or Lost Issued Firearm

1. Damage to or loss of an issued firearm will be reported to an on-duty official without delay.

2. Members who negligently damage or lose an issued firearm may be required to provide reimbursement in accordance with the Department's amortization schedule.

3. Officials will investigate a lost or damaged issued firearm. The investigation may contain recommendations for discipline.

G. Repairs/Modifications of Issued Firearms

1. Defects in issued firearms will be reported without delay to a supervisor. The firearm will be unloaded, conspicuously tagged with a written explanation identifying the defect and stored in a safe place.

2. Supervisors will ensure that the Armorer is notified.

3. All repairs and modifications to issued firearms will be performed by the Armorer, except the installation of handgrips which may be performed by a certified firearms instructor. Personal-

ized handgrips must be approved by the Commander of the Training Division before installation.

## V. Qualifications

A. Members must qualify annually, and as directed thereafter with any firearm they are authorized to carry. Qualification requirements will be determined by the Training Division.
1. Members who carry a center-fire rifle must qualify quarterly.

B. A member who fails to qualify will be:
1. relieved of the issued firearm, and
2. issued a Firearms Failure Notice.

C. A member who fails to qualify with an issued firearm will be prohibited from handling that type of firearm until successful qualification has been achieved.

D. A member who fails to qualify with his or her issued handgun may be placed in an administrative status, reassigned, or placed on leave without pay pending the successful completion of qualifications. A continued inability to qualify will result in dismissal from the Department.

## VI. Responsibilities

A. Range Officers will:
1. have authority over all range activities,
2. document range attendance,
3. provide and ensure compliance with range safety rules and training,
4. ensure that firearms scores are recorded and related paperwork is completed,
5. issue "Firearms Failure Notices" and secure the firearm(s) of members failing to attain a qualifying score,
6. retain the issued firearm(s) of a member failing to qualify, and deliver same to the Armorer for safekeeping unless the member has been scheduled to attempt qualification the following day, and
7. ensure that when the Armorer is unavailable to receive firearms as required, the firearms are tagged, identifying the member(s) to whom they are issued and stored in the safe located at

Headquarters. The Firearms Training Coordinator will be notified.

B. The Armorer will:
1. Maintain a record of each firearm owned by the Department to include:
   a. date of purchase,
   b. serial number,
   c. dates inspected,
   d. repairs, and
   e. the member's name to whom the firearm is issued and the location where it is stored,
2. coordinate with supervisors to ensure that all issued firearms are inspected, cleaned and tested at least annually,
3. repair and modify issued firearms as required, and
4. secure firearms received from supervisors and range officers.

C. Supervisors will:
1. When notified that a firearm has been discharged, notify the Watch Commander without delay and respond to the scene to conduct a preliminary investigation,
2. When notified that a member has aimed an issued firearm at another person, ensure that the member has conformed with the guidelines of this Order and that appropriate reports are completed,
3. Ensure that members checking out a shotgun or MP-5:
   a. sign the log, and
   b. are currently qualified to carry the firearm.
4. Conduct a thorough investigation whenever a member under his or her command handles a firearm in apparent conflict with the guidelines of this Order,
5. Ensure that weekly inspections are conducted of issued firearms assigned to members under their command,
6. Store issued firearms and magazines (other than spares) no longer than 15 days, then forward them to the Departmental Armorer for inspection safekeeping, and

7. Ensure that only authorized persons handle, receive, carry or transport issued firearms.

D. The Watch Commander will:

1. When notified of an incident involving the discharge of a firearm:
   a. notify the Chief of Police through the Chain of Command,
   b. respond to the scene (except animal destructions),
   c. ensure that the involved firearm(s) is examined to verify the number of rounds expended and that authorized ammunition was used, and
   d. ensure that all reports are properly prepared and that copies are forwarded to the Chief without delay.

2. Ensure that the firearm(s) issued to a member whose police powers have been suspended is surrendered to an official for safekeeping.

## VII. Investigation and Review Board

A. Firearms Discharge Investigations

1. Bureau Commanders will ensure that an official is assigned to prepare an in-depth investigation containing observations, conclusions and recommendations subsequent to the discharge of an issued firearm, except as noted in Part IV, A, 1, d or e.

2. The completed investigation will be forwarded to the Chief of Police, through channels, no later than 30 calendar days following the incident.

B. Firearms Discharge Review Board

1. Incidents involving the discharge of issued firearms may be referred by the Chief of Police to a Review Board.

2. The Board, appointed by the Chief of Police, will consist of three officials, one of whom will be designated as chairperson.

3. The Board will not function as a disciplinary or appeals body, its role will be to determine, at a minimum:
   a. the adequacy and functional requirements of the firearm and ammunition,
   b. training modifications as needed, and
   c. requisite policy and procedural changes.

Barry J. McDevitt
Chief

# EXHIBIT 8

# GENERAL ORDER
## Metro Transit Police

| Subject: Ethical Standards of Conduct and Financial Interest | Number: 217 |
| --- | --- |
| | Effective: 02/15/02 |

## I. Purpose
This Order defines the Department's policy pertaining to members' personal and ethical conduct.

## II. Policy
Members will maintain the highest standards of conduct. The authority to detain and arrest persons and seize property constitutes a public trust. Members will avoid conflicts of interest or the appearance thereof, and place ethical principles and compliance with the law before private gain and personal concerns.

## III. Procedures and Responsibilities
### A. General Personal Behavior
1. Members will not conduct themselves in an immoral, indecent or disorderly manner or in a manner that may be construed as such by a reasonable person.
2. A member who is arrested, issued a summons/citation for a criminal offense, or who has his or her driver's license suspended or revoked will notify the Watch Commander without delay. A detailed report concerning the incident will be submitted prior to his/her next regular tour of duty.
3. Members will promptly report, through channels, to the Chief of Police:
   a. any disloyalty or suspected disloyalty to the United States Government by members of the Department,
   b. any criminal conduct engaged in by members of the Department, and/or
   c. any violation of the General Orders by members of the Department.

4. Members will respond promptly and truthfully to all inquiries initiated by an official.
5. Members will not knowingly make a false statement in any written or verbal report.
6. While on-duty, members will not engage in idle conversation concerning, but not limited to, obscene matters or controversial subjects tending to disrupt morale.

### B. Gifts and Gratuities
1. Members will not, in connection with services performed within the scope of their official duties, solicit or accept money or anything of value in addition to the compensation paid to them by WMATA, unless the gift or gratuity is approved by the Chief.
2. Members will not receive or solicit anything of value as a gift, gratuity or favor for themselves or persons with whom they have family, business or financial ties if acceptance would result in, or give the appearance of resulting in, their loss of complete independence or impartiality in performing their official duties.
3. Members will not solicit a contribution from other members for a gift to a supervisor, make a donation for a gift for a supervisor or solicit/accept a gift from other members subordinate to himself or herself, without the approval of the Chief. This does not prohibit voluntary gifts or contributions of nominal value on occasions of personal significance to members.
4. Members will not accept personal or business favors which might result in an actual or apparent conflict of interest

with their official duties.

5. All duty related rewards received by members will be promptly submitted to an immediate supervisor with a detailed report explaining how and why the reward was received.

C. Official Conduct

1. When referring to or addressing a ranking member, the appropriate title of that member will be utilized (e.g., Chief, Deputy Chief).

2. Members in full uniform will render a hand salute to the National Colors in ceremony and the National Anthem.

3. Members will at all times:
   a. maintain decorum and command of temper, and
   b. be patient, discreet and courteous.

4. Members will protect and preserve WMATA property and will not use such property other than for authorized purposes.

5. Members will not engage in illicit gambling or the playing of cards or games of chance while on duty, or while off duty on WMATA facilities.

6. Members will not:
   a. swing or toy with their batons,
   b. carry an umbrella while in uniform,
   c. rest their hands in their pockets while in uniform,
   d. be connected with any active duty military organization other than reserve units of the United States Army, Navy, Air Force, Marine Corps, Coast Guard or National Guard,
   e. directly or indirectly seek publicity concerning matters that are or may be involved in any judicial or disciplinary proceeding, or
   f. use their official position for the purpose of influencing the interests of a particular individual or business entity.

D. Code of Ethics

1. Members will regard their position as one of public trust and be constantly mindful of their primary obligation to serve the public, safeguard lives and property, keep the peace and ensure the rights of all to liberty, equality and justice.

2. Members will perform all duties impartially, without favor or affection or ill will and without regard to status, sex, race, religion, political belief or aspiration.

3. Members will use the discretion vested in their position responsibly and exercise it within the law.

4. Members will not employ unnecessary force or violence or engage in cruel, degrading or inhuman treatment of any person.

5. Members will not disclose or permit others to disclose information obtained through their position with the Department, unless such information is generally available to the public. The release of official information is permitted within the scope of a member's official duties.

6. Members will not engage in, or condone, acts of corruption or bribery.

7. Members will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

8. Members will be responsible for their own standards of professional performance and will take every reasonable opportunity to enhance and improve their level of knowledge and competence.

9. Members will conduct their professional and private lives so as to avoid bringing discredit or the appearance of discredit upon themselves or the Department.

E. Standards of Financial Interest

1. Members will not be financially involved, either directly or indirectly, in any contract, sale, purchase, lease or transfer of real or personal property to which the Department or WMATA is a party, unless the involvement is that which is generally available to the public.

