# EXHIBIT 17

1

P R O C E E D I N G S

1   ARBITRATOR ALPERN:  We are on the record in
2   Washington Metropolitan Area Transit Authority and FOP
3   Metropolitan Transit Police Labor Committee, which is
4   Federal Mediation and Consolidation Service Case 05-
5   54035.  Ms. Brodnax for the employer; Mr. Jepsen for the
6   Union.  And I believe Mr. Jepsen had a motion to make,
7   but prior to that let me note that I am admitting Joint
8   Exhibits 1 through 9, which the parties have submitted to
9   me and which will now be placed in the record.
10                      [Whereupon, Joint Exhibits No. 1
11                      through 9, respectively, were
12                      marked for identification and
13                      received in evidence.]
14   ARBITRATOR ALPERN:  Mr. Jepsen?
15   MR. JEPSEN:  My motion goes to one aspect of
16   the Joint Exhibits admitted, which is to say the results
17   of the computer voice stress analysis in this case, and I
18   would move to suppress all references to the test, its
19   administration, and its results as it pertains to this
20   case predicated on the wealth of authority.  In addition,
21   an additional consideration, this matter did occur in
22   Maryland, was a Maryland matter.  This is an agency that
23   functions in Maryland, and in the State of Maryland the
24   law is quite clear that lie tests are not admissible in

10

1    charges with respect to false statements in this matter,

2    which, as counsel as indicated, is the reason that we are

3    here.

4            We also contest that the remedy is excessive,

5    regardless.  The matter of damages would be also sort of

6    a standard just cause case.  I mean, there is no peculiar

7    thing here, I don't think, and we are perfectly willing

8    to work that out in some way of a fashion, should that

9    come to pass.

10           That's all I have to say.

11           ARBITRATOR ALPERN:  Thank you.

12           I believe I failed to note for the record that

13   the parties have stipulated that the issue is whether the

14   Grievant, Taj Wilson, was terminated for just cause and,

15   if not, what shall the remedy be.

16           MS. BRODNAX:  Yes.

17           ARBITRATOR ALPERN:  Would you like to call your

18   first witness, please?

19           MS. BRODNAX:  Yes.  My first witness will be

20   Officer Scott Bird.

21   WHEREUPON

22                          SCOTT BIRD

23   a witness of lawful age, was called for examination by

24   the representative of the Authority and, having been

25   first duly sworn, was examined and testified as follows:

11

1              DIRECT EXAMINATION

2         BY MS. BRODNAX:

3         Q    Officer Bird, where are you currently employed?

4         A    With the Washington Area Metropolitan Transit

5    Authority.

6         Q    And how long have you been employed with WMATA?

7         A    Approximately three and a half years.

8         Q    And what is your current duty location?

9         A    District 2, B Section Mobile.

10        Q    And what was your duty location in August of

11   2004?

12        A    District 2, B Section Mobile.

13        Q    And what shift do you work?

14        A    Evenings, from 2:30 in the afternoon until 11

15   at night.

16        Q    And was that also your shift in August of 2004?

17        A    Yes, it was.

18        Q    Now, Officer Bird, directing your attention to

19   August 15th of 2004, did you receive a call from dispatch

20   that there was a fight in progress at the New Carrollton

21   Metro Rail Station?

22        A    Yes, I did.

23        Q    And where were you located when the call was

24   received?

25        A    Addison Road Metro.

12

1      Q    And who was with you at that time?

2      A    Taj Wilson.

3      Q    And around what time did you receive the call,

4   to your best recollection?

5      A    I think it was sometime around 2100 hours.

6      Q    And what did you do when you received the call?

7      A    I got in my car.  I believe we were outside of

8   the car.  I got in my car and began to respond Code 1,

9   lights and sirens.

10     Q    Did Officer Wilson also respond?

11     A    Yes.

12     Q    And did you two leave out together?

13     A    Yes.

14     Q    Who was in front?  Were you driving behind or

15   in front of Officer Wilson?

16     A    I was driving behind Officer Wilson.

17     Q    Now, Officer Bird, could you just tell the

18   Board exactly what happened when you left the Addison

19   Road Metro Rail Station and what occurred?

20     A    We exited Addison Road Metro and crossed over

21   Central Avenue.  When we crossed over Central Avenue, we

22   were heading down Addison Road towards 704, which is MLK.

23   As we were heading down Addison Road, after a turn, when

24   I came around -- Officer Wilson went around the turn.

25   When I came around the turn, I saw his car.  It looked

13

1    like he was making like a turn, like a left hand turn --

2    sorry, like a right hand turn, and when he made the turn

3    the car went off the roadway and into a yard.

4        Q   Now, just for clarification, what car did you

5    observe making the turn?

6        A   Officer Wilson's.

7        Q   Now, at that time did another car go passed

8    you?

9        A   I don't recall.

10        Q   And how fast were you traveling when you left

11    the Addison Road Metro Rail Station?

12        A   My speed was probably between 55 and 65, but I

13    can't recall the exact speed.

14        Q   Officer Wilson, I am going to hand you a

15    document that has already been admitted into evidence as

16    Attachment 4 to Joint Exhibit No. 2.

17        Excuse me, I said Officer Wilson, but I meant

18    Officer Bird.

19        We'll give the Board a chance to --

20        ARBITRATOR ALPERN:  This is Attachment 4?

21        MS. BRODNAX:  Attachment 4 to Joint Exhibit 2.

22        THE WITNESS:  Yes.

23        BY MS. BRODNAX:

24        Q   Can you identify this document, Officer Bird?

25        A   Yes, I can.  It is the statement I wrote in

14

1    reference to the traffic accident.

2        Q    And could you also flip the page and look at

3    the other pages?  Can you identify the other pages to

4    Attachment 4?

5        A    Yes.  These are the answers that I gave in

6    reference to several questions I was asked.

7        Q    And on the second two pages there are initials

8    by the questions.  Are those your initials?

9        A    Yes, they are.

10        Q    Now, Officer Bird, in your statement that you

11    gave, you indicated at the time that you were giving

12    around 60 miles per hour.  Is that correct?

13        A    Yes, ma'am.

14        Q    Now, Officer Bird, you just testified that you

15    did not recall another car going passed you.  Could you

16    elaborate with regard to your statement that you did not

17    recall?  Are you saying you do not remember or you did

18    not see another vehicle?

19        A    I just don't remember.  I mean, you pay

20    attention to other cars when you are responding priority,

21    but it is something that you don't really think about.

22    It is something I really don't remember.

23        Q    Were there other vehicles on the road at the

24    time, prior to the accident?

25        A    Yes, there were other vehicles on the road, but

22

1    you and Officer Wilson left the Addison Road Station, did

2    you happen to observe whether Officer Wilson had his seat

3    belt on?

4        A   I don't -- when I went up to the car --

5        Q   Let's start from Addison Road.  During the

6    drive --

7        A   We drive caged cars.  It's hard to even see

8    really into the car.

9        Q   So you wouldn't have been in a position to

10   observe that fact at that point.

11        A   No.

12        Q   Okay.  All right, now what were you going to

13   say about the accident?

14        A   When I went up to his vehicle, he didn't have

15   it on.

16        Q   At the time that you got there.

17        A   When I got -- well, I was right behind him, and

18   he was unconscious, so I don't think he could've taken it

19   off.

20        Q   Now, describe what it is, then, that you saw.

21        A   He was laying in the car.

22        Q   In other words, Wilson's car went off the road.

23        A   Correct.

24        Q   You pulled to a stop, is that correct?

25        A   Yes.

23

1    Q    You get out of your vehicle.

2    A    Yes.

3    Q    You approach the side of his car.

4         MS. BRODNAX:  Objection.  Why don't you let him

5    testify?

6         MR. JEPSEN:  This is cross examination.

7         ARBITRATOR ALPERN:  He's on cross.

8         BY MR. JEPSEN:

9    Q    You approach his vehicle.

10   A    Yes.

11   Q    Were you on the driver's or passenger's side of

12   the vehicle?

13   A    I ran up to the passenger's side of the vehicle

14   first.  I couldn't get the door opened, so I tried to

15   break the window, couldn't get it opened, ran over to the

16   driver's side of the car and couldn't get that door open

17   either.

18   Q    Okay, when you looked in the window, where you

19   look in the driver's side window, was the air bag

20   deployed?

21   A    Yes.

22   Q    So was it fully deployed?

23   A    No.  Air bags deflate right away.

24   Q    So it had deployed, but it was rest in full at

25   that point.

25

1      Q    Okay.  And who was it that actually -- somebody
2   pulled Mr. Wilson out?
3      A    Yes.  Me and the other officer both pulled him
4   off and took him over and sat him on the sidewalk.
5      Q    Okay.  So when you looked in and observed
6   Officer Wilson, it's your testimony that you didn't see
7   any seat belt engaged at that point?
8      A    Correct.
9      Q    Okay.  Now, when you were trained, the
10  operation of a car training that you had before, engaging
11  a seat belt would have been a standard part of that
12  training, correct?
13     A    Yes.
14     Q    And you routinely, prior to operating the
15  vehicle, whether it's a Code 1 or not, do you engage the
16  seat belt before you start the car up or afterwards?
17     A    It depends what I'm doing.  In terms of
18  specific training, I don't remember what they told us.  I
19  usually start the car and put the seat belt on.  That's
20  what I personally do.
21     Q    You start the car before you put your seat belt
22  on.
23     A    Yes.
24     Q    Okay.  Now, have you observed other officers
25  operate Metro vehicles such that you've observed them put

# EXHIBIT 18

# M E M O R A N D U M



**SUBJECT:** Statement                    **DATE:**   August 15,  2004

    **FROM:**  Officer Taj Wilson Badge #414

      **TO:**  Sergeant Donald Proctor


      On Sunday, August 15, 2004 at 2046hrs, The undersigned officer reports receiving a call from communications to respond code one to the New Carrollton metro station which is located at 4201 Ellin Road Landover Maryland for a fight in progress. I was driving north bound on Addison Road driving at the speed of 45 to 50 mph, at the six thousand  blocks of Addison Road I did apply ABS brakes and swerved to the right to avoid hitting an oncoming vehicle that had crossed into the undersigned officer's lane. The undersigned officer's vehicle struck a curb and lost control causing my vehicle to strike the porch of the house located at 6004 Addison Road. The undersigned officer lost consciousness and was removed from the vehicle by Officer's Bird Badge #121 and Dronsfield Badge #425.The undersigned officer was transported to P.G. Hospital, by an unknown ambulance for injuries to the head and right shoulder. The undersigned officer was treated and released.  There was major damage to the house located at 6004 Addison road. Sergeants Proctor and Boyer responded to the scene. All the above incidents occurred in Prince George's county. Prince Georges County Officer Pfc. Kowalewski Badge #2621 initiated the original Traffic Accident report #04-228-1135.


      Officer Wilson, Taj

**Washington
Metropolitan Area
Transit Authority**

A3

# EXHIBIT 19

# M E M O R A N D U M



**SUBJECT:** Statement          **DATE:** August 15, 2004

    **FROM:** Officer Scott Bird

     **TO:** Sergeant Donald Proctor

On Sunday August 15, 2004 at approximately 2100hrs the undersigned officer was responding code 1 to a fight in progress at the New Carrollton Metro rail station. The undersigned officer was traveling north bound on Addison road in wmata shop 17618 with emergency equipment on behind wmata shop 17622 driven by Ofc Wilson. When the undersigned officer came around the corner in the 6000 block of Addison Road and he observed 17622 veer off the road, strike a fence and become airborne flipping in the air and striking the residence at 6004 Addison Rd. The Undersigned officer alerted communications and exited my patrol car to check Ofc Wilson's welfare. Upon arrival Ofc. Wilson was unresponsive to the undersigned officers attempts to wake him. The undersigned officer forced the passenger side door open and again was unsuccessful in waking the officer. Ofc Dronsfield arrived and opened the driver side door and managed to wake the officer. Ofc Wilson was taken clear of the vehicle and waited on the curb for the ambulance. The undersigned officer spoke with the ambulance crew as to Ofc. Wilson's condition after the accident. After the officer's transport the undersigned officer conducted traffic control until released from the scene.

Scott M. Bird 121

**Washington**
**Metropolitan Area**
**Transit Authority**

A 4

# M E M O R A N D U M



SUBJECT: Addendum to Officer Scott Bird's  DATE:  August 23, 2004
Statement Dated August 15, 2004

FROM: MTPD - Officer Scott Bird

TO: MTPD - Lieutenant Erhart M. Olson

This addendum to your statement dated August 15, 2004, is in reference to the investigation surrounding the MTPD involved automobile accident that occurred that evening.

1. Describe the location of the accident.

A. 6004 Addison road.  The road is two lane, one in each direction.  It's kind of narrow with parking along the right side of the roadway.  There are houses along the right side and, I think, there is a park or something along the left side.  The road has a gradual curve to the right then back to the left.  You go down a slight decline then up a slight incline as the road curves back to the left.  It then straightens out and declines back to the normal grade of the road.

2. What was your speed as you were responding for the call at New Carrollton?

A. I was moving, I was probably going about 60 MPH and slowed down to about 50 as I came into the curves.  It's kind of tricky at that point if your going too fast.  I work that sector a lot, so I knew the curve was there.

3. Approximately how far behind Wilson's vehicle were you?

A. Maybe a quarter of a mile, but I was at the crest of the hill and could clearly see his vehicle.  He was in the middle of the road and I thought he was turning to the right.  I thought he knew a short cut to New Carrollton.

4. What did you observe?

A. When I came around the curve, I observed Wilson's vehicle in the middle of the road and turning to the right.  The vehicle then jumped the curve and it looked like it hooked something.  The back end of the vehicle went up into the air and this caused the vehicle to spin around, while airborne, and strike the porch of the house with the driver's side front fender.  The vehicle then spun around and came to rest in the next yard facing southbound.

5. Where were you when you received the call to respond to New Carrollton?

**Washington**
**Metropolitan Area**
**Transit Authority**

Page 1 of  2

A.   We were both at Addison Road Station.  We crossed Central Avenue and headed down Addison Road.  We were together and by the time we reached the scene of the accident, which was a distance of about a half a mile from were we started, Wilson was about a quarter of a mile ahead of me.

