## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
TAJ WILSON,                   )
                              )
         Plaintiff,           )
                              )
    v.                        )     Civil Action No. 05-2146 (GK)
                              )
WASHINGTON METROPOLITAN       )
AREA TRANSIT AUTHORITY        )
                              )
         Defendant.           )
                              )
_____)
```

### MEMORANDUM OPINION

Plaintiff Taj Wilson ("Plaintiff") brings this action against Defendant Washington Metropolitan Area Transit Authority ("Defendant" or "WMATA"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). He alleges that Defendant violated Title VII on the grounds of Disparate Treatment Based on Race and Color (Count I), Disparate Treatment Based on Gender (Count II), Racially Hostile Work Environment (Count III), and Retaliation (Count IV).

This case is now before the Court on Defendant's Motion for Summary Judgment on Count I, Disparate Treatment Based on Race and Color [Dkt. No. 77].[1]  Upon consideration of the Motion,

_____
[1]  Plaintiff withdrew Counts II-IV on June 12, 2008 [Dkt. No. 86]. See Pl.'s 2d. Errata Opp'n to Def.'s Mot. for Summ. J. at 3 n.2.

Opposition, Reply, the entire record herein, and for the reasons stated below, Defendant's Motion is **granted**.

## I.   BACKGROUND [2]

Plaintiff, an African-American male, began his employment as a police officer with Defendant's Metro Transit Police Department ("MTPD") on January 14, 2002.  He participated in field training from September to December 2002, when he completed the field training program.  During this period, Plaintiff noted that a white officer insisted on putting on gloves before touching him during a drill, even though that officer touched white officers without wearing gloves.  Plaintiff also noted that white officers called Anacostia "Animal Costia," that a white officer made racial slurs and gang references to him and other black officers, and that Metro Transit Police Chief Polly Hanson ("Chief Hanson") stated that "people like [Plaintiff] in the department do not change."  Def.'s Statement of Material Facts ¶ 141.

During his employment with WMATA, Plaintiff was the subject of five disciplinary investigations within a nine-month period.  First, on December 3, 2003, Plaintiff displayed his service weapon during an off-duty altercation at a Wal-Mart store.  He had stored the weapon in his unlocked glove compartment and failed to identify himself as a police officer during the altercation.  Captain George

---

[2]   Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h) and the parties' summary judgment papers.

Heilmann ("Heilmann") of MTPD's Office of Professional Responsibility and Integrity investigated the incident and charged Plaintiff with leaving his service weapon in his glove compartment, displaying his service weapon and failing to wear it in his holster while off duty, and failing to identify himself as a police officer. Plaintiff was suspended for one day.

Second, on May 4, 2004, while driving his MTPD scout car, Plaintiff was involved in an auto accident. He and another motorist were injured in the accident, and the scout car sustained $14,000 in damage. Sergeant Helen Acton investigated the collision and found that it was preventable. Because of its preventability, Plaintiff was suspended for one day.

Third, on June 13, 2004, Plaintiff was visiting a friend when he intervened in an altercation, at which point "an unknown person attempted to grab [his] service weapon." Id. ¶ 25. Heilmann investigated the incident and recommended remedial weapons training for Plaintiff.

Fourth, on June 18, 2004, while on duty, Plaintiff left his "assigned sector" to address personal business. Id. ¶ 28. He did so without alerting his supervisor or obtaining permission, and he subsequently turned in an "inaccurate run sheet" (daily activity log) for this period of time.[3] Id. ¶¶ 30, 32-34.

---

[3] Plaintiff asserted that he was away from his sector for 10-15 minutes, while the investigation found the duration of his absence to be more than 60 minutes. Def.'s Statement of Material Facts ¶ 41.