2. Members will not conduct themselves in a manner suggesting the appearance of private advantage from employment with the Department.

3. Members will not use their position with the Department to coerce, or appear to coerce, another person to provide any financial benefit to themselves or persons with whom they have family, business or financial connections.

4. Members will not use or permit others to use information obtained through their official positions to further their own financial interests or the financial interests of family members, business associates or other organizations, unless such information is generally available to the public.

5. Members will not offer money or any thing of value for, or in consideration of, obtaining an appointment, promotion or privilege in their employment with the Department or WMATA.

6. All members will complete and sign a Certification Statement confirming they have received, read and understood the requirements of WMATA Policy/Instruction 7.10, regarding Standards of Conduct.

7. Members whose annual salary rate is $50,000 or more and those who are significantly engaged in procurement activities will submit a Confidential Statement Affiliations and Financial Interests annually and when significant relevant changes occur.

Barry J. McDevitt
Chief

# EXHIBIT 9

# M E M O R A N D U M



SUBJECT:  Report of Investigation

DATE:  May 20, 2004

FROM:  MTPD - Sgt. Helen Acton  *2HS 07/8/04*

TO:  MTPD - Chief Polly Hanson
     MTPD - Deputy Chief Timothy Gronau
     MTPD - Captain John Triplett

## Observations:

On Tuesday, May 4, 2004 Metro Transit Police Officer Taj Wilson badge number #414 was working the 1430-2300 hours tour of duty and assigned to Sector 8.  Officer Wilson was operating a marked 2003 Ford Crown Victoria, DC tag BT-9746, shop number 17636, and vin #2FAFP71W53X214086.

At approximately 1604 hours. Officer Wilson was dispatched to a fight in progress at the Eastern Market Metro Station. Officer Wilson contacted communications and initiated a Code-1 response and activated the emergency equipment of his scout car. Officer Wilson proceeded  west bound on C Street NE  at approximately 20 MPH.  Officer Wilson approached the intersection of 17th and C  Street  NE and observed the traffic light was yellow.  Officer Wilson observed the vehicles at the intersection had came to a stop. Officer Wilson proceeded to enter the intersection and was struck by a gray Buick that had entered the intersection from 17th Street. The Buick  went over the median strip and struck a light pole at which time the driver was ejected from the vehicle.  Officer Wilson's scout car  went over the median strip and stopped in the 1600 block of C St. NE.  Officer Wilson immediately notified MTPD communications of the accident and requested a supervisor and ambulance respond to his location.  Upon Sergeant N. Frebowitz's arrival on the scene, he observed that shop #17636 had sustained extensive damage to the front end of the vehicle and that the impact of the collision had caused the air bag  to deploy. Sergeant K. Gaddis responded to MEDSTAR  to check on Officer Wilson's welfare.  The Buick had sustained extensive damage to the drivers side and hood of the vehicle.  It was daylight at the time of the accident. The weather was warm and the sky was clear.  The roadway was asphalt and dry.

Officer Wilson and the other driver were transported to MEDSTAR for treatment. Shop #17636 was towed to Bladensburg car shop. The Buick was impounded by MPDC and towed to A & B Towing.

Officer Wilson was treated for minor injuries at MEDSTAR and transported to JGB for a post-incident drug and alcohol test (attachment 8).

Washington
Metropolitan Area
Transit Authority

D 61

The driver of the other vehicle was identified as Ozzie Faison, 11/02/66, 836 21st Street NE, Washington, DC 20002. The vehicle description is a 1986 Buick Somerset, gray in color, MD FLE-387, and vin #1G4NJ27L7GM143895. The owner of the vehicle is Vickie Nixon Jeffries, 211 Castleton Terrace, Upper Marlboro, MD 20774.

Officer J. Strassman, badge #498, of the Metropolitan Police District 1 responded and initiated a PD 10, CCN #060-117. During the course of his investigation, Officer Strassman determined that Mr. Faison was not licensed to drive in the District Of Columbia. Mr. Faison was charged with fail to yield to emergency vehicle and having no DC permit. Officer Wilson was not charged with any violations.

Officer W. Donald III, badge #143, photographed the accident scene and prepared the MTPD event report.

The following documents were prepared and copies are attached to this report: MTPD Event Report #200415556 (attachment 3), written statement of Officer Wilson (attachment 2), WMATA Motor Vehicle Accident Report (RMIS) (attachment 7), and PD 10 CCN #060-117 (attachment 4), Daily Assignment Schedule for 05/04/04 (attachment 5), MTPD run card (attachment 6), and On duty Injury paperwork (attachment 8).

The WMATA vehicle shop has determined that the cost to repair the damage to Shop 17636 is estimated at approximately $14,000. This cost exceeds the value of the vehicle and as a result the vehicle will be surveyed.

**Conclusions:**

Based on the strong physical and photographic evidence, this official concludes that Officer Wilson claim (attachment #2) that his traffic light was yellow is inconsistent with this evidence. It is clear that Officer Wilson had failed to stop at the traffic light that was red and struck the other vehicle that had already entered the intersection. Officer Wilson had violated Metro Transit Police General Order 306 Subsection IV, B. 1 b. while operating shop #17636.

**Recommendations:**

It is recommended that this accident be classified as PREVENTABLE. It is further recommended that Officer Wilson receive a one day suspension without pay and attend a one day refresher driver training at NVCJA Old Dominion Speedway.

# EXHIBIT 10

# M E M O R A N D U M



SUBJECT: One (1) Day Suspension Without Pay          DATE:    June 16, 2004

FROM: MTPD- Deputy Chief Timothy Gronau *TCG*

TO: MTPD- Officer Taj Wilson *1Day   160 hrs   06-30-04*

CONFIDENTIAL

A review of the attached investigative report concerning your traffic accident on May 4, 2004, indicates that you failed to operate your police vehicle in a safe and responsible manner.

This investigation was comprehensive and the report sufficiently documented its findings, I agree with the recommendations of Sergeant Acton that the accident be classified as preventable and that you receive the same one day suspension approved for other members involved in preventable accidents.

You are advised that the disciplinary action imposed in this instance may impact unfavorably upon possible future opportunities as well as selection for special assignments. Similar incidents may result in progressively severe discipline.

In the future, you will be expected to upgrade your performance to levels required of a sworn member of the Metro Transit Police Department.

**Washington
Metropolitan Area
Transit Authority**

**D 60**

# EXHIBIT 11

# M E M O R A N D U M



**SUBJECT:** Off. Duty Incident                    **DATE:** June 13, 2004

*Tom Gray*

**FROM:** MTPD - Officer Taj Wilson #414

**TO:** MTPD -Sergeant Donald Proctor *DP 6-15-04*

On June 13, 4004 at approximately 1845 hours, I was visiting a friend at the Hungiton Apartment Complex, in the 3400 block of 6th Street in Southeast, Washington, DC. I observed two individuals in an altercation. During the altercation, one of the individuals, a black female, produced a knife and a taser gun. Upon seeing this I immediately identified myself as a police officer by displaying my MTPD badge and Credentials. I attempted to separate the two individuals and send them on their way. while preoccupied with the altercation, an unknown person approached me from behind, and attempted to grab my service weapon. At this time my service weapon was secured on my waist, in an approved off duty holster and being carried in a concealed manner. I was able to secure my weapon and prevent it from being taken when several Metropolitan Police Officers arrived on the scene. When they arrived , four subjects unknown to me, fled the area. No subjects were apprehended by the Metropolitan Police. MPDC Sgt. R. Hunter(#S68) responded and was in charge of the scene. I was interviewed by Sgt Hunter and he determined that no report would be taken. Sgt Hunter cleared the scene and I notified Sgt. D. Proctor and Sgt. K. Gaddis of the incident as soon as the scene was clear.

**Washington
Metropolitan Area
Transit Authority**

(7)

# EXHIBIT 12

# M E M O R A N D U M

**M**
**metro**

**SUBJECT:** Adminstrative Inquiry, Re: Taj Wilson    **DATE:**    **August 20, 2004**
Off-Duty & On-Duty Incidents,
6-13-04 & 6-18-04

**FROM:** MTPD - Captain George F. Heilmann

**TO:** MTPD - Chief Polly L. Hanson    **Case #:**    **PRI 04-11**

This inquiry was conducted after receiving information from Acting Deputy Chief
Timothy Gronau on June 22, 2004 that several citizen's allegations had been made about
Officer Taj Wilson's (Badge #414) conduct and use of his service weapon in two off-duty
incidents, and one on-duty during the previous week. Deputy Chief Gronau turned over to
this writer an assortment of notes and witness contact information from himself and
D/Chief J. Lee and advised that Sgt. Pavlik also had some information. Chief Hanson
believed it should be handled by the OPRI office because of Wilson's off-duty behavior
last Fall when he was disciplined for conduct involving his service weapon.

ALLEGATIONS:
The below bullets are a synopsis of the original allegations based on the notes
**(Attachment #2)** provided to this writer:

- On Sunday, June 13, 2004 at 1845 hrs., Officer Taj Wilson was off-duty at a cookout
  at 3304 6th St. SE, Washington, D.C. when an altercation occurred involving 4 females
  attacking two other females. Supposedly, Wilson encouraged the altercation and
  allowed it to occur. Wilson's girlfriend allegedly pulled Wilson's weapon from his
  holster. Wilson had to struggle with her to get it back. A witness said the gun was not
  secured and not snapped in Wilson's holster. Wilson was able to retrieve it and re-
  secure it in his holster.