6.  Did you observe any other vehicles?

A.  I honestly can't remember seeing any other vehicles.  I did see people standing out in their front yards though.

7.  Does Wilson work that sector much?

A.  Yes, he probably works it as much as I do.  He should know the sector pretty well.

8.  Do you have anything to add?

A.  No, not really.  I don't think his speed was unreasonable.

# EXHIBIT 20

1

PROCEEDINGS

1

2      ARBITRATOR ALPERN:  We are on the record in

3  Washington Metropolitan Area Transit Authority and FOP

4  Metropolitan Transit Police Labor Committee, which is

5  Federal Mediation and Consolidation Service Case 05-

6  54035.  Ms. Brodnax for the employer; Mr. Jepsen for the

7  Union.  And I believe Mr. Jepsen had a motion to make,

8  but prior to that let me note that I am admitting Joint

9  Exhibits 1 through 9, which the parties have submitted to

10  me and which will now be placed in the record.

11                          [Whereupon, Joint Exhibits No. 1

12                          through 9, respectively, were

13                          marked for identification and

14                          received in evidence.]

15      ARBITRATOR ALPERN:  Mr. Jepsen?

16      MR. JEPSEN:  My motion goes to one aspect of

17  the Joint Exhibits admitted, which is to say the results

18  of the computer voice stress analysis in this case, and I

19  would move to suppress all references to the test, its

20  administration, and its results as it pertains to this

21  case predicated on the wealth of authority.  In addition,

22  an additional consideration, this matter did occur in

23  Maryland, was a Maryland matter.  This is an agency that

24  functions in Maryland, and in the State of Maryland the

25  law is quite clear that lie tests are not admissible in

30

1    he was already passed Drylog.

2         Q    Okay.

3              MS. BRODNAX:   I have no other questions of

4    Officer Bird.

5              ARBITRATOR ALPERN:   Thank you very much,

6    Officer Bird.

7              MS. BRODNAX:   Just one second.

8              ARBITRATOR ALPERN:   Off the record, please.

9              [Off the record.]

10   WHEREUPON

11                        DONALD PROCTOR

12   a witness of lawful age, was called for examination by

13   the representative of the Authority and, having been

14   first duly sworn, was examined and testified as follows:

15                     DIRECT EXAMINATION

16        BY MS. BRODNAX:

17        Q    Lieutenant Proctor, where are you currently

18   employed?

19        A    Metro Transit Police.

20        Q    And how long have you been employed?

21        A    Seventeen years.

22        Q    And what positions have you held?

23        A    Patrol Officer, Sergeant in the Patrol

24   Division, and Lieutenant in the Patrol Division.

25        Q    And how long have you been a lieutenant?

32

1    accident scene?

2        A    Approximately 20 to 30 minutes after the call.

3        Q    And what did you observe upon your arrival on

4    the accident scene?

5        A    Officer Wilson was already transported to the

6    hospital by the time I was there.  His vehicle and the

7    adjacent house that his vehicle was struck.

8        Q    And who did you talk to at that time?

9        A    Officer Bird.

10        Q    Officer Bird?

11        A    Officer Bird.

12        Q    And what was discussed?

13        A    I asked Officer Bird what happened, and he said

14    Officer Wilson responded to a fight in progress call at

15    New Carrollton, and Officer Wilson's vehicle struck the

16    curb, went airborne, and struck the residence.

17        Q    What condition was the road surface at that

18    time?

19        A    It was dry and there were no objects in the

20    road.

21        Q    And what was the weather like on that day?

22        A    It was nice out.

23        Q    When you say it was nice out, was it raining?

24        A    No.  It was a clear day.  There was no fog.

25        Q    How long did you stay at the accident scene?

33

1    A    Approximately an hour.

2    Q    And what did you do when you left the accident

3    scene?

4    A    Responded to P.G. Hospital.

5    Q    And what did you do upon your arrival at P.G.

6    Hospital?

7    A    I met with Chief Hansen and Sergeant Holmes,

8    and then we talked to Officer Wilson, who was being

9    treated at the time.

10    Q    And what was discussed at that time, at the

11    hospital, with Officer Wilson?

12    A    Well, he was discharged approximately 10 or 15

13    minutes after I got there, and we responded to Jackson-

14    Brown Building for his post-accident test.

15    Q    Now, you say we.  Would that have been who?

16    A    Myself and Sergeant Boyer.

17    Q    Took Officer Wilson to the Jackson-Brown

18    Building?

19    A    Yes.

20    Q    For what purpose?

21    A    His post-accident urinalysis test.

22    Q    What conversation, if any, did you have with

23    Officer Wilson while you were transporting him for drug

24    testing?

25    A    Basically asked him what happened at the scene,

34

1    and he stated that he really couldn't recall.  And I

2    asked him was he wearing his seat belt.  He answered

3    affirmative.

4        Q    And what was Wilson's demeanor in the car at

5    that time?

6        A    He was calm at that time.

7        Q    And what did you do after the drug test?

8        A    I transported Officer Wilson back to District

9    2.

10       Q    And what occurred at District 2?

11       A    I had Officer Wilson write out a statement.

12       Q    Lieutenant Proctor, how many court appearances

13   do you make during a given year?

14       A    Usually between 20 and 30.

15       Q    These court appearances, are they civil cases,

16   criminal cases?

17       A    Mostly criminal.

18       Q    Do you give testimony under oath at these

19   hearings?

20       A    Yes.

21       Q    Lieutenant Proctor, I'm going to hand you a

22   document that has already been submitted into evidence as

23   Attachment 5 to Joint Exhibit 2.  Can you identify this

24   document?

25       A    Yes.  This is the statement I made.

# EXHIBIT 21

107

1  anyway and take it under advisement and give it what

2  weight it serves.  But that is our argument.

3              ARBITRATOR ALPERN:  Yes, I understand your

4  argument.  I will admit it because, if I determine that

5  that suspension was basically accepted and is no longer

6  appealable, then that document would be quite relevant.

7              MR. JEPSEN:  Sure.

8              ARBITRATOR ALPERN:  So it is admitted.

9                     [Whereupon, Authority Exhibit

10                     No. 4 was admitted in evidence.]

11             ARBITRATOR ALPERN:  Thank you very much,

12  Captain.

13             MS. BRODNAX:  And you are referring to WMATA

14  Exhibit —

15             ARBITRATOR ALPERN:  Exhibit No. 4.

16             MS. BRODNAX:  WMATA Exhibit No. 4, yes.  I just

17  wanted to make sure of that.

18             ARBITRATOR ALPERN:  Off the record.

19             [Off the record.]

20             ARBITRATOR ALPERN:  Back on the record.

21             Would you swear the witness in please.

22  WHEREUPON

23             SHAWN R. DOODY

24  a witness of lawful age, was called for examination by

25  the representative for the Authority and, having been

112

1    it from Prince George's County Police Department, and

2    this document was created by I believe it was Officer

3    Kowalski.

4        Q    Now whose police jurisdiction does accidents --

5    when there is a motor vehicle accident, who has

6    jurisdiction for P.G. County?

7        A    Prince George's County does the accident

8    investigation, and then Metro Transit Police would do an

9    internal inquiry on investigations also.

10       Q    Now the first page of Attachment No. 6, is this

11   the only document that was provided by the Maryland

12   police department?

13       A    Yes, this is the only page that was provided.

14   If you look at the top left-hand portion of the page, the

15   second box shows page 1 of 1, which means that there is

16   only one page to this document.

17       Q    And was there any determination based on this

18   report by the Maryland police department regarding who

19   was at fault for the accident?

20       A    Yes.  If you look at box 65, it states "fault,"

21   yes or no, and the box with yes is checked.

22       Q    And that is under whose information?

23       A    That would be under Officer Wilson's

24   information.

25       Q    Now is it normal for WMATA to only receive this

115

1        Q    Now how did he recover this information?

2        MR. JEPSEN:  Objection, unless he knows, unless

3  he was there to see how --

4        MS. BRODNAX:  Well he testified that -- oh,

5  well.

6        BY MS. BRODNAX:

7        Q    Were you present when he retrieved the

8  information?

9        A    Yes.  I was present when he retrieved the

10  information.  He did a general vehicle inspection, and

11  then he took his laptop, which has the program issued by

12  Ford, and downloaded the event data information from the

13  event data recorder to his laptop so that he could

14  analyze it.

15        Q    You indicated that he did a general inspection

16  of the vehicle.  What did that involve?

17        A    He basically looked at the vehicle, looked at

18  the damage, looked at where the damage was.  He did an

19  inspection of the seatbelts.  Just a general overview and

20  inspection to determine as much as he could learn about

21  that vehicle.

22        Q    Did you have a conversation with Officer Carson

23  regarding the outcome of his general inspection?

24        A    Yes, we did.  He did say that the seatbelts

25  were functioning.

116

1          MR. JEPSEN:  Objection.

2          ARBITRATOR ALPERN:  What basis?

3          MR. JEPSEN:  As to hearsay.

4          ARBITRATOR ALPERN:  I am going to allow it

5     since he was testifying concerning an official

6     investigation that he did.

7          THE WITNESS:  Corporal Carson advised me that

8     his inspection revealed no defects in the seatbelts.

9          BY MS. BRODNAX:

10         Q    When you say that, was that the driver and

11    passenger?

12         A    I believe he only checked the driver's side

13    because there was no passenger in the vehicle.

14         Q    Did you have a discussion with Corporal Carson

15    regarding the information that he retrieved, that he

16    downloaded into his laptop?

17         A    At a later date, yes I did.  But not on

18    September 7th.

19         Q    And what was the nature of the discussion that

20    you had with him at a later time regarding the

21    information that he downloaded?

22         A    I believe it was on September 17th that I met

23    Corporal Carson at the Prince George's County SOD,

24    Special Operations Division, and he advised me that with

25    this year, make, and model of the vehicle, that there

1          MR. JEPSEN:  Objection.

2          ARBITRATOR ALPERN:  What basis?

3          MR. JEPSEN:  As to hearsay.

4          ARBITRATOR ALPERN:  I am going to allow it

5    since he was testifying concerning an official

6    investigation that he did.

7          THE WITNESS:  Corporal Carson advised me that

8    his inspection revealed no defects in the seatbelts.

9          BY MS. BRODNAX:

10         Q     When you say that, was that the driver and

11   passenger?

12         A     I believe he only checked the driver's side

13   because there was no passenger in the vehicle.

14         Q     Did you have a discussion with Corporal Carson

15   regarding the information that he retrieved, that he

16   downloaded into his laptop?

17         A     At a later date, yes I did.  But not on

18   September 7th.

19         Q     And what was the nature of the discussion that

20   you had with him at a later time regarding the

21   information that he downloaded?

22         A     I believe it was on September 17th that I met

23   Corporal Carson at the Prince George's County SOD,

24   Special Operations Division, and he advised me that with

25   this year, make, and model of the vehicle, that there

117

1    really wasn't a whole lot of information that he could

2    determine from the event data recorder.  He was not able

3    to determine speed prior to, during, or after the

4    accident.  He was not able to determine braking distances

5    and stuff like that.  But he said that he was able to

6    determine that the seatbelt was not activated or it was

7    not engaged at the time of the first impulse to deploy

8    the airbag.

9        Q    Lieutenant Doody, I am going to hand you a

10   document that has been marked as Attachment No. 4 to

11   Joint Exhibit No. 2.  Could you identify Attachment No.

12   14, excuse me, I said Attachment No. 4 earlier but I

13   meant No. 14, Attachment No. 14 please?

14       A    Yes, I can.  I can identify this as a copy of

15   the investigation that Corporal Carson e-mailed me.

16       Q    I am going to move that Attachment No. 14 be

17   admitted to the record.

18            ARBITRATOR ALPERN:  It already is as part of

19   the Joint Exhibit.

20            MS. BRODNAX:  Yes.  I am sorry.

21            BY MS. BRODNAX:

22       Q    Lieutenant Doody, what role did you play in the

23   decision to give Officer Wilson a computerized voice

24   stress analysis test?

25       A    As the accident investigation was proceeding, I

1  to something that I didn't.  But the CVSA didn't clarify,

2  it just pretty much continued to go down the same path

3  that there was being deception in the statements.

4       Q    What was the basis for your recommendation that

5  the Metro Transit Police Department terminate Officer

6  Wilson?

7       A    As I was coming to the conclusion of my

8  investigation, it is standard practice to review the

9  officer's service files.  When you review an officer's

10  service files, it gives you an idea of where the

11  progressive punishment is going.  So during that

12  investigation, I did review his service file and it was

13  determined that there was prior instances where there was

14  misstatements of fact.

15       So taking that information, additionally, he

16  had a prior accident which was a very serious accident

17  where he was found at fault again, and looking at all of

18  the prior charges gives me an idea of where our

19  progressive punishment is going.  I had a discussion with

20  Captain Heilmann in reference to okay, this is now his

21  second allegation of untruthfulness, where are we going

22  with this.  And it was discussed and it was discussed

23  that termination would be the appropriate progressive

24  punishment.

25       Q    Was there any other considerations other than

1   his past record regarding termination?

2       A    Well, I guess you came here looking at the

3   totality of the circumstances.  You have got past

4   investigations where he had been found at fault, or being

5   untruthful, his suspensions, et cetera, that were taken

6   into consideration, as well as from there it is a

7   progressiveness, where you look at, okay, now we are

8   having the same issues again.  There was some retraining

9   that was done that may or may not have worked.  So,

10  basically, taking everything into consideration is where

11  we make the determination of whether or not to terminate.

12          ARBITRATOR ALPERN:  Off the record please.

13          [Off the record.]

14          ARBITRATOR ALPERN:  Back on the record.

15          BY MS. BRODNAX:

16      Q    Lieutenant Doody, why is truthfulness important

17  to the Metro Transit Police Department?

18          MR. JEPSEN:  Objection.  I mean, either the

19  chief of police sets the policy in the department or not.

20  I mean, we stipulate that truthfulness is certainly one

21  of the standard causes for discipline.  And if you can

22  prove it, sure you are going to include discipline.  As

23  to why it is important here, bring your --

24          ARBITRATOR ALPERN:  I think you can rely on the

25  Arbitrator's general knowledge of police departments and

# EXHIBIT 22

# M E M O R A N D U M



SUBJECT: Accident Investigation        DATE:    October 25, 2004

FROM: MTPD- Lieutenant Shawn R. Doody

TO: MTPD- Deputy Chief Timothy Gronau

THRU: MTPD- Captain John P. Tripelt

## Observations:

On August 15, 2004, Officer Taj Wilson badge #414 was working the 1430-2300 tour assigned to patrol sector seven in a marked scout car. He was operating shop #17622, a 2003 Ford Crown Victoria, DC tag BM-3626, vin# 2FAFP71W93X108145, showing a mileage of 104,937. Officer Scott Bird badge #121, was operating Shop #17618, patrolling sector eight (attachment #7).