Heilmann investigated the incident and charged Plaintiff with nine violations of MTPD General Orders[4]: (1) violation of oath of office; (2) making false reports in an official daily activity log with a prior history of doing so; (3) providing false information to a dispatcher regarding his whereabouts while on duty; (4) providing false information to Heilmann regarding his whereabouts while on duty; (5) conducting activities on duty that were "not related to the protection of WMATA customers, personnel, and transit facilities" and failing to call local police at the scene of a traffic accident; (6) failing to disclose his personal involvement and that of his girlfriend in a traffic accident, which endangered the officer responding to the accident; (7) leaving his sector for more than an hour without the authorization or knowledge of his supervisor or the Communications Division; (8) leaving his beat for over an hour to attend to personal affairs; and (9) leaving his sector for more than an hour without the permission of his supervisor or the Communications Division in order to attend to personal affairs. Id. ¶¶ 38-46.  As punishment, Plaintiff was suspended for eleven days.  Def.'s Mot. for Summ. J. at 8.

Fifth, on August 15, 2004, Plaintiff lost control of his MTPD scout car while responding to an incident.  His car became airborne

---

[4]  These infractions are covered under General Order 217 "Ethical Standards of Conduct and Financial Interest," General Order 105 "Authority and Jurisdiction," and General Order 215 "Duties and Responsibilities."  Def.'s Statement of Material Facts ¶¶ 39-46.

and crashed into a residence.  At the time of the accident, the weather was clear, and the road was dry and unobstructed. Plaintiff was found unconscious at the scene, and the vehicle's airbag had deployed.  Plaintiff later "estimated" his speed to have been between 65 and 70 MPH at the time of the accident.  Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 66.  Both the car and the residence were severely damaged, and the residence was subsequently closed by county building inspectors.  Def.'s Statement of Material Facts ¶ 62.

The Prince George's County Police Department investigated the incident and found that "[P]laintiff was at fault for the accident."[5]  Def.'s Statement of Material Facts ¶ 63.  On October 5, 2004, Chief Hanson notified Plaintiff in writing that any "future integrity issues" would result in his termination from employment.  Id. ¶ 47.

Lieutenant Shawn Doody ("Lt. Doody") conducted the internal investigation, and, as a result, Plaintiff was charged with seven

---

[5]   Plaintiff asserts that "both the [Computer Voice Stress Analysis] and data recorder were inconclusive regarding Plaintiff's speed."  Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 63. Plaintiff further states that he "was responding to a 'Code One' in which there are no speed restrictions."  Id. ¶ 56.  However, Plaintiff does not dispute that the official investigation found him to be at fault for the accident and to have been driving his vehicle at a high speed "without regard to life and property" or "due regard for safety."  Def.'s Statement of Material Facts ¶¶ 63, 73-74.

violations of MTPD General Orders[6]: (1) violation of oath of office, (2) providing false statements during an investigation, (3) providing a false written report, (4) responding untruthfully to inquiries posed by an official, (5) operating a "scout car at a high rate of speed and fail[ure] to maintain his lane without due regard for safety," (6) operating "his scout car at a high rate [of] speed without regard to life and property," and (7) "failing to wear a seatbelt."[7]  Id. ¶¶ 69-75.

On November 12, 2004, as cumulative punishment for these charges as well as for the "culmination of several incidents which occurred over a short period of time," Plaintiff was terminated. Id. ¶ 76.  In arbitration, the Fraternal Order of Police/DCHA Labor Committee upheld his termination on grounds of "just cause."[8] Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 77.

On April 8, 2005, following his termination, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was subjected to racial discrimination and retaliation between October 1, 2004 and November 12, 2004. Def.'s Mem. in Support of its Mot. for Summ. J. at 13-14.

---

[6]  These infractions are covered under General Order 217 "Ethical Standards of Conduct and Financial Interest" and General Order 306 "Emergency Vehicle Operations." Def.'s Statement of Material Facts ¶¶ 70-75.

[7]  Lt. Doody recommended termination as the punishment for four of these charges.  Def.'s Statement of Material Facts ¶¶ 69-72.

[8]  The hearing took place on June 2, 2005 in Washington, D.C. before Stephen E. Alpern, arbitrator and chairman.