  MPDC Sergeant Hunter responded to the scene after receiving a call that a police
  officer lost his weapon. He interviewed Wilson on the scene and called for a MTPD
  Supervisor to respond.

- On Friday afternoon/evening, June 18, 2004, Officer Wilson, who was on-duty,
  received a cell phone call from his girlfriend who was involved in an altercation.
  Wilson responded in a Metro Transit Police scout car and then watched and
  encouraged the dispute. Supposedly, during that time, Wilson's girlfriend shattered
  the complainant's (Shatise Parker) vehicle windshield with an anti-vehicle theft club.
  Wilson purportedly pulled his gun during this incident and threatened Ms. Parker.

**Washington**
**Metropolitan Area**
**Transit Authority**

United States Park Police (USPP) Sergeant Michael Snowden assisted Officer Wilson during this altercation.   Prince George's County Police (PGPD) Officer Adey responded to this call and issued citations to several individuals.

- On Sunday, June 20, 2004, while off-duty, Wilson allegedly pulled his gun again in another incident possibly involving the same females from the first incident above on 6-13-04.

ADMINISTRATIVE ACTION:
In February 2004, Officer Wilson received a one-day Suspension and Chief's Reprimand for failing to handle/secure his weapon properly, and bringing discredit to the MTPD and himself during an off-duty incident in Prince George's County. This conduct, combined with the new and similar allegations, albeit not proven, was considered enough to pose an inherent risk to the Department should Officer Wilson retain his arrest powers. Therefore, his police powers were suspended on June 21, 2004 by Acting Deputy Chief Tim Gronau, until the facts could be established regarding the latest allegations. Wilson's weapon, badge and credentials were stored in the D2 safe and he was advised to report to Capt. A. Phillips for administrative assignment with pay starting June 25, 2004 **(Attachment #3)**.

On July 15, 2004, after initial interviews were completed, it was determined that Officer Wilson could resume his normal patrol duties with full police powers, and he was reinstated to patrol operations. There was no evidence of weapon abuse as earlier alleged, and no evidence of a third incident occurring on Sunday, June 20, 2004. However, Wilson was advised that the investigation would continue to determine if there was inappropriate use of his service weapon, or other unacceptable conduct, and that discipline could still be delivered.

OBSERVATIONS (First Incident on June 13, 2004):
On June 15, 2004, Officer Wilson, at the direction of Sgt. Donald Proctor wrote a statement about his involvement in the June 13, 2004 incident **(Attachment #8)**. Wilson wrote that he did not lose control of his service weapon in that incident.

On June 30, 2004, a Mr. Eric Gray, one of the names provided by Deputy Chief Gronau to this writer as a witness to the event on June 13, 2004, called this writer after this writer left messages with him on June 23rd and June 24th. Mr. Gray verbally advised that he was at the party and said there was an altercation between some women. One woman had a stun gun and may have shot it at somebody. Mr. Gray said another woman grabbed Officer Wilson's gun out of his holster and pointed it at someone before Wilson was able to retrieve it and get it back in his holster. According to Mr. Gray, he said Wilson did nothing to stop the aggressive behavior of the women even though he identified himself as a police officer, and Mr. Gray thought that Wilson was actually encouraging the behavior. MPDC arrived on the scene but did not make any arrests.

Mr. Gray advised he would complete a written statement concerning the above and send it to this writer electronically. After two weeks passed without a statement from Mr. Gray, he was called on July 12th and 13th and messages were left again by this writer. On July 16, 2004, an electronic email from Eric Gray's fiancé, Ms. Latrice Jackson, was sent to this writer's email box which was received on July 19, 2004 **(Attachment #7)**. Ms. Jackson advised she also attended the party and her statement relates the following:

There was a group of girls ganging up on two girls and the officer (Wilson). Mr. Gray and Ms. Jackson tried to break up the incident. Officer Wilson identified himself as a police officer and said he had the fight under control, but "sort of like (Wilson) was distracting her from the fight." One of the girls had a stun gun and she "zapped" another girl with it. The girl who was stunned (Gray could not say who) then went over to the officer and grabbed for his gun, and he had to struggle to get his gun back from her. Ms. Jackson then said that Eric Gray said he was going to call the cops, and Wilson told him that he had already requested assistance.

MPDC Sergeant R. M. Hunter responded to that call for service on June 13, 2004 at 3304 6th Street SE, Washington, D.C. for a report that a MTPD Officer had his service weapon taken during a physical altercation. On July 8, 2004, Sergeant Hunter provided a written statement to this writer concerning his observations when he arrived **(Attachment #5)**.

Sergeant Hunter said he interviewed Officer Taj Wilson who advised that he was attempting to break up a fight between several females who were attending a cookout. Wilson advised that while attempting to stop the females involved in a physical altercation, he observed a female with a knife approaching towards him in a threatening manner. Wilson told Sgt. Hunter that he yelled to the armed female that he was a police officer and to stop and drop the knife. After the female complied with his demand, a large crowd gathered around him shouting, "You didn't have to pull your gun like that."

Officer Wilson stated to Hunter that the crowd closed in on him as he continued to break up the fight, and someone unknown to him grasped his weapon while it was in his holster. Wilson told Hunter that his weapon never came out of his holster nor did he drop his service weapon during the altercation. Hunter says that Wilson also told him he worked part-time at that complex but that he was not working during the cookout. He went on to say the MPDC did not make an arrest on scene because the female complainant was not cooperative with the police. Additionally, Officer Wilson advised Hunter that the female armed with the knife was no longer on the scene. Sgt. Hunter asked for a MTPD official to respond to the scene.

On July 14, 2004 at 1115 hours, Officer Taj Wilson was interviewed concerning his activity in the incidents on June 13 and 18, 2004 **(Attachment #8)**. He was accompanied by 639 Business Agent Diana Faison and the interview was audio recorded. In reference to the June 13, 2004 incident at 3304 6th Street SE, Officer Wilson relates the following:

Officer Wilson relates that he was at that location that evening in a first floor apartment attending a birthday party cookout for someone named Leon who was a friend of his girlfriend, Lavoncye Shannon. He quickly advised that he does not have a part time job at that complex as alluded to in MPDC Sgt. Hunter's statement. He says he heard a disturbance outside and went out to see what was happening. He observed a girl brandishing a knife and a taser gun. He ran out there and yelled that he was the police, and pulled out his badge and credentials. As he was doing this, he was also reaching for his firearm, but he never pulled it out because at that time, she dropped the knife and taser gun. He told her to back up from the taser and he then tried to kick it away from her.

Page 3 of 15

As soon as he bent down, someone reached for his gun. He used his "officer survival tactics" and secured his weapon. The person who was trying to take his weapon had lifted the holster and gun up to his rib area, but that person was not able to take it out of the holster. Wilson said he was not sure who was trying to take his weapon because there was a crowd around him and he did not turn to see who it was. When things had calmed down and he turned around, he saw three women behind him, the closest being his girlfriend, Lavoncye Shannon. He asked her if she had tried to take his weapon and she said no.

He also had screamed out for someone to call the police. When he heard police sirens, everybody scattered everywhere. He told the responding officers (MPDC) which way the girl with the weapons ran and he says they were able to find her and talk to her. He notified Sgt. Proctor and Gaddis through Communications and then they (MTPD Sergeants) advised him through MTPD Officer Lanier's Nextel cell phone to respond to D2 for a statement on this event. He then went to D2 to write his statement, apparently leaving the scene before his supervisors ever arrived.

He advised that he did not take the lady into custody who had the weapons because at that time, someone was trying to take his weapon and people were everywhere. When things had calmed, she was not there. He thought MPDC had retrieved the knife which was about 6" long.

On July 22, 2004, Officer Calvin Lanier was interviewed regarding this inquiry into the June 13, 2004 incident (**Attachment #9**). Lanier advised that he received a call from Officer T. Triplett, who advised him that he received a call from Wilson. Wilson had told Triplett that he was in some trouble and needed help at 3304 6th Street SE. Lanier was northbound on 295 near the Minnesota Ave. exit at that time and immediately called his Sergeant (Proctor) and advised him, and then responded to that scene. When he arrived, he saw numerous MPDC units on the scene, and Triplett arrived after him.

On July 28, 2004, Officer Terrence Triplett was interviewed regarding this inquiry (**Attachment #10**). In reference to the June 13, 2004 incident at 3304 6th Street SE, Triplett says that he received a phone call from Wilson while at Branch Avenue working a traffic accident. Wilson told him that someone tried to take his weapon (he did not know who) while at 3304 6th Street SE. Triplett says he heard a lot of voices in the background. He also said Wilson called him four or five different times from the party. Triplett told him to contact his supervisor and call the local police. Triplett then did ride by that location which was on his beat. When he got there, he observed numerous police units on the scene. He only stayed for a short period and left.

OBSERVATIONS (June 18, 2004 Incident):
This second event occurred on Marlboro Pike at the intersection with Silver Hill Road in Prince George's County, MD. The information provided to this writer included a name of an uncooperative witness to this event, Ms. Shatise Parker, who supposedly had in depth information. She initially related that she had knowledge or witnessed all the bulleted events listed on the first page of this report. She was identified as the driver of the vehicle that had the rear window shattered in the June 18, 2004 incident. On June 21, 2004, Ms. Parker called the District I station to lodge a complaint about Officer Wilson and spoke with then Sergeant Ron Pavlik.