At 2046, hours Officer Taj Wilson and Officer Scott Bird had just cleared a call at the Addison Road Metro Station. They received a radio run for a fight in progress at the New Carrollton Metro station involving six individuals (attachment # 7). Officer Bird advised communications that they were responding to New Carrollton in a code one response mode. MTPD communications acknowledged his transmission. Officers Wilson and Bird activated their emergency equipment and began to respond to New Carrollton.

Officers Wilson and Bird exited the Addison Road Kiss and Ride area, each in his own vehicle. Officer Wilson was the lead vehicle and Officer Bird following close behind. Both Officers turned right onto east bound Central Avenue. They then conducted a U-turn traveling west bound on Central Avenue. At Addison Road both drivers turned right on to north bound Addison Road. North Bound Addison Road is a four-lane road which narrows to two lanes shortly after Central Avenue. Shortly after Drylog Street, Officer Wilson lost control of his vehicle striking a residence located at 6004 Addison Road. Officer Wilson was transported to Prince Georges County Hospital by ambulance eight for injuries to his head and right shoulder. Officer Wilson was treated by emergency room staff and released. Officer Wilson was then transported by MTPD Sergeant Proctor to the WMATA medical clinic for post accident testing (attachment # 8).

Prince Georges County Police Officer Kowalewki, badge #2631 responded and initiated a MSP form one accident report, CCN # 04-228-1135 (attachment # 6). In Officer Kowalewki's investigation Officer Wilson was found to be at fault, however, he was not issued a citation.

MTPD Crime Scene Search Officer Windle, badge #228 responded to the scene. Officer Windle took fifty-one 35MM photographs depicting the accident scene. Additionally he collected some rough measurements of skid marks present on the roadway (attachment # 6 for the notes and attachment # 15 for the photographs).

MTPD Sergeant Proctor arrived at the accident scene shortly after 2100 hours and conducted the initial investigation. The following information is his observation of the scene (attachment # 5).

The accident occurred in the hours of darkness. The weather was warm and the roadway, which was constructed of asphalt was dry. The street was illuminated by street lights. The posted

Washington
Metropolitan Area
Transit Authority

speed limit was 30 miles per hour. There were no traffic control devices at this location. There was extensive damage to the front and rear of the vehicle, as well as to the residence at 6004 Addison Road. There were visible skid marks (attachment # 15). The Scout car was equipped with anti-lock brakes. The driver's side air bag had been deployed. Traffic at the time of the accident was moderate. During a brief interview with Officer Wilson, he advised he had been wearing a seatbelt. It should be noted that Prince George's County Building Inspector, Mr. Keith Goodhue closed the house located at 6004 Addison Road due to safety-related concerns.

On August 15, 2004, Officer Wilson generated an event report (attachment # 2) as well as a written statement (attachment # 3) surrounding this incident. On August 26, 2004, Officer Wilson was interviewed by Lieutenants Olson and Doody to clarify certain facts of this incident (attachment # 3). The following is a general synopsis of his statements.

> In Officer Wilson's statements he reports receiving a radio run to respond code one to the New Carrollton Metro Station for a fight in progress. While driving northbound, in the 6000 block of Addison Road, at a speed of between 45 and 50 miles per hour, an unidentified vehicle crossed into Officer Wilson's lane. This caused Officer Wilson to apply his breaks and swerve to the right to avoid a collision. His vehicle then struck a curb causing him to lose control of his vehicle. His vehicle then struck a porch located at 6004 Addison Road. Officer Wilson states he lost consciousness and was removed from the vehicle by Officers Bird and Dronsfield.

> In Officer Wilson's second statement he reports his speed to be between 45 and 55 miles per hour prior to the accident. He states that the vehicle that crossed into his lane as a small sedan/hatchback, maybe a colt or Mitsubishi Mirage, gray in color. He advised that the roads "weren't dry or wet . . . kinda dewy." He reported that the distance from the point of the swerve to the house to be 20 to 30 feet. He advised he swerved, fish tailed, applied the brakes and hit the curb. He further states he lost consciousness after the air bag deployed. When questioned how often he works sector eight, officer Wilson replied "A lot . . . That's how I know it was a blind spot coming up over the hill."

> On Sunday, August 15, 2004, Officer Bird's provided a written statement of his account of the incident (attachment # 4). On August 23, 2004, Officer Bird was interviewed by Lieutenants Olson and Doody to clarify certain facts of this incident (attachment # 4). The following is a general synopsis of his statements.

> In Officer Bird's first statement he reports responding code one to a fight in progress at the New Carrollton Metro station. He was traveling north bound on Addison Road in WMATA shop 17618 behind Officer Wilson. He reports "When the undersigned officer came around the corner in the 6000 block of Addison Road and he observed 17622 veer off the road, strike a fence and become airborne, flipping in the air and striking the residence at 6004 Addison Road."

> In his second statement Officer Bird was asked to describe the location of the accident. He stated, ". . . The road has a gradual curve to the right then back to the left. It then straightens out and declines back to the normal grade." When questioned as to what his speed was he replied "I was moving, I was probably going about 60MPH and slowed down to about 50 as I came into the curves. It's kind of tricky at that point if your going too fast . . . " Officer Bird was questioned as to what distance behind Officer Wilson's vehicle was he at the time of the accident. He advised, "Maybe a quarter of a mile." When asked to describe what he observed he advised "As I came out of the curve, I observed Wilson's vehicle in the middle of the road and turning right . . . " When he was asked if had observed any other vehicles he said "I honestly can't remember seeing any other vehicles. I did see people standing out in their front yards though."

A damage estimate has been requested for scout 17622 and will be added as addendum # 13 to this report when it is received. The scout car was towed by Henry's Towing firm to the Landover car shop located at 3334 Pennsy Drive Landover, Maryland.

On Tuesday, September 7, 2004, at 1230 hours, Lieutenant Shawn Doody met with Prince George's County Corporal Frank Carson of accident reconstruction, at the Landover car shop for recovery of the event data recorder. Corporal Carson recovered the information from the event data recorder and to analyze it. The event data recorder was removed, marked for identification and placed on the MTPD property book by Lieutenant Doody for safekeeping.

On Friday, September 17, 2004, at 1330 hours, Lieutenant Doody met with Corporal Carson for a briefing of the recovered data. In Corporal Carson's opinion, there was not sufficient data to determine the exact events leading up to the vehicle accident. Additionally, he was not able to determine Officer Wilson's speed prior to or during the accident. The event data recorder did however show that Officer Wilson was not wearing his seatbelt at the time of air bag deployment. Corporal Carson did provide an aerial photograph of 6604 Addison Road (attachment # 15). Upon Lieutenant Doody's request Corporal Carson was able to calculate the maximum safe speed to negotiate the last curve just prior to the accident scene. That speed was calculated at eighty-six miles per hour. The speed calculation assumes that all conditions affecting roadway, weather, vehicle and vehicle operation were in perfect order. Corporal Carson will forward a written report of his findings within two weeks from the date of the meeting and will be added as attachment #14.

On September 23, 2004, at 1130 hours, Lieutenant Doody met with WMATA Claims adjuster Margaret Iremiren regarding an estimate of the damage to the residence located at 6004 Addison Road. Mrs. Iremiren advised that the estimate was not completed. She advises that a tentative estimate of $20,000 would be close.

Because of contradictory written and verbal statements made by Officer Wilson during this investigation, Chief Hanson approved the use of a Computerized Voice Stress Analyzer (CVSA) Test to assist in determining fact. The CVSA was administered to Officer Taj Wilson by Lieutenant Robert Melan on October 12, 2004. A report of the test results was submitted by Lieutenant Robert Melan for inclusion in this investigation (attachment # 10). During the pre test interview conducted by Lieutenant Melan, Officer Wilson stated his speed was between 65 and 70 MPH. Lt. Melan's report also advised that Wilson was not telling the truth regarding question #6 which asked, "Were you driving in your designated lane?" Wilson responded "yes", but there was deception indicated. Officer Wilson offered no explanation for the deception indicated.

On October 25, 2004, Lieutenant Shawn Doody conducted a review of Officer Wilson's service file. The following is a synopsis of the entries since March 2, 2004.

Officer Wilson began his employment with the Metro Transit Police on January 14, 2002.

On December 3, 2003, Officer Wilson was involved in an off duty incident over a parking space at a local store. During the incident, Officer Wilson displayed his issued service weapon and failed to identify himself as a law enforcement officer. As a result, the Prince George's County Police were summoned by the citizen. An investigation was conducted by the Commander of the Department's Office of Professional Responsibility and Integrity. Captain Heilmann, the Commander, determined that the version of the incident that was offered by the complainant was much more plausible than that of Officer Wilson. As a result of the investigation, Officer Wilson received a one day suspension for discrediting the Department and a Letter of Official Reprimand for violation of Departmental General Orders relating to issued firearms.

On May 4, 2004, Officer Wilson was involved in a preventable motor vehicle accident while operating a marked MTPD Scout car. The accident resulted in injuries both to Officer Wilson and the operator

of the vehicle which he struck. The officer was responding in a code one response to a fight in progress call. Damage to the MTPD vehicle alone was estimated to be $14,000.00. Officer Wilson received a one day suspension for his culpability in this accident as well as mandatory attendance in a remedial EVOC Course. The investigating official, Sergeant Acton concluded that, ". . . Officer Wilson [sic] claim that the light was yellow is inconsistent with this evidence. It is clear that Officer Wilson failed to stop at the traffic light that was red and struck the other vehicle that had already entered the intersection."

The Department's Office of Professional Responsibility and Integrity investigated two incidents occurring on June 13 and June 18, 2004, respectively. The June 13, 2004, incident again involved Officer Wilson's issued service weapon. Officer Wilson's actions in this incident were deemed appropriate by Captain Heilmann. However, Captain Heilmann did note a concern that, "It does not seem reasonable that he did not pursue identification of the person who tried to steal his gun in what may have been a deadly force situation. He has also not provided a logical reason why he could not identify who that person was. Again, some testimony from unverified witnesses said it was his girlfriend who tried to take his weapon." Captain Heilmann recommended this complaint be unfounded and that he receive remedial training in weapon retention and additional training on proper judgement and behavior while carrying his weapon while off-duty.

The results of the inquiry into the June 18, 2004, incident gave rise to a number of issues and concerns regarding Officer Wilson's on-duty actions and conduct that do not reflect favorably on his performance. They are briefly enumerated below:

- Officer Wilson was on-duty and responded to an area far from his sector assignment (five miles) for personal business.

- Wilson did not receive permission from his supervisor or the Communications Division to do so.

- Wilson stayed at that location for more than an hour without anyone knowing his whereabouts.

- Wilson falsely advised Captain Heilmann in the first interview that he was at the Silver Hill/Marlboro Pike location for only ten or fifteen minutes. In fact it was over an hour and he may have been in Prince Georges County over two hours without ever returning to his sector. Wilson completed the Naylor Road call at 1648 hours. He called the CD at 1751 while on Marlboro Pike (said he was near Southern). His next "official" dispatched call was not until 1853 hours to Southern Avenue Station, and two hours past the Naylor Road clear time. However, Wilson tried to say that call was dispatched to him at 1810 hours on his Run Sheet.

- Wilson became immersed in a highly emotional dispute involving his girlfriend and other parties but he did not summon local police to assist although it was obvious that the gravity of the situation dictated local police response. The dispute was noticeable to the off-duty USPP Sergeant which is why he stopped to assist. The Sergeant eventually called the local police after confirming with Wilson that he (Wilson) had not requested assistance.

- Wilson provided false information to the dispatcher concerning his location when he finally did call into the CD. He said he was over by Southern on a traffic dispute when in fact he was at Silver Hill Road and Marlboro Pike, approximately four miles away.

- Wilson falsified his official daily activity log sheet (run sheet) for that day by entering a bogus run assignment within his assigned Sector 10 at the Navy Yard Station, when he was actually in Prince George's County during that time period. He then falsified times for the next two entries where he was actually dispatched to calls for service. The times were entered a half hour to 45 minutes earlier than he was actually assigned by CD. This action may have been done to make it appear that he was not involved in his unauthorized actions in Prince George's County as long as he was. As a note, before the bogus Navy Yard call entry, Wilson had entered accurate times for dispatched calls for service.

- Wilson did not provide appropriate and complete information to the off-duty USPP Sergeant who came to his aid. He should have advised the Sergeant that his girlfriend was one of the parties involved in the dispute, and that his personal vehicle was on the scene and involved in a traffic accident. This omission quite possibly jeopardized the USPP Sergeant's safety because he was unaware of Officer Wilson's personal involvement in the dispute.

The investigation of this incident resulted in nine substantiated charges of violation of the Oath of Office and Departmental General Orders and the imposition of discipline in the form of suspension without pay totaling 11 days. The formal suspension letter for this incident, served, signed and acknowledged by Officer Wilson on October 5, 2004, contained an unambiguous statement advising the officer that, ". . . and similar incident, especially those regarding integrity issues . . ." will result in his termination of employment with the Metro Transit Police.

## Conclusions:

Based on the strong physical and photographic evidence, as well as the results of the Computerize Voice Stress Analyzer, this official concludes that excessive speed was the main contributing factor to Officer Wilson losing control of his vehicle. It should be mentioned that Officer Wilson had just completed an emergency vehicle operators course at NVCJTA, Old Dominion Speedway on July 20, 2004. There is no corroborative evidence to support Officer Wilson's claim that another vehicle swerved into his lane. In Officer Bird's statement he does not mention observing another vehicle swerving into their lane. He states that he observed Officer Wilson's vehicle traveling sideways in the middle of the roadway, then veer off the road, strike a fence, then become airborne and impact the porch of 6004 Addison Road. In fact, there is irrefutable evidence, by way of skid marks, that at some time just prior to the accident, Officer Wilson's vehicle crossed the double yellow line into an oncoming lane of traffic.

There are several inconsistent statements offered by Wilson that leads this writer to believe that he was untruthful in his account of this event. First, Officer Wilson stated he was wearing his seatbelt. However, the Event Data Recorder shows that his seatbelt was not on. Second, in Officer Wilson's first written statement, he reported his speed to be between 45 and 50 MPH. During his interview just prior to the Computerized Voice Stress Test, Officer Wilson reported his speed to be between 65 and 70 MPH. Third, Officer Wilson stated a vehicle entered into his lane of travel. However, based on witness accounts, photographic evidence, as well as the Computer Voice Stress Analyzer Test, it is clear that Officer Wilson crossed into the opposing lane of traffic. Additionally, there is no corroborative evidence that suggests that there was another vehicle entering Officer Wilson's lane of travel necessitating him to take evasive action and subsequently lose control of his vehicle.