Plaintiff did not include charges of gender discrimination or racially hostile work environment in his EEOC complaint.   Id. at 14.   However, he observed that "he was [the] subject of intense scrutiny with respect to disciplinary actions and punishments, [and] that his entire class, white and black officers alike, were subject to punishment" because he complained to MTPD officials about the gloved officer incident during training.   Def.'s Statement of Material Facts  ¶ 147 (citation omitted).

On November 11, 2005, Plaintiff filed his original Complaint in this Court on counts of "Disparate Treatment Based on Race and Color in Violation of Title VII & 1981" (Count I) and "Disparate Treatment Based on Gender in Violation of Title VII" (Count II). Compl. at 2, 3.   He sought $300,000 for "compensatory damages, backpay, interests [sic], [and] emotional distress" resulting from the alleged Title VII violations as well as costs, expenses, attorney's fees, and an injunction against Defendant's allegedly discriminatory practices.   Id. at 4: ¶¶ ii-iv.

On October 29, 2007, Plaintiff filed an Amended Complaint, which added the count of "Racially Hostile Work Environment in Violation of 1981" (Count III) [Dkt. No. 46]. Am. Compl. ¶¶ 22-29. On December 18, 2007, Plaintiff filed a Second Amended Complaint, which added a fourth count of Retaliation [Dkt. No. 57].[9]

---

[9]  The Second Amended Complaint also withdrew his claim of 42 U.S.C. § 1981 jurisdiction and corrected an error as to Plaintiff's gender in ¶ 4.

On April 1, 2008, Defendant moved for Summary Judgment [Dkt. No. 77]. On June 12, 2008, Plaintiff filed an Opposition, in which he withdrew his claims of Gender Discrimination, Hostile Work Environment, and Retaliation in Counts II, III, and IV [Dkt. No. 86].

## II.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006).  In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is, it is "material" to the case.  "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  Arrington, 473 F.3d at 333 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A fact is "material" if it might affect the outcome of the case under the substantive governing law.  Liberty Lobby, 477 U.S. at 248.

In its most recent discussion of summary judgment, in Scott v. Harris, 550 U.S. 372, 380 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do

-8-

more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87... (1986) (footnote omitted). "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." [<u>Liberty Lobby</u>, 477 U.S. at 247-48.]

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not... to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." <u>Liberty Lobby</u>, 477 U.S. at 248, 249.  In both <u>Liberty Lobby</u> and <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. <u>Liberty Lobby</u>, 477 U.S. at 255.  "To survive a motion for summary judgment, the party bearing the burden of proof at trial... must provide evidence showing that there is a triable issue as to an element essential to that party's claim. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)." <u>Arrington</u>, 473 F.3d at 335.

### III. DISPARATE TREATMENT BASED ON RACE AND COLOR UNDER TITLE VII

The key inquiry on a motion for summary judgment in a Title VII case is whether the plaintiff has produced enough evidence for a reasonable jury to find, by a preponderance of the evidence, that the employer's legitimate, non-discriminatory justification for the employee's termination is pretextual, and that the true reason for the employee's termination was discriminatory.  See Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008); see also Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (instructing courts to determine whether "all the evidence, taken together, was insufficient to support a reasonable inference of discrimination").  Although discrimination claims under Title VII are typically analyzed under the McDonnell Douglas framework, Brady excused courts, when ruling on a summary judgment motion, from considering whether the plaintiff established a prima facie case of discrimination.  520 F.3d at 493-94.  Rather, once the defendant has offered his justification, the burden shifts back to the plaintiff to prove that it is pretextual.  See Plummer v. Bolger, 559 F. Supp. 324, 329 (D.D.C. 1983).

The court may rely on the totality of the evidence in conducting this inquiry, including "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of

discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) (citing Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).

There are three possible ways for a plaintiff to show that the employer's justification was pretextual and that her action was discriminatory: (1) directly, by demonstrating that a "discriminatory reason more likely motivated the employer," George v. Leavitt, 407 F.3d 405, 413 (D.C. Cir. 2005) (internal citations and quotation marks omitted), (2) indirectly, by demonstrating that the employer falsified the "underlying facts" that allegedly justified the termination, Brady, 520 F.3d at 495, and (3) indirectly, by demonstrating that a similarly situated employee received more preferential treatment or less harsh punitive measures. Id.