According to Sgt. Pavlik's notes (**Attachment #2**), she advised him that there was a traffic dispute in front of the Iverson Mall with another vehicle occupied by four females. This argument spilled over into an adjacent parking lot at which time words and a physical altercation took place. One of the females then removed a club locking device from the vehicle and shattered the rear window of Ms. Parker's car.

Parker said that Taj Wilson's girlfriend at some point in time called Wilson, and Parker said that he responded lights and sirens to the scene. She also spoke of Officer T. Triplett at the scene as well. She said they both tried to resolve the scene but Ms. Parker was not happy with the out come. She wanted insurance information from the car of females to get her window fixed, and said she thought Wilson and Triplett were PG county officers. She said that Ofc. Wilson gave her insurance information, which turned out to be bogus, and that Wilson threatened them all with jail if they did not leave the scene. She said Wilson and Triplett then hastily left the scene.

Ms. Parker went on to tell Sgt. Pavlik that some time later in the night, the same two car loads of people hooked up and another altercation occurred. Again she said Ofc. Wilson responded to the scene and made some verbal threats at the victims and quickly left the area. Ms. Parker went on to say she also has knowledge of the incident on Sunday, June 13, 2004. She said that Wilson went there and threatened some "drug boys" to leave his girlfriend alone and he apparently was involved in a physical altercation with them in an attempt to take his service weapon.

Ms. Parker added that the incident near Iverson Mall was handled by PG County police who issued citations to some of the girls. Wilson and Triplett did not stay on the scene for their arrival. She finished her verbal conversation with Sgt. Pavlik by saying that she was willing to come downtown to make a statement.

Later that same day, June 21, 2004, Ms. Parker responded to the JGB and spoke with Acting Deputy Chief Tim Gronau. She was highly upset and Chief Gronau had to calm her down. Once he did so, she was advised of procedures for filing a formal complaint and she left.

This writer made several attempts to contact Ms. Parker to arrange for an interview and obtain a written statement. Contact was finally made on June 23, 2004 by telephone. She advised that she would come down to headquarters for an interview the next day at 1000 hours. She was asked if she could write a statement and bring it with her but she said, "I'm not doing your work, that's your job." She was raising her voice on the phone and mostly complaining that Officer Wilson will pay for her windshield that was shattered by Wilson's girlfriend. Ms. Parker went on to say that she was going to seek an arrest warrant against Wilson and then hung up on this writer.

On June 24, 2004, the day of the scheduled interview with Ms. Parker, this writer called her to confirm the appointment. She refused to come to the phone and she did not show for her scheduled appointment. A written letter of complaint was never received from Ms. Parker.

On July 8, 2004, USPP Sergeant Michael Snowden provided a written statement complaining about Officer Wilson's behavior on June 18, 2004 in Prince George's County, MD (**Attachment #4**). He was also interviewed and he relates the following:

On June 18, 2004 at around 1730 hours, Sergeant Snowden was off-duty in civilian attire, but driving an unmarked USPP cruiser and observed what appeared to be an altercation between some females in a parking lot located on the southwest corner of Silver Hill Road and Marlboro Pike in Prince George's County, MD. He observed a MTPD Officer in a blue BDU type uniform, who had a cruiser with him, trying to keep the female groups apart. Sgt. Snowden stopped to render assistance to the MTPD Officer who was identified as Taj Wilson from his nameplate.

Snowden says that one of the woman on the scene who owned the White Honda Civic hatchback started screaming that one of the females in the parking lot busted her window and that she would have to pay for it (the rear window of that vehicle was shattered). Based on what Snowden heard on the scene, the window was shattered at 23rd Parkway near Iverson Mall and the victim (Shatise Parker?) just happened to find the parties involved where they were located. According to one of the females, she said she had shattered the window after the guy who was with Shatise, kicked her in the face. Sergeant Snowden said that woman accepted responsibility for the shattered window and said she would pay for it.

Sgt. Snowden says he realized that he nor Officer Wilson had jurisdiction there so he called his USPP dispatch center and asked them to send the PG County Police to the scene. Review of that audio recorded call **(Attachment #13)** from Sergeant Snowden indicates that at approximately 1745 hours, he asked his dispatcher to call the PG County Police and he advised that it was an emergency. Several female voices can be heard screaming at each other in the background of the recording. When the P. G. Police arrived (two units, one male and one female) they obtained Snowden's ID information and he then left the scene.

Sergeant Snowden went on to complain about Wilson's behavior on the scene. He said that normally in these type situations, police officers will separate the parties involved to calm the situation down. He tried to do that but it seemed like the parties were venting more at Wilson than each other. Sergeant Snowden later found out from the victim (Shatise called him) that one of those females was Wilson's girlfriend. However, Wilson never told him that on the scene.

Sergeant Snowden finished his account by saying that he first thought Wilson was just trying to keep the peace in a confrontation he came upon like himself. However, he feels as though because Wilson did not divulge that his girlfriend was involved in the confrontation, that it increased the danger for Snowden on that scene because the parties were not calming down. He added that when he first arrived, he asked Wilson if he had called County (Police), and Wilson said no.

Sergeant Snowden added during interview that he did not see any other MTPD units on the scene nor were any weapons used by Wilson or anybody else. He ended by saying he did not understand that an accident had occurred and that he did not stay to see insurance exchanged by parties involved.

On July 14, 2004, PGPD Officer Adey, #2712, who was the responding PG Officer for the above event on June 18, 2004, wrote a statement concerning his observations and actions **(Attachment #6)**. It is related as follows:

On June 18, 2004 at approximately 1800 hours, Officer Adey responded to Silver Hill Road and Marlboro Pike for a group of people fighting in the parking lot. Upon his arrival, he observed two individuals, Muhumed Lucas and Kimberly McCree, involved in a heated argument. He also observed a MTPD Officer trying to separate them. Adey says he assisted the officer in separating them and learned that McCree had broken out the back window of Lucas' vehicle after an argument at Branch Avenue and Silver Hill Road. Adey said he later learned that McCree was the Transit Officer's cousin.

Adey finished by saying that while he was there, the transit officer's actions were professional. He did not observe him try to protect his cousin, and he did not observe him unholster or use his weapon. Additionally, Mr. Lucas did not advise him (Adey) that the officer (Wilson) ever used his weapon (before Adey arrived).

Officer Adey issued two Maryland Uniform Criminal Citations before clearing the scene (**Attachment #6**). One citation was issued to Mr. Lucas for willfully damaging the vehicle window of Ms. McCree's vehicle. The other citation was issued to Ms. McCree for willfully smashing out Ms. Shatise Parker's window with a "Klub" (steering wheel locking device).

On July 14, 2004 at 1115 hours, Officer Taj Wilson was interviewed concerning his activity in the incidents on June 13 and 18, 2004 (**Attachment #8**). He was accompanied by International Brotherhood of Teamsters (IBT) 639 Business Agent Diana Faison and the interview was audio recorded. In reference to the June 18, 2004 incident at Silver Hill Road and Marlboro Pike in Prince George's County, Officer Wilson relates the following:

On that day, Wilson says he was on duty and assigned to mobile patrol in Baker 10 sector. While backing up Baker 9 at Naylor Road on a traffic stop, he received a cell phone call from his girlfriend, Lavoncye Shannon, who advised him that while driving Wilson's personally owned vehicle, she became involved in an accident. He did not recall what time she had called him, but he said he had been at Naylor Road for five or ten minutes, and he and Lanier were waiting for a tow for the vehicle stopped when she called.

Ms. Shannon told him she was near the CVS (drugstore) up the hill from the Suitland Station, and that the person was still there. Wilson told her to hold tight until he could get there to look at the damage. He said he did not advise MTPD Communications that he was responding to his girlfriend, and that he did not respond Code 1 (as verbally alleged by Ms. Parker). He estimated that it took him three to five minutes to get to the CVS from the Naylor Road Metro Station.

When he arrived, he said there was just a little minor scratch on his vehicle which was a goldish brown Mitsubishi Gallant, MD registration HNA-527. He says his girlfriend, who was alone in his car, told him the accident occurred just up the street, and that she was friends with the other operator because she does her hair. That operator, Kim, was also the lone occupant in her car.

A minute or two after arriving, a 3rd vehicle drove up and a lady and a man jumped out and started screaming "We are going to f___ you up. Look what you did to the window." They started going towards Kim, so at that time, Wilson told everybody to calm down and separated the parties, Kim and Ms. Shannon to one area, and the other two in another area.

Wilson says off-duty USPP Sgt. Snowden arrived about three to four minutes after he did. Snowden identified himself as a police officer and took Ms. Shannon and Kim, while Wilson took the other two and told them that the best thing to do is get back in their car and let's sort everything out. They were screaming back and forth, "F___ that, if you don't lock her up, we are going to f___ her up right now." Wilson said the scene was getting chaotic but they got back in their car.

Wilson says he talked with the USPP Sergeant who told him that they should call PG to sort this out because this is not on any of them. He says Sgt. Snowden then called PGPD. They then told the parties on the scene that PGPD is on the way and that they would handle the incident, but the parties kept screaming back and forth the whole time.