Based on all the above, this writer concludes that this accident was PREVENTABLE and should not have occurred. Additionally, it is clear that Officer Taj Wilson was not truthful in his written and verbal statements to his supervisors surrounding the events of this accident. It appears he hindered this investigation to avoid consequences for his actions. Officer Wilson was not truthful when asked if he was wearing his seatbelt, he was not truthful when he reported his speed just prior to the accident, and he was not truthful when he reported that a vehicle swerved into his lane of travel.

Inasmuch as Officer Wilson has only been employed by the Metro Transit Police since January 14, 2002, it is quite disturbing to note that in this past year, he has been involved in a total of five separate incidents requiring investigation into his actions. The five, including this investigation, all have a common theme involving the officer's use of extremely poor judgement and is further compounded by his lack of truthfulness, evasiveness and intentional omissions, when responding to inquiries from officials assigned to investigate his actions. The Department has ascribed to implementing progressive discipline and remedial training in an attempt to enhance Officer Wilson's performance to a level expected of our employees. The formal suspension letter served on October 5, 2004 to Officer Wilson, unequivocally informed him that future incidents, especially ones involving integrity issues WOULD result in his termination. It is imperative for a police officer to be credible in order to effectively perform his/her duties. This is most obvious in swearing in as a witness and presenting testimony in court. At this point, Officer Wilson's credibility has been eroded to a point that prevents him from being effective as a police officer for this Department.

**Recommendations:**

It is the recommendation of this Official that this accident be classified as **PREVENTABLE** and that Officer Wilson be disciplined accordingly. Additionally, because Officer Wilson has again been charged with several counts of false statements after receiving a final written warning from the Chief regarding these issues, it is recommended that Officer Wilson be **TERMINATED** from employment with the Metro Transit Police. This investigation should be made a part of Officer Wilson's police service file. The specific charges, specifications and recommendations are listed as follows:

**CHARGE 1:**  Violation of **Metro Transit Police "Oath of Office"** - Under Oath, and signature to confirm his Oath (attachment # 11), Taj Wilson swore to support and defend the constitution of the United States and discharge his responsibilities as a police officer of the Washington Metropolitan Area Transit Authority, with dispatch, total dedication, integrity and impartiality, and faithfully perform the duties of that office. He swore to obtain all evidence lawfully and work diligently to determine facts without fear or favor. He swore to accurately report his findings regardless of whether they establish the guilt or innocence of an individual. He swore to obey and enforce the law where it is incumbent upon him to do so. He swore to abide by the rules and regulations of the Transit Authority and obey his superiors in all lawful matters of duty performance. He accepted the police credential and shield as being representative of the special trust placed in him as a Metro Transit Police Officer.

**SPECIFICATION:**  See Charges 2 through 7

**RECOMMENDATION:**  TERMINATION

D 41

**CHARGE 2:**   Violation of **General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section A, 5** - Members will not knowingly make a false statement in any written or **verbal** report.

**SPECIFICATION:**   On August 15, 2004, Wilson gave a false verbal statement to Sergeant Proctor stating he was wearing his seatbelt when in fact he was not. This fact was proven to be a lie by the event data recorder recovered from Officer Wilson's vehicle.

On August 26, 2004 Wilson gave a false verbal statement to Lieutenant Doody and Lieutenant Olson stating a vehicle swerved into his lane of travel. This fact was proven to be a lie by the physical evidence present at the scene as well as the Computerized Voice Stress Analyzer Test results.

**RECOMMENDATION:**   TERMINATION

**CHARGE 3:**   Violation of **General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section A, 5** - Members will not knowingly make a false statement in any **written** or verbal report.

**SPECIFICATION:**   August 15, 2004 and August 26, 2004  Wilson provided false written information as to his speed of travel, as well as the exact events which caused the accident (attachment 3). In one written statement Wilson advised his speed was 45 to 50 MPH. In his second statement he advised his speed was 45 to 55 MPH. In an oral Interview with Lieutenant Melon just prior to the Computerized Voice Stress analyzer test he stated his speed was 65 to 70.

**RECOMMENDATION:**   TERMINATION

**CHARGE 4:**   Violation of **General Order 217, "Ethical Standards of Conduct and Financial Interest" Part III, Section A, 4** - Members will respond promptly and truthfully to all inquiries initiated by an official.

**SPECIFICATION:**   Wilson failed to be truthful numerous times.

In one written statement Wilson advised his speed was 45 to 50 MPH. In his second statement he advised his speed was 45 to 55 MPH. In an oral Interview he stated his speed was 65 to 70.

Wilson reported a vehicle swerved into his lane causing him to take evasive action and ultimately lose control of the vehicle. The investigation, physical evidence, as well as a voice stress test revealed the vehicle did not enter into Wilson's lane. In fact Wilson entered into the opposing land of travel.

Wilson reported he was wearing his seatbelt when in fact the event data recorded revealed he was not wearing a seatbelt.

**RECOMMENDATION:**   TERMINATION

**CHARGE 5:** Violation of **General Order 306, Emergency Vehicle Operations, Part IV, Paragraph B, Subsection 3.** - Members are reminded that traffic law exemptions do not relieve the driver of an emergency vehicle from the duty to drive with due regard for safety

**SPECIFICATION:** On August 15, 2004 Wilson operated a Metro Transit Police Marked scout car at such a high rate of speed and failed to maintain his lane, thus failing to drive with due regard for safety.

**RECOMMENDATION:** Two Day Suspension

**CHARGE 6:** Violation of **General Order 306, Emergency Vehicle Operations, Part IV, Paragraph C, Subsection 1.** - Emergency vehicles will not be operated at speeds so great that life or property is endangered.

**SPECIFICATION:** On August 15, 2004 Wilson operated a Metro Transit Police Marked scout car at such a high rate of speed and with total disregard for life and property. Wilson crashed into an occupied house causing in excess of $20,000 to the house and totaling the police vehicle.

**RECOMMENDATION:** One Day Suspension

**CHARGE 7:** Violation of **General Order 306, Emergency Vehicle Operations, Part IV, Paragraph C, Subsection 2(f).** - Operators of emergency vehicles, with emergency warning devices activated, will comply with the following . . . Seatbelts will be fastened.

**SPECIFICATION:** On August 15, 2004 Wilson operated a Metro Transit Police Marked scout car in a code one response mode with emergency warning devices activated failing to utilize the seatbelt.

**RECOMMENDATION:** Chief's Letter of Reprimand

# EXHIBIT 23

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## TAJ WILSON
## VS.
## WMATA

## CONTINUED DEPOSITION OF:
## POLLY HANSON
## TAKEN ON:   JANUARY 11, 2008



CONDENSED TRANSCRIPT AND CONCORDANCE:
PREPARED BY:

RAAKEEBAH L. HENDERSON

13017 Wisteria Drive, Suite 364
Germantown, Maryland 20874
Cell:  (301) 717-9468  Fax: (240) 912-7323
E-mail:  keebahcr@comcast.net

1    A.    Mr. Wilson was terminated from WMATA for rule

2   violations and conduct.

3    Q.    Specifically Mr. Wilson was charged, was he

4   not, with an incident that occurred June the 18th,

5   Marlboro Pike and Silver Hill Road?

6    A.    I don't know the exact date.  And what I would

7   say is it was a culmination of incidents is what led up

8   to Mr. Wilson's termination of employment from the Metro

9   Transit Police.

10    Q.    Why don't you take a moment and identify what

11   those culmination of events were.

12    A.    Well, there were several events that occurred

13   in a short span that had to do with the display of a

14   firearm over a parking dispute, a display of a firearm,

15   that was off duty, and a display of a firearm off duty at

16   a social gathering.

17          There was an incident on duty where Mr. Wilson

18   showed up at the scene of a traffic accident involving a

19   friend and that resulted in a the citizen's complaint

20   from another police department.  And then there was an

21   incident on duty with a motor vehicle that resulted in

22   the condemnation of a private home.

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
l1: (301) 717-9468    Fax: (240) 912-7323  E-mail: keebahcr@comcast.net

1   something that's put in investigations and it did defer

2   like the one with Mr. Wilson or it said you will be.

3   This says may.

4        Q.   Can you think of any other employee other than

5   Mr. Wilson where it says that you will be terminated for

6   continuous conduct or conduct regarding integrity issues

7   or was Mr. Wilson the only one?

8        A.   I don't know.  What I know was very clear

9   because of the nature of incidents we have, the severity

10  of the incidents, the compressed time period in which

11  they were and the fact that, you know, there was a

12  concern that had been expressed both verbally in-depth

13  with Mr. Wilson about veracity.

14       Q.   When you say compressed time period are you

15  talking about because of the fact that the nature of the

16  charges, number of charges within, what, a year, year and

17  a half?

18       A.   You had a number of very severe incidents

19  involving firearms, incidents off-duty, incidents off

20  duty discrediting the department, motor vehicle accidents

21  with substantial damage to vehicles.

22       Motor vehicle accidents involving the

1    condemnation of a house, then endangering of the public.

2    A number of those within a short amount of time.

3        Q.    I got those into the record but let me go

4    directly to the document dated January 13th, 2005.  All

5    right?  That may be number 10.

6            Have you seen this document before or after

7    today January 13th, 2005?

8        A.    I don't know that I did.  Heilman would have

9    told me which is who this is addressed to.  It's

10   addressed to Captain Heilman from the labor president

11   Officer Jimmy Hill invoking arbitration so Heilman would

12   have informed me about that.

13       Q.    Do you recall what specific disciplinary or

14   grievance Mr. Williams was involved in that led up to the

15   arbitration?

16       A.    I would think that this would have pertained to

17   his remove from the mobile patrol division and

18   reassignment of foot patrol.

19       Q.    But you can't recall whether or not and back to

20   your previous responses whether or not Mr. Williams

21   challenged Sergeant Hanna's recommendation of 13-day

22   suspense?

# EXHIBIT 24

# State of Maryland Motor Vehicle Accident Report

| REPORT NO. 09578933 | PAGE OF 1/1 | ACCIDENT DATE 08115104 | ACCIDENT TIME 2045 | REPORT TYPE ☐ FATAL ☒ INJURY ☐ PDO ☐ HIT & RUN ☐ NON-TRAFFIC | RESEARCH | LOCAL CASE NUMBER 01-228-1135 | LOCAL CODES 320 | PHOTOS ☐ NO 9 ☒ YES |
|---|---|---|---|---|---|---|---|---|

| INVESTIGATING OFFICER ID P.F.C. KOWALEWSKI 2021 | AGENCY AND AREA D.A 132 | SUPERVISING OFFICER ID #7946 Cpl. J. Lane (Actg) | REVIEWER ID | CODE E – AND – NAME OF MUNICIPALITY 1 3 4 SEAT PLEASANT | COUNTY 16 |
|---|---|---|---|---|---|

| RD CHAR 4 | RTE NUM CO1 03 6 6 00 | ROAD NAME ADDISON RD. | IN LANE N1 | TRAF SIG ☒ NO 20 ☐ YES | ON RAMP ☒ NO 21 ☐ YES | Ramp Number (Direction) 1-N·W 2-N·W 3-E·W 3 5-E 6 5-W 7 W·S 8 S·W 9 Other | OFF-Not Ramp ☒ NO 22 ☐ YES | IN INTERSECTION ☒ NO 23 ☐ YES |
|---|---|---|---|---|---|---|---|---|

| RD COND 0 | INT-RTE MUI 00.7018 | INTERSECTING ROAD NAME or Log Mile Reference Manual description. DRY LOG ST. | MILEPT 000.133 | DIR 350 | Dist. of Acc fr INT-RTE/Rel. & Dir. 01·100 N |
|---|---|---|---|---|---|

| LT DIV 0 | ACCIDENT DIAGRAM Show & Label: Roads, Traffic Units, the Travel Direction consistent with the Log Mile Reference Manual, and Movement of Traffic Units. | NORTH: | DESCRIBE ACCIDENT briefly: identify units by numbers. Also identify the following a) the OBJECT DAMAGED & NATURE OF DAMAGE (Property other than vehicles) and b) the NAME & ADDRESS OF OWNER when applicable. |
|---|---|---|---|

SRF COND 0

M/M ZONE ☒ NO 35 ☐ YES

JUNCTN 0

EVENT-1 1

EVENT-2 0

FIX OBJ 0

COLL TY 1

LIGHT 1

WEATHER 0

VEH. 1, WHILE RESPONDING TO A PRIORITY CALL, WITH LIGHTS AND SIRENS, SWIRVED TO MISS AN APPROACHING VEHICLE THAT CAME INTO HIS LANE. THE DRIVER OF VEH. 1 THEN LOST CONTROLE OF THE VEHICLE WHEN IT BECAME AIRBORNE. THE VEHICLE THEN STRUCK THE HOUSE LOCATED AT 6004 ADDISON RD. & CAME TO REST IN THE YARD OF 6002 ADDISON RD. JAMES WILSON OWNS PROPERTY AT 6004, MAINE DENT IS OWNER @ 6002. BUILDING INSPECTOR GOODWINE WAS NOTIFIED & RESPONDED.