In evaluating the possibility of pretext, "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, [] there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." Id. See also Fischbach v. D.C. Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers").

-11-

The D.C. Circuit has time and again resisted serving as a "super-personnel department" that double-checks hiring and firing decisions made by a business or organization.  Holcomb, 433 F.3d at 897 (quoting Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999)).

### A.   Defendant Provided a Legitimate, Non-Discriminatory Justification for Plaintiff's Termination

Defendant argues that it has established a legitimate, non-discriminatory justification for Plaintiff's termination and that Plaintiff's named comparators do not discredit this justification. Def.'s Mem. in Support of its Mot. for Summ. J. at 16.  Therefore, it is unnecessary to decide whether Plaintiff has established a prima facie case of discrimination.  See Brady, 520 F.3d at 493-94.

Plaintiff's disciplinary record for the short duration of his employment with MTPD is an exceedingly serious one.  The charges against him consist of both ethical violations and instances of very poor judgment involving his service weapon and service vehicle.  He was involved in five disciplinary incidents within a nine month span prior to the August incident, and all of his violations endangered either the public or a fellow officer. Investigations of two of the violations uncovered further wrongdoing in the form of Plaintiff's deliberate falsehoods in recounting his version of the incidents.

Therefore, under the Fischbach analysis, supra, a jury may find that Defendant's act of terminating Plaintiff is reasonable in light of Plaintiff's recurring disciplinary problems.  Unless Plaintiff establishes pretext or falsity of Defendant's justification, there is no ground on which a reasonable jury could find discrimination by a preponderance of the evidence.

### B.    Plaintiff Has Not Proven that Defendant's Justification for Plaintiff's Termination is Pretextual

Plaintiff denies that Defendant has provided a legitimate, non-discriminatory justification for his termination.  He argues that even if, assuming arguendo, Defendant had made such a showing, that justification would be "both dishonest and unreasonable."  Pl.'s 2d. Errata Opp'n to Def.'s Mot. for Summ. J. at 5.  Plaintiff considers Defendant's justification to be pretextual on two grounds: first, that Plaintiff's "veracity" and "integrity" have not been "impugned" by his disciplinary violations, and second, that in comparison to allegedly similarly-situated employees who were not terminated, Plaintiff was terminated on the basis of race.  Id. at 6.

### 1.    Plaintiff Has Not Demonstrated that Defendant's Justification Is "Unreasonable" and "Dishonest."

Plaintiff addresses each violation to demonstrate that his veracity and integrity were not damaged by his disciplinary record.  This argument is patently wrong.  As the basis for it, he

appears to insinuate that, but for a complete undermining of his veracity and integrity, his termination is discriminatory.

For example, in regard to the Wal-Mart incident on December 3, 2003, Plaintiff asserts that he "was not charged with any violation that challenged his veracity or integrity related to the incident."[10]   Id. at 7.   However, Plaintiff was charged with a violation of General Order 217 "Ethical Standards of Conduct and Financial Interest" in connection with that incident.   Def.'s Statement of Material Facts ¶ 16.   In regard to the June 13, 2004 incident, Plaintiff makes a series of observations but fails to present any argument or conclusion.   Plaintiff's strongest observation is that "Defendant's motion acknowledges that Hellman's [sic] observations rests [sic] upon, 'unverifiable sources.'"   Pl.'s 2d. Errata Opp'n to Def.'s Mot. for Summ. J. at 5.   This is, at best, a mischaracterization of the cited portion of Defendant's Motion for Summary Judgment, which clearly explains that the only unverified information pertained specifically to the identity of the person who tried to take Plaintiff's gun.   Def.'s Mem. in Support of its Mot. for Summ. J. at 5 (stating that unverified witnesses testified that Plaintiff's girlfriend was the person who attempted to take his service weapon).

---

[10]   Plaintiff fails to provide any citation for this assertion.