Wilson said the whole scene maybe took 5 minutes before PG arrived. The USPP Sergeant recommended that he get out of there because the scene had nothing but mess written all over it. Wilson told PGPD that it was his car (involved in the accident), but the USPP Sergeant left before he could tell him. He also said he did not tell the USPP Sergeant that his girlfriend was involved in the altercation because he did not have the chance.

Wilson advised that from what he understood, Kim (Kimberly McCree, the girl who does Ms. Shannon's hair and was involved in the accident with his girlfriend) was the one who shattered the window of the 3rd vehicle over by Iverson Mall (he was not sure of the exact location). Wilson went on to say that Kim lives near 3304 6th Street SE and was at the party on June 13, 2004 at that location, but that she is not his cousin (as alluded to by PGPD Officer Adey). He said he thought she shattered the window because the male passenger in the 3rd vehicle had kicked her (Kim) or something to that effect.

Wilson was asked how long he was at the scene and he said he was there about ten minutes. He was asked if he had any contact with the MTPD Communications reference this incident and he advised that he called once when the USPP Sergeant identified himself, and told them to hold him out on Silver Hill Road assisting with a traffic dispute.

A review of call records **(Attachment #11)** and audio recordings **(Attachment #13)** for June 18, 2004 from the MTPD Communications Division revealed the following. Officer Lanier (Baker 9) and Officer Wilson (Baker 10) cleared the call at Naylor Road at 1648 hours which was assigned MTPD Control # 2004-21491. Over an hour later at 1750 hours, a call was dispatched to foot unit, Badge #210 for a panhandler at the Navy Yard Station, MTPD Control #2004-21512. That call was in the Baker 10 Sector which was Officer Wilson's mobile sector responsibility as mentioned earlier in this report.

Wilson apparently heard that transmission and immediately called the CD dispatch by phone at 1751 hours and advised them that he would start that way. However, he told them that he was backing up an off-duty officer with an accident, and that there was a couple people irate, so he was going to wait until his backup arrived. CD Dispatch asked for his location and he said, "Right over here by Southern." Dispatch acknowledged and the conversation ended.

A review of Officer Wilson's run sheet for June 18, 2004 (**Attachment #11**) indicates that he backed up Baker 9 at the Naylor Road Station. That call was cleared on his run sheet at 1647 hours which was accurate according to the CD records (1648 clear time). However, his run sheet then has what appears to be several inaccuracies listed following the Naylor Road call. First, it indicates that he conducted an area check of the Navy Yard Station from 1700-1720 hours, which was a portion of time between the Naylor Road call and Wilson's phone call to the CD.

The next entry says he was dispatched to a call at Southern Avenue at 1810 but the nature is left blank. The run sheet indicates that he arrived at 1820 and cleared the call at 1830 with a disposition of nothing found. The CD call for service record indicates that he was actually dispatched to Southern Avenue at 1853 hours (not 1810) for juveniles vandalizing a vehicle. He was listed as a backup to Baker 9, MTPD Control # 2004-21524. The CD record shows the call was cleared at 1859 (not 1830 as indicated on his run sheet).

In the next entry on his run sheet, he lists a call at Clinton Bus/Woodyard Road for a disorderly on a bus. The run sheet indicates he was dispatched at 1850, arrived at 1855 and cleared the call at 1915 (bus left the scene, 10-22). The CD call for service record indicates he was dispatched to that call, MTPD Control # 2004-21527 at 1936 hours (not 1850). The CD record also shows arrival time as 1939 (not 1855) and clear time of 1940 (not 1915).

This writer conducted a followup interview with Officer Wilson on August 5, 2004 (**Attachment #8**). He was accompanied by Shop Steward Randy Dawson and this interview was also audio recorded. The information garnered from that interview follows:

Wilson was questioned about his earlier testimony concerning how long he was at the Silver Hill Road and Marlboro Pike location. He had said about ten minutes. He was advised that according to the above records, it appears he was out for over an hour (1648 to 1751). If what he said was true, he would have left that scene no later than 1710 hours. He said he had stated what he recalled from his mental time frame. However, after this writer explained the actual recorded times from CD, he reluctantly agreed saying, "If it's saying an hour, then OK."

He then agreed that he was at that location on Marlboro Pike for a least an hour and that the CD had no knowledge of his whereabouts during that time between 1648 and 1751 hours. The closest station that he actually had responsibility for that evening was Anacostia (special attention) which was at least five miles air distance east of his actual location.

Wilson was questioned about his run sheet entry on June 18, 2004 that indicated he did an area check of the Navy Yard Station between 1700-1720 (time when he was actually at Silver Hill Road and Marlboro Pike). He was asked if that was in error and his response was, "It has to be." When asked if he was the one who entered that information on the run sheet, he responded, "Error on my part."

Wilson was asked about his information provided to the dispatcher when he called them at 1751 hours. He told them he was backing up an off-duty officer. He was asked that if in actuality, the off-duty officer was backing him up as he stated in his first interview (1st interview, Wilson said the

USPP officer arrived three to four minutes after he got there). When asked if the USPP officer may have gotten there before him, he said, "I didn't see him until people got out of their cars and started arguing and going back and forth, so I don't know how long he was there." He said, "If you want to play word games, I mean yes or no, I mean it was not my traffic stop.

Wilson was questioned concerning the location ("over here by Southern") he provided to the dispatcher when he called them at 1751 hours (above entry). He advised he was actually at Silver Hill Road and Marlboro Pike at that time which he said was just down the road from the Suitland Station. He said it was a slip of the tongue and said he's done that before where he mistakenly said he was at Southern when he was really at Suitland. They both start with "S" and it is easy to confuse them. He advised he even heard his Lieutenant give out the wrong location recently when he was at Suitland.

Maps indicate that the Silver Hill Road and Marlboro Pike address is 1 ½ miles northeast of the Suitland Station and four miles northeast of the Southern Avenue Station (**Attachment #12**). The Naylor Road Station was also closer to Wilson 's location than the Southern Avenue Station. Wilson advised he knew that the most important piece of information an officer needs to provide when out on a call is his/her exact location.

In reference to the June 18, 2004 incident on Silver Hill Road, MTPD Officer Calvin Lanier said that Wilson backed him up on a call at Naylor Road (**Attachment #9**). He had stopped a vehicle with bad temporary tags and eventually impounded the car. He did not hear any cell phone conversation that Wilson may have had while on the scene at Naylor Road, and he did not know where Wilson went when he left the scene.

He said Wilson called him about an hour later and sounded upset. The next day he saw Wilson's car at work and observed damage to his rear bumper (black marks on the gold colored bumper). He thought it may have been about $300 in damage.

In reference to the June 18, 2004 incident on Silver Hill Road, MTPD Officer Terrence Triplett said Wilson called him from Marlboro Pike and said he was out with an off-duty officer and he could hear women screaming in the background (**Attachment #10**). He drove over to Wilson's location and when he got there he observed two PG County units on the scene but no USPP officer. There were 10-15 people standing around at the scene. He only recognized one person there, a friend of Wilsons who he knew as "Shaun?" She was about 5'7" and weighed about 180. He was only there for about five minutes. He did not see any other MTPD units at the scene.

*A check of Officer Taj Wilson's police service file revealed the following:*
- *June 16, 2004:*    *One-day suspension for preventable traffic accident that occurred on May 4, 2004.*
- *February 26, 2004:*    *One-day suspension for bringing discredit to himself and the MTPD on December 13, 2003.*
- *February 26, 2004:*    *Chief's Reprimand for violating firearms policy and procedure on December 13, 2003.*

## CONCLUSIONS:

The original allegations of inappropriate, unlawful use and abuse of a service weapon were not corroborated by any credible witness. The only issue related to Wilson's service weapon was his ability, or inability to retain it when someone tried to take it out of his holster. In both incidents, on June 13 and then June 18 (there was no third incident as originally reported), it appears Officer Wilson was involved as a mediator/peacekeeper during heated arguments between groups of females. However, both times, his girlfriend was involved, and local police were summoned to the scene to settle the disturbances.

In the first incident on June 13, 2004, this writer believes that Officer Wilson's off-duty actions were appropriate given that a person at the party had a knife and a taser gun and purportedly may have shot the taser at Wilson's girlfriend. However, two things concern this writer about that first incident.

One is that someone was able to grab hold of Officer Wilson's weapon which was in his holster on his hip. That person may have actually pulled his pistol out of the holster. Although there is not enough evidence to confirm that, it was verbally alleged by a couple witnesses. Wilson has denied it and said the person was not able to remove the weapon from the holster. The second concern is that it seems unreasonable to believe that Officer Wilson did not know who tried to take his weapon. A normal officer would focus on who was attempting such severe actions considering the gravity of that situation.

Officers are taught in the police academy that when someone attempts to take your weapon, that could be a deadly force situation. Once a release has been effected, the officer must evaluate the threat level and de-escalate appropriately. It does not seem reasonable that he did not pursue identification of the person who tried to steal his gun in what may have been a deadly force situation. He also has not provided logical reason why he could not identify who that person was. Again, some testimony from unverified witnesses said it was his girlfriend who tried to take his weapon.