| UNIT # 0.1 | NAME (First, Middle, Last) TAJ DEMOND WILSON | SEX 0.1 | INJ 01 | UNIT # 02 | NAME (First, Middle, Last) | SEX | INJ |
|---|---|---|---|---|---|---|---|

| TYPE OF VEH 46 ☐ DRIVER "PED" | ADDRESS (No., Street, City, State, Zip) 607 5TH ST. N.W. WASHINGTON D.C. 20001 | TEL ☐ Work ☐ Res (202) 962-2121 | EMS 49 | TYPE OF UNIT 47 ☐ DRIVER "PED" | ADDRESS (No., Street, City, State, Zip) | TEL ☐ Work ☐ Res | INJ 48 |
|---|---|---|---|---|---|---|---|

| MOVEMENT 0 | CONDITN 1 | SUBST 0 | TEST 0 | RESULT .00 | FOR PEDS ONLY 55 | AGE | TYPE 56 | LOCAT'N 57 | OBEY | VISIBL 58 | MOVEMENT 50 | CONDITN | SUBST 52 | TEST 53 | RESULT 54 | FOR PEDS ONLY | AGE | TYPE 56 | LOCAT'N 57 | OBEY | VISIBL 58 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| SPEED LIMIT 50 | SAF. EQU 01 | EQ PROB 0 | EJECT 0 | CITATION NUMBER (S) 00 | FAULT ☐ NO 65 ☒ YES | SPEED LIMIT | SAF. EQU | EQ PROB | EJECT | CITATION NUMBER (S) | FAULT ☐ NO ☐ YES |
|---|---|---|---|---|---|---|---|---|---|---|---|

| GOING 0.1 | DRIVER'S LICENSE NUMBER W-425-785-139-067 | STATE M | CLASS C | GOING | DRIVER'S LICENSE NUMBER | STATE | CLASS |
|---|---|---|---|---|---|---|---|

| CONTINU 0.10 | DR DATE OF BIRTH 0121517 | IRREGULAR CONDITION ☐ PARKED ☐ CAUGHT FIRE ☐ HIT & RUN ☐ DRIVERLESS | HM SPILL ☐ NO | HAZ MAT NUMBER 00 | CONTINU | DR DATE OF BIRTH | IRREGULAR CONDITION ☐ PARKED ☐ CAUGHT FIRE ☐ HIT & RUN ☐ DRIVERLESS | HM SPILL ☐ NO | HAZ MAT NUMBER |
|---|---|---|---|---|---|---|---|---|---|

| BODY TY 02 | COMMER. VEHICLE ONLY | U.S. DOT NUMBER 00 | ICC NUMBER 00 | BODY TY ☐ NO 78 ☐ YES | CDL ☐ NO 7 ☐ YES | BODY TY | COMMER. VEHICLE ONLY | U.S. DOT NUMBER 00 | ICC NUMBER | BODY TY ☐ NO ☐ YES | CDL ☐ NO ☐ YES |
|---|---|---|---|---|---|---|---|---|---|---|---|

| MOST HE 09 | OWNER OR CARRIER NAME (Write "SAME" if Driver) WASHINGTON METRO TRANS. AUTH. | TEL ☒ Work ☐ Res (202) 962-2121 | MOST HE | OWNER OR CARRIER NAME (Write "SAME" if Driver) | TEL ☐ Work ☐ Res |
|---|---|---|---|---|---|

| CONTRIB CIRCUM- STANCES 00 | OWNER / CARRIER ADDRESS 600 5TH ST. N.W. WASHINGTON D.C. 20001 | TOWED VEH (S) ☐ NO 00 | CONTRIB CIRCUM- STANCES 82-1 | OWNER / CARRIER ADDRESS | TOWED VEH (S) |
|---|---|---|---|---|---|

| 82-2 00 | YEAR & MAKE OF VEHICLE 8.81 FORD | MODEL CROWN VIC. | 1st IMPACT PT. 87 2.3 | MAIN IMPACT 88 2.3 | 82-2 | YEAR & MAKE OF VEHICLE | MODEL | 1st IMPACT PT. 87 | MAIN IMPACT 88 |
|---|---|---|---|---|---|---|---|---|---|

| 82-3 00 | EXP YR & REGISTR & STATE 00 BM3626 1 DC 2 3 00 00 | AREAS DAMAGED | INSURER SELF | 82-3 | EXP YR & REGISTR & STATE | AREAS DAMAGED | INSURER |
|---|---|---|---|---|---|---|---|

| 82-4 00 | VEHICLE ID NUMBER 2FAFP71W93×108145 | POLICY NUMBER SELF | 82-4 | VEHICLE ID NUMBER | POLICY NUMBER |
|---|---|---|---|---|---|

| DAM EXT 0.5 | VEHICLE REMOVED BY WASH. METRO TRANSIT AUTH. | VEHICLE REMOVED TO DESTINATION | DAM EXT | VEHICLE REMOVED BY | VEHICLE REMOVED TO |
|---|---|---|---|---|---|

| TRAFFIC UNIT # | SEATING POSITION | CODE all injured & uninjured PASSENGERS below. Use "W" for witness in TRAF UNIT and SEAT columns. WRITE NAME & ADDRESS of Injured Passengers and Witnesses. | Witness telephone #. | SEX 100 | AGE 101 | SAFETY EQUIP | EQUIP PROB. | INJUR SEVER | EJEC- TION |
|---|---|---|---|---|---|---|---|---|---|
| W 97 | 00 98 | SCOTT BIRD 600 5TH ST. N.W. WASHINGTON DC 20001 (202)962-2121 | 99 | 0.1 | 23 | U 0 | 00 | 00 | 00 |
| | | | | 0 | | | | | |
| | | 00 | | 0 | | | | | |
| | | | | 0 | | | | | |
| | | | | 0 | | | | | |

| E UNIT M ☐ I ☐ F ☐ | INJURED TAKEN BY: AMB 88 | INJURED TAKEN TO: P.G.H. | EMS RUN REPORT # 10692722 | E UNIT M ☐ I ☐ F ☐ | INJURED TAKEN BY: 00 | INJURED TAKEN TO: 00 | ERM RUN REPORT # 00 |
|---|---|---|---|---|---|---|---|

MSP - CENTRAL RECORDS DIVISION COPY

# EXHIBIT 25

# M E M O R A N D U M



**SUBJECT:** Statement                    **DATE:**  August 15,  2004

     **FROM:**  Officer Taj Wilson Badge #414

       **TO:**  Sergeant Donald Proctor


     On Sunday, August 15, 2004 at 2046hrs, The undersigned officer reports receiving a call from communications to respond code one to the New Carrollton metro station which is located at 4201 Ellin Road Landover Maryland for a fight in progress. I was driving north bound on Addison Road driving at the speed of 45 to 50 mph, at the six thousand  blocks of Addison Road I did apply ABS brakes and swerved to the right to avoid hitting an oncoming vehicle that had crossed into the undersigned officer's lane. The undersigned officer's vehicle struck a curb and lost control causing my vehicle to strike the porch of the house located at 6004 Addison Road. The undersigned officer lost consciousness and was removed from the vehicle by Officer's Bird Badge #121 and Dronsfield Badge #425.The undersigned officer was transported to P.G. Hospital, by an unknown ambulance for injuries to the head and right shoulder. The undersigned officer was treated and released.  There was major damage to the house located at 6004 Addison road. Sergeants Proctor and Boyer responded to the scene. All the above incidents occurred in Prince George's county. Prince Georges County Officer Pfc. Kowalewski Badge #2621 initiated the original Traffic Accident report #04-228-1135.

                                        Officer Wilson, Taj

**Washington
Metropolitan Area
Transit Authority**

A3

# EXHIBIT 26

# M E M O R A N D U M



**SUBJECT:** Addendum to Statement - Vehicle
Accident Dated August 15, 2004

**DATE:** August 26, 2004

**FROM:** MTPD-Officer Taj Wilson

**TO:** MTPD-Lieutenant Erhart M. Olson

During the administrative inquiry into the vehicle accident which occurred on August 15, 2004, questions have developed and must be clarified.

1. Describe in detail the accident from the radio run until you woke up?

A. I cleared a call at ADRD with Baker-8 ( identifies sector car Baker 8 as Officer Bird) and received a radio run for a large group fighting in front of the kiosk at NEWC. I activated lights and sirens and went southbound on Addison Road. The street curves and a car swerved into my lane ( the car was traveling northbound on Addison Road). I swerved to avoid hitting the car, hit the curb and the air bag hits me in the face. The next thing I know is officers are pulling me out of the car.

2. Your speed?

A. Last look, I was doing between 45-55. About 50.

3. When you all (Baker 7 and Baker 8 Officer Bird) left ADRD, were you together?

A. Yes, I had at least 2 car lengths ahead of Bird.

4. Describe Addison Road.

A. The street is curvy. I swerved to keep from hitting the car, hit the curb, the air bag hit my face and that's all I remember.

5. (Drawing the scene/street on paper) Where did you lose control?

A. Shows on sketch where he loses control.

6. There were no skid marks...street must have been straight here (points to sketch)... I have an eye witness saying the He/she (no gender specification) saw no vehicle.

A. The streets weren't dry or wet...kind of dewy. Whether or not they saw the vehicle, I don't know. I saw a small sedan/hatchback...maybe a colt of mitsubishi mirage, gray in color.

Washington
Metropolitan Area
Transit Authority

7.  Did it pull out or...

*TDW* — A.  The street is curvy.  I don't know.  I swerved to the right to avoid hitting him.

8.  From the point of the swerve to the house, what is the distance?

*TDW*  A.  20-30 feet.  I don't know when I initially swerved I didn't hit the curb.  I fish tailed, hit the brakes and I hit the curb.

...so you lost it, recovered and lost it again?

*TDW*  A.  Yeah.

9.  You hit the brakes immediately when you saw the car?

*TDW*  A.  Yes

10.  Anything else?

*TDW*  A.  I just swerved...then the air bag hit me.  As far as the car flipping, I don't remember.

11.  How often do you work Sector 8?

*TDW*  A.  A lot.  I usually work 7, 8 or 9.  That's how I knew it was a blind spot coming up over the hill.

12.  Anything more to add?

*TDW*  A.  No, sir.

...that's it.  Thank you.

# EXHIBIT 27



**METRO TRANSIT POLICE**
600 Fifth Street, NW, Washington, DC 20001
(202) 962-2150

**Polly Hanson**
CHIEF

## COMPUTERIZED VOICE STRESS ANALYZER TEST

**PREDICATION:**
This truth verification examination was predicated upon a request by Captain George Heilmann, Office of Professional Responsibilities and Inspections.

**SCOPE:**
The scope of this truth verification examination will be limited to the honesty of Officer Taj Wilson as it relates to his Departmental motor vehicle accident on August 15,2004.

**PRETEST INTERVIEW:**
During the pretest interview Officer Wilson related the series of events that lead to his motor vehicle accident. From that we formulated a series of nine questions to be used in a Zone of Comparison test sequence. Officer Wilson stated a vehicle had come into his lane of traffic causing him to swerve to avoid a collision. This caused his vehicle to fishtail back and forth which lead to him striking the curb deploying the vehicle's air bag. He believes he lost consciousness when struck by the air bag and can remember little else. The prior assessment of Officer Wilson lead to the formulation of the following relevant questions, which were interspersed with irrelevant and control questions. It should be noted in Officer Wilson's written statement dated August 15, 2004, Officer Wilson stated his speed prior to the accident was between 45 to 50 MPH. In a follow-up interview dated August 26, 2004, he stated his speed was 45-55 MPH, clarifying about 50 MPH. During the interview with this examiner Officer Wilson stated his speed was 65-70 MPH.

**REPORT:**
On October 12, 2004, an interview was conduct with Officer Taj Wilson with regards to the motor vehicle accident he was involved in on August 15, 2004. The following relevant/irrelevant questions were used:

4 R. Did a vehicle come into your lane of traffic, cause you to lose control? Wilson responded yes, there was no deception indicated.

5 IR. Is today Tuesday? Wilson responded yes, there was deception indicated.

6 R. Were you driving in your designated lane? Wilson responded yes, however, there was deception indicated.

**POST-TEST INTERVIEW:**
Officer Wilson was adamant with regard to all of his answers to the relevant questions and offer no explanation to the contrary.

A 10

**CONCLUSION(S):**

Based upon my training and experience, it is my opinion that Officer Wilson  was not truthful to stated irrelevant question (number5). This indicates carry over stress from its' relevant question (number 4). Additionally, it is my opinion that Officer Wilson was not truthful to stated relevant question (number 6). A "cold call" was rendered by Detective Sergeant Julious Byrd "in the blind." Det./Sgt Byrd's conclusions were consistent with those of this examiner.


CVSA Examiner

Lieutenant Robert Melan

# EXHIBIT 28

# GENERAL ORDER
## Metro Transit Police

| | |
|---|---|
| **Subject:** Emergency Vehicle Operations | **Number:** 306 |
| | **Effective:** May 15, 1999 |

## I. Purpose
This Order provides guidelines for the operation of emergency vehicles.

## II. Policy
Members operating emergency vehicles, whether on routine patrol or responding to an emergency call for service, will exercise due regard for the safety of all persons and property. It is the policy of the Department that all members will adhere to statutory restrictions relative to the operation of emergency vehicles and the use of emergency warning devices. Such devices may be employed only under prescribed conditions and circumstances and in a manner that minimizes the risk of accidents or injuries. It is important to respond swiftly to emergencies; however, it is essential to reach the destination safely.

## III. Definitions
*Code I Response* - Designates a member to activate all emergency warning devices to expedite travel to the scene of an emergency.
*Code II Response* - Designates a member to proceed to an incident routinely, without the use of emergency warning devices.
*Controlled Intersection* - A location of intersecting streets or highways where vehicular traffic is controlled by signal lights or signs.
*Emergency Vehicle* - Department vehicle equipped with emergency warning devices.
*Emergency Warning Devices* - Siren and a roof mounted beacon light(s), or a blue portable beacon light affixed to the roof or front dash of unmarked vehicles, or a beacon light affixed to a Departmental motorcycle.

## IV. Procedures and Responsibilities
A. Response Modes
   1. A Code I assignment will be dispatched for the following calls for service:
      a. felony in progress, one that has recently occurred or when the suspect may be in the immediate vicinity,
      b. misdemeanor in progress where the violator is armed, and/or
      c. request alleging an immediate threat to the safety of others.
   2. Code I units will utilize the following siren positions:
      a. First unit - Wail
      b. Second unit - Yelp
      c. Third or supervisory unit - High/Low
   3. Emergency vehicles will not be operated in a Code I mode without prior authorization from the Communications Division (CD) or an official. Units in the immediate vicinity of emergency calls for service will advise the dispatcher of their location and be governed by the instructions received. When it is impractical or impossible to obtain prior Code I authorization, members will advise the CD of the circumstances and their response mode without delay.
   4. Members will respond to their destinations utilizing the most expeditious route.
B. Road Privileges
   1. Jurisdictional statutes define certain traffic law exemptions granted to police officers engaged in emergency response. However, members will comply with the following minimum standards while engaged in emergency response:
      a. **stop** at all intersections before entering when a stop sign is posted

or a red signal is displayed, and
  b. **stop or reduce** vehicle speed so as to enable safe entering and traversing of all other controlled or uncontrolled intersections.
 2. The following privileges may be exercised during emergency vehicle response if they do not endanger life or property:
   a. exceed the posted or prima facie speed limit, or
   b. disregard traffic control devices regulating the direction of movement (except in the Commonwealth of Virginia).
 3. Members are reminded that traffic law exemptions do not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons.
C. Operation of Emergency Vehicles
 1. Emergency vehicles will not be operated at speeds so great that life or property is endangered.
 2. Operators of emergency vehicles with emergency warning devices activated will comply with the following (if applicable):
   a. The front windows will be open in two-person units and the left front window will be open in one-person units.
   b. The Wig-Wag light system will be activated during daylight hours but its use is prohibited during the hours of darkness. Vehicles not so equipped will activate the headlights regardless of the time of day.
   c. Spotlights will not be directed at moving vehicles.
   d. Emergency flashers will not be activated.
   e. The public address system may be utilized to direct motorists or pedestrians as necessary, and
   f. Seatbelts will be fastened.
D. Use of Emergency Warning Devices
 1. While in a Code I response mode, emergency lights and siren will be activated.