Plaintiff does not deny his involvement in any of the incidents for which he was disciplined but instead challenges the degree to which they damaged his value as an employee of MTPD.[11] Given the fact that the charges against him were the result of formal, departmental investigations and that a union arbitrator, Stephen E. Alpern, upheld his termination without questioning the accuracy of his disciplinary record, Defendant was more than reasonable in believing the charges to be accurate.

In short, Plaintiff argues that his veracity and integrity have not been called into question by his disciplinary violations. However, not only has he offered virtually no persuasive evidence or legal argument to this effect, the undisputed facts are completely to the contrary.  On a motion for summary judgment, no genuine issue of material fact is raised if the non-movant offers only "conclusory allegations lacking any factual basis in the record."  Hussain v. Nicholson, 435 F.3d 359, 365 (D.C. Cir. 2006).  The non-movant must do more than offer "'mere allegations'"; rather, she must demonstrate "'specific facts'" through evidence or affidavits.  See Lujan v. Defenders of

---

[11] The issue raised by Hitt v. Harsco Corp., 356 F.3d 920 (8th Cir. 2004), relied on by Plaintiff, where plaintiff in that case asserted a genuine issue of fact as to whether he engaged in the conduct for which he was terminated, is not the issue in this case. Assuming arguendo that it were, as long as the employer reasonably believes that the charges for which the plaintiff was terminated are true, the termination may be legitimate and justified even if the charges were, in actuality, false.  See George, 407 F.3d at 415 (citation omitted).

<u>Wildlife</u>, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)).  Because Plaintiff has failed to provide evidence that Defendant's justification for terminating him was either dishonest or unreasonable, no reasonable jury could find pretext in this regard.

> ### 2.   <u>Plaintiff Has Not Demonstrated that Similarly-Situated Employees Were Treated More Favorably.</u>

In order to establish that a plaintiff is similarly-situated to another individual, she must "demonstrate that 'all of the relevant aspects of her employment situation were 'nearly identical' to those of the" comparator.  <u>Holbrook v. Reno</u>, 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting <u>Neuren v. Adduci, Mastriani, Meeks & Schill</u>, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (citation omitted)).  This includes demonstrating that the comparator was "charged with offenses of 'comparable seriousness.'"  <u>Id.</u>  If a reasonable juror would be unable to find that the plaintiff and the comparator were similarly situated, the court may decide, as a matter of law, that the two are not similarly situated.  <u>See</u> <u>George</u>, 407 F.3d at 414-15.

Plaintiff and Defendant have discussed eight MTPD employees as alleged comparators at various points throughout the record.[12] Defendant's Interrogatory No. 1 reads "Please identify each and

---

[12]  Plaintiff refers to these as his "Non-White Comparators."  <u>See</u> Pl.'s 2d. Errata Opp'n to Def.'s Mot. for Summ. J. at 9.   The Court assumes this is a mistake and that he intends to say "Non-Black Comparators."

every person whom you consider to be a 'similarly situated while [sic] Police Officer' who was not subjected to the same discipline to which you were subjected." Pl.'s Resp. to Def.'s Interrogs. at 2.  Plaintiff's answer provided six names: Steven Morrison ("Morrison"), Jason Williams ("Williams"), Julie Musitano (Dronsfield) ("Musitano"), Scott Bird ("Bird"), Tommie Call ("Call"), and Thomas Stolz ("Stolz").  Def.'s Mem. in Support of Mot. for Summ. J. at 16.

Defendant argues that, because Plaintiff failed to name Robert Burkholder ("Burkholder") and Kenneth Honick ("Honick") as comparators in his response to Interrogatory No. 1, he is precluded from identifying them as comparators after the conclusion of discovery.  See id.; Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 5 n.5 (citing Gadaleta v. Nederlandsch-Amerekaansche Stoomvart, 291 F.2d 212 (2d. Cir. 1961)).

It is not clear that this non-controlling authority fully supports Defendant's assertion.  Gadaleta found that, even though responses to interrogatories may be used as admissions at trial, the responses in that case were not treated as admitted because they were predicated on the party proving that another condition was present.  291 F.2d at 213 (finding that "[t]he answers here... were conditional on the prior establishment of the existence of the wet condition of the pier, which was not admitted by

defendant").