In the second incident on June 18, 2004, Officer Wilson again became immersed in a heated emotional dispute that he tried to mediate between two groups of people that included his girlfriend. However, many issues and concerns about Officer Wilson's actions and conduct surfaced during this part of the inquiry that do not reflect favorably on his performance and they are listed as follows:

- Officer Wilson was on-duty and responded to an area far from his sector assignment (five miles) for personal business.
- Wilson did not receive permission from his supervisor or the Communications Division to do so.
- Wilson stayed at that location for more than an hour without anyone knowing his whereabouts.
- Wilson falsely advised this writer in the first interview that he was at the Silver Hill/Marlboro Pike location for only ten or fifteen minutes. In fact it was over an hour and he may have been in Prince Georges County over two hours without ever returning to his sector (Wilson completed the Naylor Road call at 1648 hours. He called the CD at 1751 while on Marlboro Pike (said he was near Southern). His next "official" dispatched call was not until 1853 hours to Southern Avenue Station, two hours past the Naylor Road clear time. However, Wilson tried to say that call was dispatched to him at 1810 hours on his Run Sheet).

- Wilson became immersed in a highly emotional dispute involving his girlfriend and other parties but he did not summon local police to assist although it was obvious that the gravity of the situation dictated local police response. The dispute was noticeable to the off-duty USPP Sergeant which is why he stopped to assist. The Sergeant eventually called the local police after confirming with Wilson that he (Wilson) had not requested assistance.
- Wilson provided false information to the dispatcher concerning his location when he finally did call in to the CD. He said he was over by Southern on a traffic dispute when in fact he was at Silver Hill Road and Marlboro Pike, approximately four miles away.
- Wilson falsified his official daily activity log sheet (run sheet) for that day by entering a bogus run assignment within his assigned Sector 10 at the Navy Yard Station, when he was actually in Prince George's County during that time period. He then falsified times for the next two entries where he was actually dispatched to calls for service. The times were entered a half hour to 45 minutes earlier than he was actually assigned by CD. This action may have been done to make it appear that he was not involved in his unauthorized actions in Prince George's County as long as he was. As a note, before the bogus Navy Yard call entry, Wilson had entered accurate times for dispatched calls for service.
- Wilson did not provide appropriate and complete information to the off-duty USPP Sergeant who came to his aid. He should have advised the Sergeant that his girlfriend was one of the parties involved in the dispute, and that his personal vehicle was on the scene and involved in a traffic accident. This omission quite possibly jeopardized the USPP Sergeant's safety because he was unaware of Officer Wilson's personal involvement in the dispute.

This writer notes that some witnesses failed to come forward and commit their allegations against Officer Wilson to writing. Some of the early claims proved to be exaggerated and some other claims could not be confirmed because of credibility issues with the uncooperative witnesses. However, this writer believes there is more to this event than what has been documented here. Time frames offered by Officer Wilson have noticeable gaps that remain unexplained.

Officer Wilson's record thus far has not been stellar. He has been the subject of two investigations this calendar year with suspensions issued in both instances. His actions in this inquiry lend support to a conclusion that he has not accepted the importance of following rules and procedures, and living by the Oath of Office he swore to uphold.

RECOMMENDATIONS:

It is recommended that the allegation of Officer Wilson's inappropriate use of his service weapon be classified as UNFOUNDED. However, Officer Wilson should attend remedial training in weapon retention for deficiencies noted in the first incident on June 13, 2004. Additionally, he should receive training on proper judgement and behavior while carrying his weapon off-duty.

In reference to the second incident on June 18, 2004, it is recommended that Officer Wilson be SUSPENDED for eleven (11) days for the numerous violations of policy and procedure and the Oath of Office he swore to uphold. This investigation should be made a part of Officer Wilson's police service file. The charges, specifications and recommendations are listed as follows:

## CHARGE 1:

Violation of **Metro Transit Police "Oath of Office"** - Under Oath, and signature to confirm his Oath (**Attachment #14**), Taj Wilson swore to support and defend the constitution of the United States and discharge his responsibilities as a police officer of the Washington Metropolitan Area Transit Authority, with dispatch, total dedication, integrity and impartiality, and faithfully perform the duties of that office. He swore to obtain all evidence lawfully and work diligently to determine facts without fear or favor. He swore to accurately report his findings regardless of whether they establish the guilt or innocence of an individual. He swore to obey and enforce the law where it is incumbent upon him to do so. He swore to abide by the rules and regulations of the Transit Authority and obey his superiors in all lawful matters of duty performance. He accepted the police credential and shield as being representative of the special trust placed in him as a Metro Transit Police Officer.

    **SPECIFICATION:**  See Charges 2 through 9

    **RECOMMENDATION:**    TWO-DAY SUSPENSION

## CHARGE 2:

Violation of **General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section A, 5** - Members will not knowingly make a false statement in any written or verbal report.

    **SPECIFICATION:**

    Wilson falsified his official daily activity log sheet (run sheet) on June 18, 2004 by entering a bogus run assignment at the Navy Yard Station between 1700-1720 hours, when he was actually in Prince George's County during that time period. The times on the next two entries on the same Daily Activity Log Sheet were entered a half hour to 45 minutes earlier than actually assigned by CD. This action may have been done to make it appear that he was not involved in his unauthorized actions in Prince George's County as long as he was. As a note, before the bogus Navy Yard call entry, Wilson had entered accurate times for dispatched calls for service.

    **RECOMMENDATION:**    TWO-DAY SUSPENSION

## CHARGE 3:

Violation of **General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section A, 5** - Members will not knowingly make a false statement in any written or verbal report.

    **SPECIFICATION:**

    Wilson provided false information to the dispatcher concerning his location when he finally did call in to the CD on June 18, 2004 at 1751 hours. He said he was over by Southern on a traffic dispute when in fact he was at Silver Hill Road and Marlboro Pike, approximately four miles away.

    **RECOMMENDATION:**    TWO-DAY SUSPENSION

D 57

**CHARGE 4:**

Violation of **General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section A, 4** - Members will respond promptly and truthfully to all inquiries initiated by an official.

> **SPECIFICATION:**
> Wilson falsely advised this writer in the first interview on July 14, 2004 that he was at the Silver Hill/Marlboro Pike location for about ten minutes. In fact it was over an hour at that location, and he may have been in Prince Georges County over two hours without ever returning to his sector.
> **RECOMMENDATION:**    TWO-DAY SUSPENSION

**CHARGE 5:**

Violation of **General Order 105, "Authority and Jurisdiction" Part II, Policy Statement** - Law Enforcement services provided by MTPD members will be related to the protection of WMATA customers, personnel, and transit facilities.

> **SPECIFICATION:**
> Wilson responded to his girlfriend's call for assistance regarding a minor traffic accident which was not related to his MTPD duties and was far outside his assigned sector. He was on-duty at the time and did not receive authorization from his supervisor or Communications to respond. Additionally, once there, he attempted to handle a highly emotional dispute involving his girlfriend and other parties but he did not summon local police to assist, although it was obvious that the gravity of the situation dictated local police response.
> **RECOMMENDATION:**    Combine Charges #5 and 6; ONE-DAY SUSPENSION

**CHARGE 6:**

Violation of **General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section D, 9** - Members will conduct their professional and private lives so as to avoid bringing discredit or the appearance of discredit upon themselves or the Department.

> **SPECIFICATION:**
> Wilson's actions brought discredit for himself and the Metro Transit Police Department when he failed to inform his backup officer, Sergeant Michael Snowden of the situation concerning his personal involvement in the dispute. His actions jeopardized the Sergeant's safety. Wilson did not provide appropriate and complete information to the off-duty USPP Sergeant who came to his aid. He should have advised the Sergeant that his girlfriend was one of the parties involved in the dispute, and that his personal vehicle was on the scene and involved in a traffic accident. This omission quite possibly jeopardized the USPP Sergeant's safety because he was unaware of Officer Wilson's personal involvement in the dispute.
> **RECOMMENDATION:**    See Recommendation for Charge #5

**CHARGE 7:**
Violation of **General Order 215, "Duties and Responsibilities" Part III, Section B** - On-duty members will devote their full time and attention to the business of the Department.

    **SPECIFICATION:**
    Wilson, while on-duty, tended to personal business for more than an hour far from his sector assignment (five miles) without authorization or knowledge of any supervisor or CD personnel.
    **RECOMMENDATION:**    Combine Charges #7, 8 and 9;  TWO-DAY SUSPENSION

**CHARGE 8:**
Violation of **General Order 215, "Duties and Responsibilities" Part III, Section F** - Members will remain constantly on patrol within their beat and respond immediately to calls for service.

    **SPECIFICATION:**
    Wilson did not patrol or stay in his beat for more than an hour consecutive as he tended to personal business far (five miles) from his sector assignment, and without authorization or knowledge of any supervisor or CD personnel.
    **RECOMMENDATION:**    See Recommendations for Charge #7

**CHARGE 9:**
Violation of **General Order 215, "Duties and Responsibilities" Part IV, Section A, 11** -.......... .
Members will advise Communications prior to leaving or when returning to their beat.