 2. Activated emergency beacon lights may be operated without use of the siren in the following situations:
   a. Protection of life or property,
   b. Protective barriers, or
   c. Vehicle stops.
 3. When conducting vehicle stops, audible and/or visible emergency warning devices will be activated to ensure adequate notice of your intent to stop the operator.
 4. Emergency warning devices will be deactivated as soon as possible when not required for safety needs.
 5. When emergency warning devices are deactivated, vehicle operation will be consistent with the local traffic laws and Departmental policy.
E. Department Accident Reporting Procedures
 1. Member Responsibilities
   a. Members involved in motor vehicle accidents while operating Authority vehicles or when such vehicles are damaged, will immediately request that an official respond to the scene.
   b. Members will not move the subject vehicle from the point of impact without approval from an official or the accident investigator unless there exists a threat to the safety of persons or property.
   c. A member whose Authority vehicle is struck by a vehicle which leaves, may leave the accident scene to identify the striking vehicle/operator. The CD will be advised of this action without delay. A pursuit of the vehicle may be authorized by General Order 307.
 2. Supervisor Responsibilities
   a. Supervisors will ensure that a member responds for a Federal Transit Administration sanctioned drug and alcohol test if the member is involved in the following type of accident:
     (1) A loss of human life.
     (2) Their performance contributed

to the accident as determined by using the best information available at the time.

(3) When an individual suffers a bodily injury and immediately receives medical treatment away from the scene.

(4) One of the vehicles involved incurs damage as a result of the accident and is transported from the scene.

b. Using the best information available at the time of the decision, if the members' performance can be completely discounted as a contributing factor to the accident, drug testing need not be performed.

c. If a required breath alcohol specimen is not preformed within two hours following the accident, the supervisor will prepare and forward a memorandum to the Chief, as soon as possible, stating the reason(s) the member was not tested.

d. If a breath alcohol specimen is not obtained within the two-hour time limit, attempts to obtain a breath alcohol specimen must continue up to eight hours before ceasing and the two-hour report must be updated.

e. Post-accident drug testing is conducted following an accident as soon as practical but no later than 32 hours following the accident.

f. An appropriate supervisor will conduct an administrative investigation of all MTP motor vehicle accidents and/or vehicle damage. The investigation will encompass a thorough examination of the events which culminated in the accident and/or damage to include:

(1) Observations, conclusions and recommendations, and

(2) Photographs and/or sketch of the scene.

g. Bureau Commanders will recommend to the Chief of Police if accidents or damages to Authority vehicles should be forwarded to an Accident Review Board for determination of preventable/non-preventable classification.

3. Reports to be Submitted

a. The following reports will be prepared, when appropriate, by the operator of a vehicle that is involved in an accident or damaged:

(1) Event Report,

(2) Detailed statement(s),

(3) RMIS - WMATA Motor Vehicle Accident Report (Form AR 1&2),

(4) Employee on the Job Injury and Occupational Illness Report, and

(5) Employee's Notice of Accident Injury or Occupational Disease Form (DC Form 7 DCWC).

b. The following reports will be prepared/obtained, when appropriate, by the investigating official:

(1) Metro Transit Police Event Report,

(2) Local police report concerning the accident/damage,

(3) Employer's First Report of Injury or Occupational Disease Form, and

(4) FTA sanctioned test results.

c. The on-scene supervisor will be responsible for ensuring the completion of the accident related reports when the vehicle operator is incapacitated.

*Barry McDevitt*

Barry J. McDevitt
Chief

# EXHIBIT 29

# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

TAJ WILSON,

      **Plaintiff,**

v.                                    **Civil No: 05-2146 (JGP)**

WMATA

      **Defendant.**

---

## PLAINTIFF'S RESPONSES
## TO DEFENDANT'S INTERROGATORIES

**NOW COMES** Plaintiff, Taj Wilson, by and through undersigned counsel, and hereby responds to Defendant's First Set of Interrogatories in accordance with F.R.C.P. 33 as follows:

### GENERAL STATEMENT

By responding to Defendant's First Interrogatories, Plaintiff does not waive any objections which may be appropriate (a) to the use, for any purpose, by Defendant of any of the information or documents given in response to Defendant's First Interrogatories or (b) the admissibility, relevancy or materiality of any of the information, documents, or Interrogatories to any issue in this case.

The responses set forth below constitute the best information presently available to Plaintiff. However, Plaintiff reserves the right to amend, supplement, or change the responses made herein, if an when additional, different, or more accurate information becomes available and/or additional facts are developed.

1

## GENERAL OBJECTIONS

1. Plaintiff objects to Defendant's instructions and definitions to the extent they seek disclosure of information protected by the attorney-client privilege and/or the attorney work product doctrine. Furthermore, Plaintiff objects to the interrogatories to the extent they request information from any and all agents, attorneys, investigators, consultants, experts, and other representatives Plaintiff has retained.

2. Plaintiff objects to each and every interrogatory to the extent they call for information to which Defendant's has equal or greater access than Plaintiff.

3. Plaintiff objects to Defendant's definition of "you" and "your" to the extent Defendant seeks to obtain information outside Plaintiff's personal knowledge and/or seeks information protected by the attorney-client privilege and or work product doctrine.

4. Plaintiff objects to these interrogatories to the extent they purport to impose duties and obligations which exceed or are different than those imposed by the Federal Rules of Civil Procedure or Court orders in this action.

## INTERROGATORY RESPONSES

**INTERROGATORY NO.1:**        Please identify each and every person whom you consider to be a "similarly situated while Police Officer" who was not subjected to the same discipline to which you were subjected. For each person identified, provide the following:

a.      Your understanding of the actions, if any, committed by said person that were comparable to any acts for which you were disciplined;

1. **RESPONSE**: A) Steven Morrison- was involved in falsifying time sheets and knowingly submitting the time sheets even though he knew they was wrong. This is an example of falsifying official WMATA documents and a clear definition of theft because it involved the above named officer being paid in wages that he did not earn. For these violations the above named officer only received 3 days while I was charged in falsifying statements for not filling out my run sheet correctly and not knowing my speed. For both charges I was given an 11 day suspension as well as termination.

2

Jason Williams- was involved in given a false statement in a written report, unauthorized transport, failure to pay full attention to duty, and failure to perform duty impartially. The above named officer was also involved in an incident in which himself and Officer Burkholder was involved in an illegal stop. The above named officer was given only an 1 day suspension for each offense totaling 4 days, while I was given 11 days for filling out my runsheet incorrectly and terminated for not knowing my speed during an on duty accident.

Julie Dronsfield – was involved in a case in which she failed to safeguard a prisoner's property as well as returning the prisoners property ( theft) and giving false statements and conflicting statements during an official investigation. The above name officer was only given a total of 2 days suspension for these offenses. I was given 11 days suspension for filling out my runsheet incorrectly and terminated for not knowing my speed during an on duty auto accident

Scott Bird – in a written statement claimed that his weapon discharged due to weapon malfunction, which through investigation proved to be false. The above name officer was only given an 3 day suspension for failure to secure his weapon and was never given a false charge even when evidence proved that his statement was false. I was given an 11 day suspension for filling out my runsheet wrong and terminated for not knowing my speed during an on duty auto accident.

Tommie Call- Knowingly gave false information about an officer and then tried to cover it up during a recent investigation. The above name officer was only given a 2 day suspension. I was given a 11 day suspension for filling out my run sheet wrong and terminated for not knowing my speed during an on duty auto accident.

b.      The source of your knowledge of the actions of said person(s). if your source is a person, identify the person and describe in detail the circumstances of your conversation with the "source," and the substance of the conversations(s) with said person pertaining to the "comparable acts" of the similarly situated white officer.  If your source is other than a person, provide a detailed description of that source.

**INTERROGATORY NO.2:**        Describe all facts upon which you rely in your allegation that "race and color were facts" in WMATA's decision to terminate your employment.

**RESPONSE**:        The facts that lead me to believe that race and color were factors in WMATA's decision to terminate me from employment are the questionable statements that were made to me numerous times by Metro Transit Management officials sometimes statements that were made while in the company of union officials. Also Metro Transit past practice in handling complaints that was made by myself when race and color discrimination was brought to their attention. While going through the proper chain of command, my complaints was ignored by management and on one occasion was informed by a Captain, that "Metro Transit Police Department does not have a racial

3

problem". Even with this act witnessed by numerous police officers and being encouraged to write a complaint, the problem was never resolved. Lastly Metro Transit Police department's history of unbalanced punishment in regards to white officers and officers of minority background which is illustrated with my recent findings and discussions with other officers that are still employed by this department.

**INTERROGATORY NO.3:**      Identify all similarly situated individuals who were treated more favorably than you were treated.  For each such person, provide the following information:

a.      The acts committed by that person which subjected him or her to discipline by MTPD and/or WMATA.

b.      The discipline actually rendered to that person; and

c.      All facts supporting your conclusion that the person was "similarly situated" to you.

2.   **RESPONSE**: A list of all the similarly situated individuals who were treated more favorably than I was treated were:
Steven Morrison- falsified his time sheets, which is an official MTPD document. He was charge with Discredit and given a 3 day suspension and to restitute lost leave. Steven Morrison falsified his time sheets which is used by MTPD to determine pay for its officer, I unknowingly filled my daily run sheet incorrectly which is a common mistake made by officers. Steve Morrison was given a 3 day suspension while I was given a 11day suspension and eventually terminated from employment for not knowing my speed during an emergency call.

Jason Williams – gave a false written statement during an investigation in which he did an unauthorized transport of a female juvenile.  Jason Williams was given a 1 day suspension for the false statement charge but I was given a 11 day suspension for incorrectly filling out my runsheet and termination for not knowing my speed during an emergency response call for duty.

Thomas Stoltz- was actually working on another job while on duty for MTPD for this he was charge with failure to answer call for service and given a dereliction. Thomas Stoltz  did not put this on his daily runsheet as well but was not charge for falsifying documents like I was. He was outside his service area and failed to answer his radio for call of duty possibly putting people lives in danger as well as his fellow officers. I was given 11 days for the same mistake of not filling out my runsheet correctly but if you read the investigative report, I called communications informed them that I was outside of sector and still responded to all radio calls for service.

Julie Dronsfield – is believed to have given false written and verbal statements during an investigation of a prisoner's missing property. During investigation it

4

was proven that Julie Dronsfield did posses the missing prisoners property and lied about her involvement. For this she was charge with failure to safeguard prisoner's property and prisoner's property not returned ( theft) and given only 2 days suspension. I was charge with false statements for not knowing my speed and later given an estimation of my speed for investigative purposes. In which I told them it was only an estimation and that I had no idea how fast I was driving. I was later terminated for not being truthful even though Julie Dronsfield lied about a case involving the theft of a prisoner's property.

Tommie Call- was involved in given a false statement during an investigation involving another officer that he supervises, he was given only a 2 day suspension. Again I was charge with false statements for not knowing my speed during an on duty auto accident and terminated .

  Also with the cases just listed involving white officers, none of these officers were subjected to what is commonly known as double jeopardy. In reviewing my files you will noticed that on more that just one occasion MTPD officials charge me twice and in some cases 3 times for the same offense but just worded differently. None of the above named officers were subjected to this treatment.

**INTERROGATORY NO.4:**        Identify each person who, to your knowledge, was alleged to have committed offenses similar to or the same as those for which you were disciplined while employed as a Metro Transit Police officer.

**RESPONSE:** Officers that were alleged to have committed offenses similar to or the same as those I was disciplined for while employed as a Metro Transit Police officer are; Steve Morrison, Jason Williams, Scott Bird, Thomas Stoltz, Julie Dronsfield, Tommie Call, Robert Honick, Ofc Burkholder.

**INTERROGATORY NO.5:**        Identify each of your employers since your termination from WMATA, providing for each the following information:

a.    A description of the position that you held;
b.    The dates during which you held the position;
c.    The identify of your immediate supervisor;
d.    Your salary or wage; and
e.    The date and reason why you left the employment.

**RESPONSE:**        Since my termination I went to work for Georgetown Law Center, my current position there is Special Police officer with the department of Public Safety. I started working there in Jan. 11, 2006 to the present. My immediate supervisor there is Sgt. Eugene Nock. My salary there is currently $30,000 a year.

**INTERROGATORY NO.6:**        Identify all persons with knowledge of facts that support your allegations that you were treated differently from similarly situated persons.

5

# EXHIBIT 30

1

```
 1    IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
 2                       OF COLUMBIA
 3    - - - - - - - - - - - - - - - - - - -
                                           |
 4    TAJ WILSON                           |  ORIGINAL
                                           |
 5                                         |
                                           |
 6                                         |
                                           |
 7              Plaintiff,                 | Civil No.
                                           |
 8         v.                              | 05-2146  (GK)
                                           |
 9    WMATA                                |
                                           |
10                                         |
                                           |
11                                         |
                                           |
12              Defendant.                 |
                                           |
13    - - - - - - - - - - - - - - - - - - -
14              Deposition of Taj Wilson
15              Washington, D.C.
16         Wednesday, February 20, 2008
17                  10:08 a.m.
18
19    Job No.:1-122617
20    Pages 1 - 84
21    Reported by:  Jennifer A. Bosley
22
```


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW  •  Suite 850, Washington, D.C. 20036
Tel: 202.861.3410  •  800.292.4789  •  Fax: 202.861.3425
Web: ladreporting.com  •  E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD  •  Baltimore, MD  •  Greenbelt, MD  •  McLean, VA

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

18

1    And it came about three or four days letter.

2         MR. SHAFFER:   I don't believe that letter

3    he's referring to has been produced to us.  I looked

4    through the file.  I do acknowledge that I'm new to

5    the case.  I have examined the file.  And I don't

6    recall seeing any such letter from him to the EEOC.  I

7    would ask that that be produced.

8         MR. THOMPSON:   No problem.

9    BY MR. SHAFFER:

10        Q    Now, in conjunction with the filing of this

11   charge of discrimination, do you recall filing what's

12   called a, Charging affidavit?

13        A    Not familiar with that.  I mean, I might be

14   just ignorant to the fact.  Can you explain it to me?

15        Q    Sure.  It's normally EEOC procedure that in

16   addition to this charge that there be a narrative

17   typed up regarding your allegations and that you

18   signed that also under penalty of perjury.  It happens

19   to be called a charging affidavit?