In the instant case, the issue is not that Plaintiff responded to interrogatories in such a way that they were dependent upon proof of an underlying condition. Here, the issue is that Plaintiff failed to name all of his alleged comparators in his interrogatory response and subsequently addressed only three (Burkholder, Williams, and Musitano) in his Opposition to Defendant's Motion for Summary Judgment.

Plaintiff does list Burkholder and Honick in his response to Interrogatory No. 4 as officers who allegedly committed offenses similar to Plaintiff's [Dkt. No. 39].[13]  Pl.'s Resp. to Def.'s Interrogs. at 5.  He also mentions Burkholder in his deposition and, for that reason, argues in favor of Burkholder's inclusion as a comparator.  Pl.'s Dep. at 150:3-4.  Plaintiff does not mention Morrison, Bird, Call, Honick, or Stolz in his Opposition to Summary Judgment or his Complaint.  He does mention Bird in his Statement of Material Facts as well as his Response to Defendant's Statement of Material Facts, <u>see</u> Pl.'s Statement of Material Facts ¶¶ 8-9; Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 117. However, his allegation that Bird is a similarly-situated individual is cited to *Defendant's* Motion for Summary Judgment, and the remainder of his discussion of Bird is in reference to a

---

[13] Names in the interrogatories are heavily redacted and it is, therefore, difficult to ascertain whether Burkholder and Honick were mentioned repeatedly.

conclusory statement that Plaintiff made in his deposition. Pl.'s Statement of Material Facts ¶¶ 8-9. For the sake of thoroughness, Bird is discussed as a comparator below; however, Plaintiff has legally conceded Bird's position as a similarly-situated individual by failing to include any discussion of him in his Opposition.

Without admitting that Burkholder or Honick are similarly-situated, Defendant does discuss all comparators mentioned by Plaintiff anywhere in the record in its Motion for Summary Judgment. Because Plaintiff effectively abandoned four alleged comparators (Morrison, Call, Stolz, and Honick) by not discussing them in his Opposition to Defendant's Motion for Summary Judgment or his Statement of Material Facts, those individuals are conceded as <u>not</u> being similarly-situated to Plaintiff and, therefore, will not be discussed herein. See <u>FDIC v. Bender</u>, 127 F.3d 58, 67-68 (D.C. Cir. 1997) (finding that a plaintiff concedes an argument raised in a defendant's motion if she fails to respond to that argument in her opposition to the motion).

a. <u>Julie Musitano</u>

Musitano is a white female, employed by MTPD between May 8, 2000 and October 6, 2006, when she resigned. Musitano received two disciplinary charges during her tenure, and both were in connection with a single incident: "failure to safeguard prisoner property... and failure to ensure that prisoner property is

returned to the rightful owner." Def.'s Statement of Material Facts ¶ 91. She was suspended for two days for the former charge and one day for the latter.

Plaintiff argues that there was a disparity in treatment between himself and Musitano because Defendant "should have concluded" that Musitano was lying about misplacing prisoner property. Pl.'s 2d. Errata Opp'n to Def.'s Mot. for Summ. J. at 15. However, the MTPD investigation did not make that finding. Although MTPD retained an expert to review Musitano's polygraph results, it did not do so for Plaintiff's admittedly unfavorable results. See id. at 17. Plaintiff alleges that this also reveals discriminatory treatment.

Based on the investigation's findings, Musitano's infractions were significantly less serious and less numerous than Plaintiff's. They were in connection with a single incident, did not endanger anyone, and did not involve the misuse of a service weapon or service vehicle. For these reasons, Musitano is not similarly-situated to Plaintiff.