    **SPECIFICATION:**
    Officer Wilson, while on-duty, responded to Silver Hill Road and Marlboro Pike in Prince Georges County, MD,  far (five miles) from his sector ten assignment, for personal business. Wilson did not receive permission from his supervisor or the Communications Division to do so.
    **RECOMMENDATION:**    See Recommendations for Charge #7

**ATTACHMENTS:**
1. Running Resume
2. Initial Notes from MTPD Supv.'s
3. Administrative Actions/Police Powers
4. USPP Sgt. Snowden Statement/Interview dated July 8, 2004
5. MPDC Sgt. Hunter Statement dated July 8, 2004
6. PGPD Ofc. Adey Statement faxed July 10, 2004
7. Witness Latrice Jackson Statement dated July 16, 2004
8. Officer Taj Wilson Statement/Interviews, June 13, July 14, and August 5, 2004
9. Officer Calvin Lanier Interview dated July 22, 2004
10. Officer Terrence Triplett Interview dated July 28, 2004
11. MTPD Call Records, Daily Assignment Schedules and Activity Reports
12. Maps of area in question
13. Audio Recordings or Transcripts from MTPD CD or USPP
14. Officer Taj Wilson Signed MTPD Oath of Office dated 9-24-02
15. Miscellaneous Documents

# EXHIBIT 13

**Capital Reporting Company**

Page 1

1              UNITED STATES DISTRICT COURT FOR THE

2                     DISTRICT OF COLUMBIA

3   -------------------------------x

4   TAJ WILSON                        )        ORIGINAL

5            Plaintiff,               )

6        v.                           )   Civil Action No.

7   WASHINGTON METROPOLITAN           )      05-2146 (JGP)

8   AREA TRANSIT AUTHORITY            )

9            Defendant.               )

10  -------------------------------x

11                              Washington, D.C.

12                        Monday, August 6, 2007

13  Deposition of:

14                      TAJ WILSON

15      called for examination by counsel for Defendant,

16  pursuant to notice, at Washington Metropolitan Area

17  Transit Authority, 600 Fifth Street, N.W., Washington,

18  D.C. 20001, before Joseph Kanahele, Jr. of Capital

19  Reporting Company, a notary public in and for the

20  District of Columbia, beginning at 11:46 a.m., when

21  were present on behalf of the respective parties:

22

## Capital Reporting Company

Page 64

Q      Okay.  And that is your statement, correct?

A      Yes.

Q      Okay.  And you did sign it, right?

A      Yes.

Q      Okay.  Let's talk about the June 18th incident.  You apparently were involved in an altercation on June 18th, in either trying to break it up or someway; why don't you tell me what happened?

A      Well, basically, I was at Miller Road backing up Officer Lanier on a traffic stop.  During the traffic stop while waiting for the tow truck, my then at the time girlfriend called and said that the vehicle that she's driving which was mine was involved in a car accident. She was pretty -- she sounded pretty upset over the phone.  I told her I was out on a traffic stop and I'll call her back.  Once the traffic stop was cleared, I asked what happened.  She told me somebody hit the back of the car.  I asked her what was her location; she said she was by the Suitland subway station.  I told her, well, meet me at the CVS parking lot because she said that's where she was en route to going.  I met her at the CVS parking lot.  Once I met her at the CVS parking lot,

**Capital Reporting Company**

Page 69

1     I don't know how they would know.

2          Q     Okay.  So let's back up and talk about where

3     you were.  You were on duty at the time, correct?

4          A     Yes.

5          Q     And what was your sector at the time?

6          A     Section 10.

7          Q     And this incident was outside of Sector 10,

8     was it not?

9          A     Yes.

10         Q     Okay.  And you're required to let -- I guess

11    the term you use is -- Dispatch know when you're going

12    outside your sector, correct?

13         A     Yes.

14         Q     You did not do that?

15         A     Yes, I did.

16         Q     You did?

17         A     Yes.

18         Q     At what point did you do that?

19         A     When I called them out on the scene, I was

20    still monitoring my radio.  I heard a call go out to

21    Sector 10.  I called Communications and told them that,

22    hey, I'm out on a traffic dispute over here.  Now, like I

**Capital Reporting Company**

Page 72

1    that?

2        A    Yes.

3        Q    All right.  And the run sheet that you

4    submitted that day was inaccurate?

5        A    Yes.

6        Q    Okay.  Is that pretty common also?

7        A    Yes.

8        Q    And how do you know that it's common for

9    officers to go outside their sectors and not let Dispatch

10    know that?

11        A    Sometimes I'm with them when they go out of

12    their sectors, sometimes we talk about it -- officers

13    talk -- you even might hear of cases where an officer

14    actually got caught by a supervisor being outside of

15    their sector, but they didn't ask permission or, you

16    know, call Communications -- whether to get something to

17    eat or go home or sometimes take care of personal

18    business at the bank.

19        Q    What about the run sheets that -- you know

20    that that's pretty common as you were talking to other

21    officers?

22        A    Yes.  I mean, even while I was being trained

Page 85

1      A     Yes.

2      Q     And that's the one where you were with Diana

3  Fazon?

4      A     Yes.

5      Q     Okay.  And that's the one where Heilman

6  suggested that you had been untruthful in December of

7  2003 and May of 2004?

8      A     Yes.

9      Q     Right, okay, all right.  And then, August 15,

10  2004 was the car crash?

11      A     Yes.

12      Q     Okay.  Again, tell me what happened?

13      A     At Addison Road, backing up Officer Scott

14  Bird on an incident -- I believe it was juveniles cutting

15  up the train seats -- we get a call, well, I got a call

16  to respond to New Carrollton from Addison Road, Response

17  Code 1, which means lights and sirens.  The station

18  manager says that juveniles are fighting and they saw

19  possible weapons.  I get on the air and ask them did we

20  know the validity of the weapons -- knives, guns, unknown

21  at this time, Response Code 1, so we responded, I

22  activated lights and cameras and responded to Code 1.

# EXHIBIT 14

# GENERAL ORDER
## Metro Transit Police

| Subject: Authority and Jurisdiction | Number: 105 |
| --- | --- |
| | Effective: 02/01/98 |

## I. Purpose

The purpose of this Order is to delineate the authority and jurisdiction of the Metro Transit Police Department as established by Public Law 94-306, Article XVI, Section 76(a-h), and to provide guidelines for law enforcement by its members.

## II. Policy

Law enforcement activity conducted by members of the Metro Transit Police Department will be governed by Public Law 94-306, Section 76(a-h) as amended November 13, 1997. In that regard, law enforcement services provided by MTP members will be related to the protection of WMATA patrons, personnel, and transit facilities.

## III. Definition

A. Signatory - The Commonwealth of Virginia, the District of Columbia and the State of Maryland.

B. Transit Facility - all real and personal property located in the Transit Zone, necessary or useful in rendering transit service between points within the Transit Zone, by means of rail, bus, water or air and any other mode of travel, including without limitation, tracks, rights of way, bridges, tunnels, subways, rolling stock for rail, motor vehicle, marine and air transportation, stations, terminals and ports, areas for parking and all equipment, fixtures, buildings and structures and services incidental to or required in connection with the performance of transit service.

C. Transit Zone - the District of Columbia, the cities of Alexandria, Falls Church and Fairfax and the counties of Arlington and Fairfax and political subdivisions of the Commonwealth of Virginia located within those counties, and the counties of Montgomery and Prince George's in the State of Maryland and political subdivisions of the State of Maryland located in said counties.

## IV. Public Law 94-306 Section 76

A. The Authority is authorized to establish and maintain a regular police force, to be known as the Metro Transit Police, to provide protection for its patrons, personnel, and transit facilities. The Metro Transit Police shall have the power and duties and shall be subject to the limitations set forth in this section. It shall be composed of both uniformed and plainclothes personnel and shall be charged with the duty of enforcing the laws of the signatories, and the laws, ordinances and regulations of the political subdivisions thereof in the Transit Zone, and the rules and regulations of the Authority. The jurisdiction of the Metro Transit Police shall be limited to all the transit facilities (including bus stops) owned, controlled or operated by the Authority, but this restriction shall not limit the power of the Metro Transit Police to make arrest in the Transit Zone for violations committed upon, to or against such transit facilities committed from within or outside such transit facilities, while in hot or close pursuit or to execute traffic citations and criminal process in accordance with subsection (c) below. The members of the Metro Transit Police shall have concurrent jurisdiction in the performance of their duties with the duly constituted law enforcement agencies of the signatories and of the political subdivisions thereof in

which any transit facility of the Authority is located or in which the Authority operates any transit service. Nothing contained in this section shall either relieve any signatory or political subdivision or agency thereof from its duty to provide police, fire and other public safety service and protection, or limit, restrict or interfere with the jurisdiction of or the performance of duties by the existing police, fire and other public safety agencies. For the purposes of this section, "bus stop" means that area within 150 feet of a Metrobus bus stop sign, excluding the interior of any building not owned, controlled or operated by the Washington Metropolitan Area Transit Authority.

B. A member of the Metro Transit Police shall have the same powers, including the power of arrest, and shall be subject to the same limitations, including regulatory limitations, in the performance of his duties as a member of the duly constituted police force of the political subdivision in which the Metro Transit Police member is engaged in the performance of his duties. A member of the Metro Transit Police is authorized to carry and use only such weapons, including handguns, as are issued by the Authority. A member of the Metro Transit Police is subject to such additional limitations in the use of weapons as are imposed on the duly constituted police force for the political subdivision in which he is engaged in the performance of his duties.

C. Members of the Metro Transit Police shall have power to execute on the transit facilities owned, controlled, or operated by the Authority any traffic citation or any criminal process issued by any court of any signatory or of any political subdivision of a signatory, for any felony, misdemeanor, or other offense against the laws, ordinances, rules, or regulations specified in subsection (a). However, with respect to offenses committed upon, to, or against the transit facilities owned, controlled, or operated by the Authority, the Metro Transit Police shall have power to execute criminal process within the Transit Zone.