20        A    Okay.

21        Q    Do you recall any other papers that you

     signed in conjunction with the filing of this charge

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

19

1    of discrimination with EEOC on or about April 8th,

2    2005?

3        A    Truthfully, we went through a lot of

4    paperwork there on top of the intake paperwork I

5    guess.  And this -- I do recall looking at some other

6    documents.  If that was the affidavit, I'm not sure.

7    I'm not going to lie to you.

8            But I do recall looking at other papers and

9    signing other papers.  But to say if was the actual

10   affidavit, I don't want to say are "yes" or "no"

11   because I'm not 100 percent sure.

12       Q    Okay.  Do you recall being provided with

13   copies of everything you signed that day when you

14   filed this charge of discrimination?

15       A    Yes, I was provided copies of numerous

16   paperwork.  Again, I don't know if it was

17   particuarly -- it could be.  I would have to go home

18   and look through my records and see if the affidavit

19   is there that you speak of.  I don't want to say yes

20   or no now because I don't know.

21       Q    Okay.

22           MR. SHAFFER:  Again, counsel, I would

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

22

1      Q      And that's why you see in here, for example,

2  in Paragraph 1, Section 1981, hereafter, you want to

3  stricken out.  And you see on Page 4 in Paragraph 26

4  it's all bold which means that it's new.

5      A      Okay.

6      Q      Now, with respect to Paragraph 26, would you

7  read that to yourself?

8      A      Okay.

9      Q      By the chief in this paragraph, were you

10  referring to Chief Polly Hanson.

11      Q      Did you witness this remark?

12      A      Yes I was there.

13      Q      And where did this take place?

14      A      It took place in her office on the fifth

15  floor.  It was a Step 3 hearing been Captain Hielmann,

16  George Hielmann, Chief Polly Handson, myself, and

17  Terrance Edwards who was the union rep along with the

18  president of teamsters at the time.  I'm drawing a

19  blank on his name.  And a teamsters attorney named, I

20  believe, Mr. Daniel Gibson.

21      Q      Was this proceeding recorded to the best of

22  your knowledge?

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

29

1    comments about people based upon their gender?

2              MR. THOMPSON:   Objection, beyond the scope.

3         A    No.

4    BY MR. SHAFFER:

5         Q    Now, I want you to look at Paragraphs 22

6    through 27 here.  And these are the various

7    allegations that you have made of incidents in which

8    you were subjected to a racially hostile work

9    environment.

10             The question I'm going to ask you is whether

11   there are any other instances in which you were

12   subject to a racially hostile work environment other

13   than those which are contained in Paragraphs 23

14   through 27.  And please read that with that question

15   in mind.

16        A    Okay.

17        Q    Okay.  Can you answer my question?

18        A    Has there been any other times besides this

19   towards me, no.

20        Q    Okay.  Have there been any other instances

21   of a racially hostile work environment at WMATA of

22   which you are aware other than those directed against

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

30

1    you?

2        A    I can't be 100 percent sure.  It would just

3    be hearsay.  I mean, I wouldn't know.  I wasn't after

4    there after my termination; so I wouldn't know what it

5    was like there after I left.

6        Q    So these are the only all allegations to

7    which you are aware; is that correct?

8        A    Towards me, yes.

9        Q    Thank you.  Can you turn the page, please.

10            Now, you will see that Count 4, Retaliation

11    is all in bold from, Paragraphs 29 through 33.  That

12    means they're all new.

13            I would ask that you to read those to

14    yourself and let me know when you're finished.

15       A    Okay I'm finished.

16       Q    Now, in Paragraph 30, the first phrase says

17    that plaintiff averse that he engaged in protected

18    activity when he complained of discriminatory;

19    treatment while attending the academy.

20       A    Yes, sir.

21       Q    Are there any other instances in which you

22    aver that you were engaged in protective activity?

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

31

1     A     Okay, I'm not sure if I'm understanding your

2  question.

3     Q     What part of it are you having trouble with?

4     A     When you say, other activities, you mean

5  while I at the academy did any other instances take

6  place of discriminatory acts or --

7     Q     Any other time you were employed with WMATA,

8  did you engage in other acts of protected activity?

9     A     When you say protected -- maybe that's the

10  part that's throwing me when you say protected

11  activity.

12     Q     Okay, let me try to define it for you.

13     A     Okay.

14     Q     And your counsel can object if I don't get

15  it right.

16          Protected activity is activity in which you

17  assert your rights not to be discriminated against or

18  treated differently because of your race or sex.

19     A     Okay.

20     Q     Now, let me rephrase my question with that

21  definition in mind.

22          Other than the complaint of discriminatory

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

32

1    treatment at attending the academy, are there any

2    other instance in which you allege that you were

3    discriminated against because of protesting or

4    complaining about your treatment on the basis of race

5    or sex?

6         A     No.

7              MR. THOMPSON:  Objection.  Rather than

8    object to clarify the record.  Your EEOC filing is, of

9    course, protected activity as well.

10        A     Okay.  Yeah I do follow that way in

11   reference to that as far as filing the EEO complaint,

12   just the way they handled my investigation afterwords

13   I believe so.

14   BY MR. SHAFFER:

15        Q     Are talking about the internal EEO complaint

16   or the EEOC EEO complaint or both?

17        A     The complaint that I filed while I was at

18   the academy the way that anything that involved me

19   afterwards, it seemed like they handled it more

20   harshly in my opinion than other cases that were

21   similar to.

22        Q     They handled what, sir?

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

33

1       A       Any type of discipline they would have to do

2   in reference to myself, it seemed like they handled it

3   more harshly than they would in other cases in my

4   opinion; and then when I brought it up with the union.

5       Q       Okay.  Now, you attended the academy in

6   2002; is that correct?

7       A       Yes.

8       Q       You started in January of 2002; is that

9   correct?

10      A       Yes.

11      Q       When did you graduat from the academy?

12      A       I graduated from the academy I believe June

13  of 2002.

14      Q       When did the protected activity, that is

15  when did you complain of the treatment of yourself at

16  the academy?

17      A       I believe not having the paper in front of

18  he or just going off of mental recall, probably around

19  May or April of 2002 while attending the academy.

20      Q       Okay.  Now, after that complaint, when was

21  the first instance in which you were disciplined more

22  harshly?

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

40

1   you.  I know a lot of people used to always tell us,

2   Why can't you all conform.  Why can't you all so --

3   but we didn't do anything.

4          So that's how I felt like a work environment

5   was made hostile.  They didn't necessarily do it

6   themselves, but they let led other people to believe

7   that we was the cause of them having extra work to do.

8       Q    Okay.  Now, other than these acts, were you

9   subjected to any other adverse actions as a result of

10  your complaint at the academy?

11      A    Not that I can recall right now.

12          MR. THOMPSON:  Objection as to scope and

13  time.

14  BY MR. SHAFFER:

15      Q    My question is with respect to any time

16  while you were employed at WMATA, were you subjected

17  to any other adverse actions as a result of your

18  complaint at the academy other than what you have just

19  told me?

20      A    I still believe my punishment as far as like

21  the incident at Wal-Mart might have had something to

22  do to do with my complaining of racial issues, just my

DEPOSITION OF TAJ WILSON
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

41

1    belief.

2        Q    What was the approximate date of the

3    incident at Wal-Mart?

4        A    I believe that was '03.  I'm not sure.  I

5    don't have the date in front of me.  But I believe

6    it's December '03.

7        Q    Okay.  And that was another investigation

8    where you were alleged to have not told the truth; is

9    that correct?

10       A    I wasn't charged with that, no.  The charge

11   was I didn't properly identify myself as police

12   officer.  There was never a charge of integrity.  And

13   at the time of the investigation, they never brought

14   up any integrity issues or lying.

15       Q    What causes you to believe that the

16   investigation of the Wal-Mart incident was caused by

17   your complaint a year earlier at the academy?

18       A    I wouldn't say it was caused.  I just said I

19   think it has direct connection or indirect connection

20   so to speak.

21            When I initially made the complaint in the

22   academy, I was told by other CE officers, you don't

# EXHIBIT 31

T:\WP8\CONTRACT\L246M\9804FnlCBAlang.wpd
April 22, 2002 (4:29PM)

# AGREEMENT

## BETWEEN

## WASHINGTON METROPOLITAN
## AREA TRANSIT AUTHORITY

## AND

## LOCAL 246

## OF THE

## INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL-CIO
## (METRO TRANSIT POLICE)

Effective From October 1, 1998
To
September 30,  2004, Inclusive

**JOINT EXHIBIT**

# 1

and arbitration procedure. Questions of the participation of individuals in activities prohibited by this Article, may, at the option of the Union, be submitted to the grievance and arbitration provisions herein.

Section 2.   The Authority will not lockout any employees as a result of a labor dispute with the Union.

## ARTICLE 16 - NOTICES AND VISITS

Section 1.    Notices of meetings of the Union may be posted by the Union from time to time on the bulletin boards of MTPD. Any such notice shall be permitted to remain on the MTPD bulletin boards until the time set for the meeting mentioned. Other notices may be posted by the Union concerning matters under this Agreement. No political matter whatsoever will be posted on the said bulletin boards.

Section 2.   Business Representatives of the Union shall have access to the Authority's locations, provided advance notice is given to the Chief or specified designee prior to the time of each visit and provided that such visit does not disrupt the operation of MTPD.

## ARTICLE 17 - POLICE SERVICE FILES

Section 1.    An employee's police service file shall be kept under the direct control of MTPD. At the time of inserting any document, except examination papers and background investigations, in the police service file, MTPD shall forward a copy of such document to the employee.

Section 2.    Access to an employee's police service file shall be limited to authorized Authority personnel (COUN, CIVR, MTPD, HRMP and LABR) the employee, the trial board or arbitration panel selected in accord with the provisions of Articles 9 and 10 of this Agreement, or any individual possessing the proper order of any court, administrative body or similar body requiring the production of such file.   Any employee shall, upon request, be permitted to inspect, in the presence of a duly authorized supervisory employee of the Authority, any document appearing in an employee's police service file except examination papers and background investigation. Any person viewing an employee's file, other than the employee, will sign and date an appropriate form.   Individual service files will reflect date and reason whenever authorized persons review said file.

Section 3.    Adverse entries into an employee's personnel file shall not be used in determining disciplinary action or cited in subsequent disciplinary action after a period of eighteen (18) months from the effective date of such adverse entry. Unfounded complaints shall not be retained in the employee's personnel file. Police service files shall be retained in MTPD Offices only.

# EXHIBIT 32

In the Matter of the Arbitration Between:  :
                                                   :

WASHINGTON METROPOLITAN AREA  :
TRANSIT AUTHORITY (WMATA),        :
                                                 :

Employer,                              :    FMCS Case No.  05-54035
               and              :    (Taj Wilson, Grievant.)
                                                 :

FRATERNAL ORDER OF POLICE/DCHA :
LABOR COMMITTEE,             :
                                                 :

Union.                                  :
_____:

Hearing held on June 2, 2005 in Washington, D. C.
Before: Stephen E. Alpern, Arbitrator, Chairman

Matilda A. Brodnax, Esq., Employer Member

William G. Jepson, Jr., Esq., Union Member

## OPINION AND AWARD

### Statement of the Case

     As parties to a collective bargaining agreement ("the Agreement"), effective from October 1, 1998 to September 30, 2004, the Union and WMATA submitted this matter to arbitration.  The dispute involves the termination of the Grievant, Taj Wilson, from his position as a police officer for WMATA.  Accordingly, the parties stipulated to the following issue:

     Whether the termination of the Grievant was for just cause,
     and, if not, what shall the remedy be?

## Facts

The Grievant is a WMATA uniformed police officer. He was first employed on January 4, 2002. On August 15, 2004, while on duty at approximately 9:00 p. m., he received a call asking him to respond to a fight in progress at the New Carrolton METRO station. At the time, the Grievant was standing outside of the Addison Road METRO station, which is at least several miles from the New Carrolton station. He was standing with fellow officer Scott Bird, and upon receiving the call, they both went immediately to their respective patrol cars and proceeded to respond to the call with emergency lights and siren engaged. The two patrol cars turned right onto Central Avenue and then made a u-turn and headed west toward Addison Road. At Addison Road they turned right and headed toward Martin Luther King Avenue. The Grievant's vehicle was in the lead at all times. Officer Bird estimated that he was traveling 55-65 MPH. He testified that the Grievant's vehicle was "a significant distance" in front of his, but couldn't say whether it was four car lengths or a quarter of a mile. After turning onto Addison Road, the Grievant's vehicle was always within Officer Bird's sight. Shortly after the turn onto Addison Road, the road curves slightly to the right and then back to the left.

As he was coming out of the turn, Officer Bird observed the Grievant's vehicle in the middle of the road and then saw it veer to the right, hit a curb and then become airborne before striking the residence at 6004 Addison Road. The vehicle then came to rest, pointing in the opposite direction, in front of the residence at 6002 Addison Road. At the time of the accident the road conditions were dry and the weather was clear. Officer

Bird testified that he did not recall seeing any oncoming traffic on Addison Road when the accident occurred.

Officer Bird stopped his vehicle immediately and ran to the Grievant's vehicle. The Grievant was unconscious, the driver's side airbag had deployed and deflated, and, according to Bird, the Grievant's seatbelt was not fastened. At first Bird was unable to remove the Grievant from the vehicle. When another WMATA officer arrived, the two of them were able to extricate the Grievant. The Grievant was transported to a nearby hospital from which he was released later in the evening.

After being released from the hospital, the Grievant was driven by Lt. Proctor to the Jackson Graham Building for a post-accident test and then to the District 2 headquarters. After arriving at District 2, the Grievant wrote out a statement describing his recollection of the incident. In his statement, he wrote that he was traveling northbound on Addison Road at 45-50 mph and that he hit his brakes to avoid an oncoming vehicle which had crossed into his lane and that his vehicle hit the curb, whereupon he lost control of the vehicle.

In a subsequent interview, on August 26, the Grievant stated that he was traveling between 45 and 55 mph prior to the accident, and that he swerved to avoid the oncoming car, fishtailed, and then hit his brakes prior to hitting the curb.

Officer Kevin Windle, an evidence technician, testified that he arrived at the accident scene at approximately 9:20 p.m., and that he took photographs of the scene. He observed two sets of skid marks on the road. Although he did not determine whether they were from the Grievant's vehicle, the direction of the skid marks was toward the house which was struck by the Grievant's vehicle. The first skid mark was on the center solid

double line of Addison Road. The second set of marks was further down the road and about fourteen feet from the curb, leading in the direction of the house. Further on, there were tire marks in the grass leading toward the house. The accident resulted in estimated damage to the vehicle and to the residence of more than $20,000 each.