b. Jason Williams

Williams is a white male, employed by MTPD since July 19, 1999. His first disciplinary incident occurred on September 13, 2003, when he attended to personal affairs while on duty and falsified entries on his run sheet. He received four charges: "failure to devote full time and attention to the business of the

department... failure to provide the Communications Division with an odometer reading prior to and following the transport of juveniles or persons of the opposite sex... knowingly make [sic] a false statement in any written or verbal report, and... failure to perform duties impartially, without favor or affection or ill will, and without regard to status, sex, race, religion, political belief or aspiration."  Def.'s Statement of Material Facts ¶ 104. As a result, he was removed from mobile patrol and suspended for four days.

Williams' second infraction was on March 10, 2005, when he "conducted an unauthorized traffic stop" with Robert Burkholder. Id. ¶ 106.  Williams was charged with voluntarily participating in a traffic stop without jurisdictional authority, searching a vehicle on the basis of misleading information, making false statements during an investigation (two charges), and discrediting the MTPD.  Pl.'s Ex. D at 8-10.  His original punishment of a thirteen day suspension with a reprimand was reduced by Chief Hanson to a six day suspension with a reprimand, and he was warned that further infractions would eventually lead to his termination. Pl.'s Resp. to Def.'s Statement of Material Facts  ¶ 107.

Williams was involved in two disciplinary incidents within eighteen months, in comparison to Plaintiff, who was involved in five disciplinary incidents within nine months.  Neither of his infractions endangered anyone or involved the misuse of a service

weapon or service vehicle.  Although the second incident involved
giving false information, which was similar to Plaintiff's
conduct, Williams did "'clarify' his statements."  Def.'s 2d.
Errata Opp'n to Def.'s Mot. for Summ. J. at 14.  Furthermore,
Plaintiff provided false information at the time of the incident,
following the incident, and during the investigation, resulting in
three charges for false information in comparison to Williams'
single charge.  Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for
Summ. J. at 7-8.  For these reasons, Williams is not similarly-
situated to Plaintiff.

### c.  Scott Bird

Bird is a white male, employed by MTPD between December 17,
2001 and October 24, 2007, when he resigned.  His single
disciplinary violation was the accidental discharge of a weapon,
for which he was suspended for three days.  The investigation did
not result in a finding of deception.

Although Bird's incident did involve the misuse of a service
weapon, it was his single violation in a roughly six-year period,
significantly less than Plaintiff's extensive disciplinary record.
For these reasons, Bird is not similarly-situated to Plaintiff.

### d.  Robert Burkholder

Burkholder is a white male, employed by MTPD since August 25,
1997.  During his tenure, he has received twelve disciplinary
violations, and Chief Hanson has characterized his behavior as

involving "deception by omission."  Hanson Dep. at 88:3-4.  First, on December 11, 1998, he "received a dereliction for failure to reinspect the prisoner transport area of his patrol vehicle" after transporting a prisoner.  Def.'s Statement of Material Facts ¶ 128.  As a result, he received counseling and was removed from solo patrol for a month.

On April 7, 1999, Burkholder was suspended for one day following an accident with his police vehicle.

On December 27, 1999, he received counseling and an order for training in regards to his profanity use.

On March 13, 2000, Burkholder was reprimanded, removed from solo patrol, and denied the opportunity to obtain outside employment due to his use of inappropriate language.  He again received additional training.[14]

On February 8, 2001, he underwent formal counseling for rudeness to a fellow employee.

On April 4, 2001 and December 29, 2003, Burkholder was involved in two separate vehicle accidents and received a one day suspension for each.[15]

---

[14]  Plaintiff includes a brief description of additional training that Burkholder received in 2000: February 24, 2000, "Communicating with Tact" Training; June 22-23, 2000, Verbal Judo; September 18-22, 2000, Crisis Management Training.  Pl.'s 2d. Errata Opp'n to Def.'s Mot. for Summ. J. at 12.

[15]  Neither accident resulted in any injuries, and Burkholder admitted all surrounding facts.  Furthermore, a collective bargaining agreement prohibited consideration of the prior vehicle accident(s) at the time of each incident.

On January 25, 2005, he conducted an unauthorized traffic stop when his duty at the time was with the rail canine explosives team.  He received counseling for the incident and "was directed to discontinue unsupervised traffic stops."  Id. ¶ 137.