D. Upon the apprehension or arrest of any person by a member of the Metro Transit Police pursuant to the provisions of subsection (b), the officer, as required by law of the place of apprehension or arrest, shall either issue a summons or a citation against the person, book the person, or deliver the person to the duly constituted police or judicial officer of the signatory or political subdivision where the apprehension or arrest is made, for disposition as required by law.

E. The Authority shall have the power to adopt rules and regulations for the safe, convenient, and orderly use of the transit facilities owned, controlled, or operated by the Authority, including the payment and the manner of the payment of fares or charges therefor, the protection of the transit facilities, the control of traffic and parking upon the transit facilities, and the safety and protection of the riding public. In the event that any such rules and regulations contravene the laws, ordinances, rules or regulations of a signatory or any political subdivision thereof which are existing of subsequently enacted, these laws, ordinances, rules, or regulations of the signatory or the political subdivision shall apply and the conflicting rule or regulation, or portion thereof, of the Authority shall be void within the jurisdiction of that signatory or political subdivision. In all other respects the rules and regulations of the Authority shall be uniform throughout the Transit Zone. The rules and regulations established under this subsection shall be adopted and published in accordance with all standards of due process, including, but not limited to, the publishing or otherwise circulating of a notice of the intended action of the Authority and the affording to interested persons the opportunity to submit data or views orally or in writing, and the holding of a public hearing. Any person violating any rule or regulation of the Authority shall, upon conviction by a court of competent jurisdiction, pay a fine or not

in the same manner in which violations of law, ordinances, rules and regulations of the signatory or political subdivision are prosecuted.

F.  With respect to members of the Metro Transit Police, the Authority shall -

1.  establish classifications based on the nature and scope of duties, and fix and provide for their qualifications, appointment, removal, tenure, term, compensation, pension and retirement benefits;

2.  provide for their training and for this purpose, the Authority may enter into contracts or agreements with any public or private organization engaged in police training, and this training and the qualifications of the uniformed and plainclothes personnel shall at least equal the requirements of each signatory and of the political subdivisions therein in the Transit Zone for their personnel performing comparable duties; and

3.  prescribe distinctive uniforms to be worn.

G.  The Authority shall have the power to enter into agreements with the signatories, the political subdivisions thereof in the Transit Zone, and public safety agencies located therein, including those of the Federal Government, for the delineation of the functions and responsibilities of the Metro Transit Police and the duly constituted police, fire and other public safety agencies , and for mutual assistance.

H.  Before entering upon the duties of the office, each member of the Metro Transit Police shall take or subscribe to an oath or affirmation, before a person authorized to administer oaths, faithfully to perform the duties of that office.

Barry J. McDevitt
Chief

# EXHIBIT 15

# GENERAL ORDER
## Metro Transit Police

| Subject: Duties and Responsibilities | Number: 215 |
|---|---|
| | Effective: 02/15/02 |

## I. Purpose
This Order defines members' duties and responsibilities.

## II. Policy
Members will perform their duties in an efficient, courteous and orderly manner employing patience and good judgment at all times. Members will respond to the lawful order of a supervisor as well as a request for assistance from a citizen and take proper police action whenever required.

## III. Duties
A. It is each member's duty and responsibility to:
1. protect WMATA passengers, employees, revenue and properties,
2. prevent crime, and
3. preserve peace.

B. On-duty members will devote their full time and attention to the business of the Department.

C. Members, without the prior approval of the Chief, will not communicate orders, contemplated movements, or information pertaining to a police incident to anyone but law enforcement personnel or the WMATA General Manager.

D. Requests from outside the Department for a statement concerning a member's official duties will not be granted unless approved by the Watch Commander. The Watch Commander will notify the Deputy Chief, Field Operations Bureau, of the decision.

E. Members will display coolness and firmness at all times and will protect each other in times of peril. Shirking of this responsibility will constitute gross neglect of duty, which may result in termination.

F. Members will remain constantly on patrol within their beat and respond immediately to calls for service.

G. Members will conduct a preliminary investigation into all applicable matters coming to their attention and take the appropriate action to include:
1. observing all conditions, events, and remarks,
2. locating and identifying witnesses,
3. maintaining the crime scene,
4. interviewing the complainant and the witnesses,
5. interrogating the suspect,
6. arranging for the collection of evidence,
7. effecting the arrest of the criminal, and
8. reporting the incident.

H. Members will become thoroughly acquainted with their beat and investigate suspicious activity observed or reported within their jurisdiction.

I. Members will not interfere with the cases of other members without their consent or that of an Official.

J. Members will restore order and disperse crowds using moderate efforts of persuasion, if possible, when a disturbance occurs on WMATA property.

K. Members will not collect money or fare media unless approved by an Official.

L. Members will not malinger or feign illness/disability in order to evade the performance of their duties.

M. Members answering a Departmental telephone will state the name of the Department/Division followed by their rank and surname.

N. Members will provide their name and badge number to persons requesting same.

O. Members will not serve civil process.

P. Unless legally summoned, members will not render assistance or testify in civil cases arising out of the scope of their official duties.

## IV. Responsibilities

A. General

1. Members will be in possession of a valid driver's license from their jurisdiction of residence. Any change in the license status will be reported to their supervisor prior to their next tour of duty.

2. On-duty members will carry a notebook and record matters of importance coming to their attention. The notebook will be subject to inspection by supervisory personnel.

3. Members participating in any law enforcement action while off-duty will, without delay, notify the Watch Commander. The member will prepare a written account of the event and submit it to their supervisor prior to their next tour of duty.

4. Members will maintain a functional telephone at their residence. The phone number will be provided to their supervisor for inclusion in the Alert Notification Roster. Any change will be reported, within 24 hours, to a supervisor of their Division and forwarded to the Commander, Communications Division.

5. Members will ensure their Personnel Information Form maintained by the Department is accurate and complete. Any change will be reported, within 24 hours, to a supervisor of their Division and forwarded to the Field Services Bureau for inclusion in the master file.

6. Members will not contact other offices within the Authority without going through the chain of command.

7. Members will not send reports to outside agencies without prior approval of a Deputy Chief or above.

8. Members will not divulge any information which might assist a person suspected or guilty of a criminal act in escaping arrest or punishment or which might compromise a criminal case.

9. On-duty members will carry a watch which displays the time as broadcast by the Communications Division.

10. Members will give attention to all written directives and orders disseminated at roll call.

11. When reporting to or from a beat, members will use the most expedient route/method and will not use their privately owned vehicle unless so directed by an Official. Members will advise Communications prior to leaving or when returning to their beat.

12. Members scheduled to relieve other members, will do so at designated locations and times.

13. When not in full uniform, members who take police action will identify themselves by displaying their shield or credentials, as soon as possible.

14. Members will not congregate while on patrol.

15. Members in full uniform, on or off duty, will not slouch, lean against partitions, or be seated in Metrorail stations, on Metrorail trains or Metrobuses.

16. Smoking by members is prohibited in WMATA vehicles and facilities, except in designated areas authorized by the General Manager. On-duty members will not use smokeless tobacco while in public view.

17. Members are required to have a minimum of eight hours off prior to their next scheduled regular tour of duty in every twenty-four hour period, with the exception of court-related matters.

18. Members must pay for all parking and moving violations, other than those resulting from mechanical failure, arising from their operation of WMATA automotive equipment. This responsibility includes red light infractions captured by a camera at or near the scene of the violation.

B. Prisoner Care and Custody

1. Members will be responsible for safeguarding prisoner's personal property

throughout the booking process.

2. Prisoners will be processed without unnecessary delay and afforded an opportunity to make a local telephone call from the detention facility.

3. Members will advise prisoners of their constitutional rights (Miranda Warning) prior to custodial interrogation.

4. Members will not promise immunity, prosecution of a lesser degree or offer any inducement to a suspect for any purpose.

5. Members will not suggest, recommend, advise or otherwise counsel anyone concerning the retention of an attorney or bondsman resulting from a Metro Transit Police action.

Barry J. McDevitt
Chief

General Order 215
Page 3

# EXHIBIT 16

# M E M O R A N D U M



SUBJECT: Eleven (11) Day Suspension
Without Pay

FROM: MTPD - Chief Polly L. Hanson

TO: MTPD - Officer Taj Wilson

DATE:    October 5, 2004

**CONFIDENTIAL**

A review of the attached investigative report pertaining to your on duty incident that occurred June 18, 2004, clearly indicates that you violated established Department policy and procedure and ethical policing standards.

The investigation was comprehensive and the report is sufficiently documented to support both its findings and recommendations. I have therefore approved the recommendation that you be suspended from duty without pay for eleven (11) days.

You are advised that the disciplinary action imposed in this instance will impact unfavorably on possible future opportunities as well as your selection for special assignments. Should you be involved in any similar incident, especially regarding integrity issues, you will be terminated from employment with the Metro Transit Police Department.

In the future, you will be expected to upgrade your performance and sense of responsibility to levels required of a sworn member of the Metro Transit Police Department.

*This report includes two separate incidents.*

I have read the above report
and am aware that a copy will
be placed in my personnel folder.

10-05-2004
_____
Date

_____
Signature

D 44