Sometime after the vehicle was towed, its event data recorder was removed and information from it was downloaded to a computer. That information reflected that the seat belt was not engaged when the air bags deployed. An inspection of the vehicle revealed that the seat belts were operational.

On October 12, 2004, Lt. Robert Melan administered a Computerized Voice Stress Analyzer (CVSA) test to the Grievant. The CVSA purportedly "measures inaudible stress dealing with FM vocal patterns with regards to answering specific questions and it measures the voice and stresses as related to deception." Lt. Melan testified that he was trained to administer the CVSA tests by an organization called the National Institute for Truth Verification. Although the Grievant took the test, he did so under protest. Prior to administering the test, Lt. Melan explained the purpose of the test to the Grievant and explained how it was conducted. Lt. Melan conducted an extensive pre-test interview with the Grievant in which he went over the details of the accident. Then, during the course of the test, he asked the Grievant a series of questions concerning the accident. During the course of the pre-test interview and the test, the Grievant again stated that his seat belt was fastened, that a vehicle crossed the center line causing him to swerve. For the first time, he stated that he was traveling 65 or 70 mph.

Following these events, WMATA Police Chief, Polly Hanson, issued a memorandum terminating the Grievant's employment on November 5,

2004. Attached to the memorandum was an Accident Investigation Memorandum prepared by Lt. Shawn Doody which recommended the action taken by Chief Hanson based on a number of charges arising out of Grievant's conduct relating to the accident and subsequent investigation. Although a number of the charges basically restated the same misconduct, essentially they set forth three alleged acts of misconduct by the Grievant: 1) falsely stating that his seat belt was fastened; 2) falsely stating that a vehicle crossed the center line causing him to swerve; and, 3) falsely stating his speed at the time of the accident. The Union grieved the termination and, after the parties failed to resolve the grievance, it was referred to arbitration.

## Discussion and Conclusions

The first issue presented is an evidentiary one. The Union objected to the admission of evidence relating to the CVSA test. It argues that both arbitration precedent and statutory law preclude the admission of the results of a lie detector test. WMATA argues that, as the creature of an interstate compact, it is not subject to these statutory restrictions and cites to one arbitration case which considered the results of a polygraph test as corroborative evidence. The Chairman reserved ruling on the Union's objection, pending post-hearing briefing by the parties.

Having fully considered the arguments of the parties, there is no basis for permitting the introduction of evidence relating to the results of the CVSA test, and such evidence has not been considered in reaching the decision in this matter. Quite simply, there is absolutely no evidence in the record that the CVSA test is a scientifically valid indicator of an individual's

truthfulness during the test. The CVSA is not a polygraph, thus any arbitration decisions relating to polygraphs are irrelevant. A CVSA may be infallible, it may be the computerized equivalent of a Ouija Board, or it may lie somewhere in between. This panel, however, has been presented with no competent evidence upon which to determine where on the spectrum a CVSA falls.

The evidence relating to the Grievant's statements made during the course of the CVSA testing is another matter. WMATA, as an interstate compact entity, is not subject to the statutory restrictions that might otherwise be applicable to employers in the jurisdictions where it operates. The federal statute, the Employee Polygraph Protection Act of 1988 ("EPPA"), 29 U. S. C. §§ 2001, et seq., specifically excludes employees of the federal, state and local governments and subdivisions of state and local governments from its coverage. 29 U. S. C. § 2006 (a). This exclusion also applies to any interstate governmental agency. 29 C.F. R. § 801.10 (a). Pursuant to the interstate compact creating WMATA, WMATA is, with exceptions not here relevant, not subject to the laws of its creating jurisdictions. There are also no restrictions in the parties' Agreement which prohibit the use of any form of lie detector tests. Although the Grievant objected to being required to take the CVSA test, it was inherent in his responsibility as a police officer to cooperate in official investigations, and, indeed, he did cooperate by participating in the pre-test and test interviews conducted as part of the CVSA. There is nothing in the record which would indicate that the statements made by the Grievant during the course of the examination were inherently unreliable, and no evidence that he was subject to deception, coercion or untoward pressure to give other than

truthful answers. His answers to the questions are relevant to the issues before me, and we find no basis to exclude them.

WMATA contends that the Grievant falsely stated that he fastened his seat belt when he first began to respond to the call on August 15. Immediately after his release from the hospital, as he was being driven to WMATA Headquarters by Lt. Proctor, the Grievant told Proctor that he had fastened his seat belt. Although Proctor testified that the Grievant was calm at the time, Proctor said that the Grievant could not remember much about the accident. Also, on a form which he signed, dated August 15, the Grievant checked that his seat belt was fastened. Given the timing of his release from the hospital, it is unlikely that the form was signed on August 15, but because it was a report of an on-the-job injury, it is likely that it was signed soon thereafter. There is no evidence that WMATA asked about the seat belts in subsequent interviews.

At the hearing, the Grievant testified that he attempted to fasten his seat belt, but does not remember whether it actually engaged. Officer Bird testified that the seat belt was not fastened immediately after the accident, and that the Grievant was still unconscious at the time Bird observed the unfastened seat belt. WMATA also introduced a Crash Data Retrieval report which was prepared based on data which was downloaded from the vehicle event recorder. Although, as noted in the report, and as argued by the Union, the information produced by the report is subject to numerous limitations. However, none of these limitations bring into question the conclusion of the report that WMATA relies upon. Specifically, the report concludes that the driver's side seat belt was not fastened at the instant the air bag deployed. The Grievant does point out that the report states that the accident occurred on August 6, 2004. The date is obviously in error, as the

report is for a vehicle with the same vehicle identification number as that driven by the Grievant, and it is extremely unlikely that the same vehicle was in an accident nine days prior to the accident in question, in which the air bag also deployed. Thus, even if we were to credit the Grievant's testimony that he does not remember whether his seat belt engaged, WMATA proved by a preponderance of the evidence that the Grievant falsely stated that his seat belt was fastened.

WMATA also contends that the Grievant falsely stated that the accident resulted from his having to swerve to avoid an oncoming car that had crossed the solid yellow line into his lane. The Grievant has consistently made this assertion, although at the hearing he stated for the first time that he swerved right to avoid the vehicle and then swerved back to the left, hit his brakes, and then swerved again to the right and hit his brakes again. This statement is inconsistent with his initial written statement that he "did apply ABS brakes and swerved to the right to avoid hit an oncoming vehicle." It is also inconsistent with his statement on August 26 that he hit the brakes immediately when he saw the car. Officer Bird did not remember seeing any other vehicles.

The limited physical evidence does not support the Grievant's claim that there was an oncoming vehicle in his lane. The skid marks photographed by Evidence Technician Windle clearly show the initial skid marks heading northbound on Addison Road and slightly crossing the center line. Although the skid marks were not positively identified as being from the Grievant's vehicle, they appeared to be connected to the subsequent skid marks near the curb heading toward the house that the Grievant's vehicle struck, and we find it more likely than not that all of the skid marks photographed by Windle were from the Grievant's vehicle. Had

the Grievant braked immediately upon seeing an oncoming vehicle in his lane, there would have been skid marks to the right of the center line. Indeed the first skid marks are more consistent with a head on crash, as opposed to an attempt to avoid an oncoming vehicle. If as the Grievant later claimed, he swerved to the right and then to the left and then hit the curb, there is no explanation as to why the skid marks were not headed more to the left in the direction of his purported motion, and why the second set of skid marks were ahead and to the right, headed in the direction of the house. If the Grievant lost control of his car while it was fishtailing to the left, it seems unlikely that he would wind up in a yard on the right. Finally, we note that, understandably, the Grievant does not seem to have a clear recollection of the accident. From the date of the accident on, his accounts of the accidents varied in critical respects. In his discussions with Lt. Melan in the course of the CVSA examination, the Grievant stated he remembered hitting his brakes, but he didn't know exactly when. His initial account was that he hit the brakes immediately. The Grievant testified at the hearing that he hit the brakes after swerving to the right and then to the left. Because of the Grievant's varying accounts of what happened, the fact that Officer Bird did not recall seeing an oncoming vehicle, and the physical evidence of the skid marks, we find that WMATA has met its burden of showing that the Grievant falsely stated that the accident resulted from his attempting to avoid an oncoming vehicle in his lane.

Finally, WMATA contends that the Grievant falsely stated his speed at the time of the accident. In his initial statement the Grievant asserted that he was going about 45-50 MPH at the time of the accident. In a subsequent statement, on August 26, the Grievant stated, "[l]ast look, I was doing 45-55. About 50." During the interview with Melan in the course of the CVSA



examination, the Grievant stated his speed was 65-70. On direct examination, the Grievant testified that before his formal CVSA interview, Lt. Melan discussed the accident with him and asked about his speed. He said the last he looked at his speedometer he was doing about 50 MPH, but then acknowledged that he could have been going faster, but he didn't know. Melan asked if it was possible that he was going 100MPH, and the Grievant said he doubted that he was going that fast. Then Melan "threw the number out there – 65-75 miles an hour. I agreed to it. I said it's a chance I could have been doing that, I don't know." After the Grievant's testimony, WMATA played the tape of Melan's pre-CVSA test interview with the Grievant. During the interview, Melam asked the Grievant, "how fast would you say you were going?" The Grievant replied, "I wasn't looking at the speedometer, but if I had to guess, I'd say between, realistically, maybe 65-70." At the end of the interview the Grievant did state that he wasn't 100% sure about his speed. After the tape was played the Grievant testified that the conversation he recounted on direct examination took place during a break in the taping when Melan informally discussed the accident with him. Even if we were to credit the Grievant's testimony, he did clearly state in the interview that he guessed he was going about 65-70, and there is no indication that he was just going along with Melan's suggestion from a number of minutes previous to his statement.

While there is ample evidence in the record that the Grievant made inconsistent statements concerning his speed, it also seems clear that his earliest statements concerning his speed were not truthful. Officer Bird consistently stated in written statements and in his testimony that his speed was about 55-60 MPH, and that the Grievant was ahead of him. Although there was no formal accident reconstruction which might have helped

determine a more precise speed, the physical evidence is especially telling. The photographs of the accident scene reveal that the Grievant's vehicle first skidded along the center line of Addison Road, and then thirty feet further on there were additional skid marks. After that the Grievant's vehicle hit the curb and apparently traveled across the sidewalk and lawn of 6004 Addison Road, knocking over the front porch of the home at that address and then winding up, facing the opposite direction in front of the home at 6002 Addison Road. Both the home at 6004 Addison Road, and the Grievant's vehicle suffered extensive damage. Officer Bird's testimony, together with the physical evidence and the Grievant's statement during the course of the CVSA examination lead me to conclude that the Grievant's speed was <u>at least</u> 55 MPH and quite likely a good bit faster. Accordingly, we find that WMATA showed by a preponderance of the evidence that the Grievant made untruthful statements concerning his speed at the time of the accident.

The final issue is whether the Grievant's misconduct provides just cause for his removal. All of the Grievant's untruthful statements were related to one incident. Quite simply, he falsely recounted the circumstances surrounding the accident. His statement concerning the seat belt is the least serious, in that he made it shortly after the accident when he was quite possibly still subject to confusion. His testimony at trial could be regarded as a clarification that he attempted to fasten his seat belt but wasn't sure if it engaged. We have concluded that his statement regarding the oncoming vehicle was a fabrication and, as such, is more serious. Similarly, his various accounts of his speed, together with his testimony at trial that his subsequent inconsistent statement was prompted by Lt. Melan,

do not reflect the truthfulness that WMATA has the right to expect from its police officers.

Whether or not these false statements, in and of themselves, are sufficient to warrant the Grievant's discharge need not be determined. These false statements, when viewed in light of the Grievant's prior misconduct, form ample justification for Grievant's termination. The Grievant is a relatively short term employee, having been employed by WMATA for only slightly over 2 ½ years. His record as a police officer was not good. As a result of an incident on December 3, 2003, the Grievant received a one day suspension for discrediting the Department and a letter of reprimand for violating the Department's rules relating to firearms. This discipline resulted from off-duty conduct in which he displayed his service weapon and failed to identify himself as a law enforcement officer during the course of a dispute with a private citizen. After an investigation, the Commander of the Department's Office of Professional Responsibility determined that the citizen's version of the incident was much more plausible than the Grievant's.

On May 4, 2004, the Grievant was involved in a preventable motor vehicle accident that resulted in injuries to himself and to the driver of the other motor vehicle, and in more than $14,000 damage to the WMATA vehicle that the Grievant was driving. The investigating officer determined that the Grievant's statement that the light that he went through was yellow, rather than red, was inconsistent with the evidence. The Grievant was suspended for one day.

On June 18, 2004, the Grievant was involved in an incident that resulted in an 11 day suspension. The Grievant, while on-duty, responded to an area five miles from his assignment, without telling anyone, without

permission, and for personal business. He falsely stated that he was only away from his assigned area for about 15 minutes when it was at least an hour. While away from his assignment he radioed in, and falsely stated his position. While away from his assigned location, he became involved in a personal dispute that resulted in the local police being called. He also falsified his daily log sheets to indicate that he was within his assigned sector when he was not. The suspension was served on the Grievant after the August 15 incident at issue in this case. The Union did not appeal the Grievance of that suspension to the Trial Board or to Arbitration, and thus under the parties' Agreement it became "final and binding upon the aggrieved employee and the Union." The suspension letter warned the Grievant that should he be involved in any similar incident, especially regarding integrity issues, he would be terminated. We are not considering this warning, inasmuch as it was given after the incidents involved in this case. We are, however, considering the findings which resulted in the suspension.

The Grievant's false statements regarding the incident on August 15 appear to be part of a disturbing and consistent pattern. The Grievant becomes involves in situations where he has not conducted himself in an exemplary manner, and then he gives false accounts of his conduct. He has amply demonstrated that WAMATA cannot rely on him to be truthful concerning his official conduct. As a sworn police officer, the Grievant must frequently be available to testify in judicial proceedings. Because of his record of untruthfulness, the Grievant's credibility as a witness would be seriously impaired. Under these circumstances, WMATA had just cause to remove the Grievant.

**Award**

The grievance is denied.

Dated this _24_th day of September, 2005

_____

Stephen E. Alpern
Chairman


*Matilda A. Brodnax*   9/30/05

Matilda A. Brodnax, Esq.
Employer Member

*William G. Jepsen*

William G. Jepsen, Jr., Esq.
Union Member