On March 10, 2005, Burkholder was suspended for four days for his involvement in the incident with Williams, supra.  He was charged with participating in a stop outside of MTPD jurisdiction, failing to report a traffic stop and conducting it with misleading information, failing to notify the Communications Division  of the stop, conducting a routine traffic stop contrary to specific instructions for Metro Rail Canine Explosive Teams, and discrediting the MTPD.  Pl.'s Ex. D at 10-12.  The investigation also found that Burkholder "displayed signs of deception."  Id. at 7.

On April 29, 2005, Burkholder was suspended for one day "for conduct unbecoming of an officer."[16]  Def.'s Statement of Material Facts ¶ 138.

On June 24, 2005, Burkholder was suspended for one day for his part in a traffic stop conducted by him and Honick.  He received two charges: leaving "his sector without notification and fail[ure] to notify communications that he had initiated a traffic

---

[16]  Plaintiff denies this paragraph and states that Burkholder was not disciplined for false reporting and his persistence in making unauthorized stops.  Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 138.  However, Plaintiff does not deny that Burkholder received a one-day suspension.

stop, as well as fail[ure] to notify an official that his vehicle had become disabled." Id. ¶ 139.

Defendant omits from his Statement of Material Facts an additional incident on May 10, 2005, when a citizen complaint was filed against Burkholder's erratic driving of his service vehicle. Burkholder stated that he was pursuing a drunk driver at the time. His account of the incident differed significantly from the complainant, who was also a police officer.  An investigation found that either Burkholder or the complainant was lying and that, at the least, Burkholder "behaved unprofessionally... and that his conduct was unbecoming [to] that of an MTPD officer." Pl.'s Ex. G at 3.  Sergeant Thomas A. Sharkey, who conducted the investigation, recommended a one day suspension without pay.

Despite this admittedly extraordinary disciplinary record, Plaintiff relies on only three incidents in comparing Burkholder to himself -- those of March 10, 2005, May 10, 2005, and June 24, 2005.  Pl.'s 2d. Errata Opp'n to Def.'s Mot. for Summ. J. at 9-13. However, none of the three incidents involves Burkholder's misuse of his service weapon, a significant difference in comparison to Plaintiff's two gun violations.

Burkholder's veracity and professionalism were certainly called into question by the charges against him.  However, his violations differ from those against Plaintiff in that Burkholder's infractions were largely related to his lack of

restraint in carrying out his duties, i.e., over-stepping jurisdiction and making traffic stops without authorization.  As already noted, many of Plaintiff's violations involved his use of MTPD resources (his service weapon, his service vehicle, and his paid, on-duty time) in attending to his personal affairs.

Furthermore, Plaintiff refers to Burkholder as "similarly-situated to [himself] in position and tenure."  Pl's 2d. Errata Opp'n to Def.'s Mot. for Summ. J. at 9.  However, Burkholder had worked at MTPD for almost twelve years, whereas Plaintiff's tenure with MTPD lasted less than two years.

As discussed above, in order for an individual to qualify as similarly-situated to Plaintiff, "'all of the relevant aspects of [his] employment situation'" must be '"nearly identical'" to Plaintiff's, including a history of disciplinary violations of "'comparable seriousness.'" Holbrook, 196 F.3d at 261.  While Burkholder has a substantial disciplinary history, for the reasons stated above, he does not qualify as a similarly-situated individual.

**IV.  Conclusion**

Once Defendant established a legitimate, non-discriminatory justification for Plaintiff's termination, the burden of proof shifted to Plaintiff to prove that this justification was pretextual. See Plummer, 559 F. Supp. at 329.  Because Plaintiff failed to meet this burden, no reasonable jury could find that

Plaintiff's termination was discriminatory.  For all the reasons
set forth, Defendant's Motion for Summary Judgment is granted.  An
Order shall accompany this Memorandum Opinion.


July 6, 2009                    _____/s/_____
_____Gladys Kessler
                                 United States District Judge


**Copies via ECF to all counsel of record**